JOHN RANDEL, jun'r. *vs.* The PRESIDENT, DIRECTORS and COMPANY of the CHESAPEAKE and DELAWARE CANAL.

Construction of the contract between John Randel, jun., and the Chesapeake and Delaware Canal Company.

A contract is to be construed with reference to the whole instrument.

No form of words necessary to make a *covenant;* but any expression in a sealed instrument which manifests an intention to bind either party to do or omit any act, possible in itself and not immoral or unlawful, will make a covenant.

If there be any doubt on the words of an agreement they are to be referred to the proper party.

If the language used be the language of both parties, it may be taken distributively, and used as the words of either, according to the true intent and meaning of the contract:

And, even where the language is that of the covenantee, it will be applied to the other party, if the intent so require it.

An agreement on the part of A. to pay B. *every fortnight* for the work which A's. engineer *shall certify* to have been done by B. is a *covenant* on the part of A. that his engineer shall make the certificates.

An agreement that the plff's. work shall during its progress be carefully examined and inspected; and to prevent misunderstandings and disputes, it is agreed that B. W. or some other competent engineer, to be selected by the defendant, shall be the inspector of the works, and shall estimate the excavation and embankment, and his estimate thereof, when certified to the defendant, shall be final and conclusive between the parties—construed a *covenant* by defendants to select an engineer, and that their engineer should inspect and estimate the work; and a *covenant* on the part of the plaintiff, that he would be bound by the result of such estimate.

An agreement that in case the plaintiff shall, from the default of the defendant, be prevented from pursuing the best mode of executing his contract, the pecuniary damage sustained by him in consequence thereof, shall be certified by the defendants' engineer, and, on his certificate, which shall be final and conclusive between the parties, the defendant shall make to the plaintiff such reasonable compensation as by said certificate may be fixed—construed a *covenant* on the part of the defendant, that in case of prevention, their engineer should make a certificate of damage.

An agreement that the time within which it shall be incumbent on the plaintiff to complete his contract shall not be taken to be less than four years, is a *covenant* by the defendant that he will allow the plaintiff four years to complete it in; and the unlawfully driving him away from the work within that time is a *breach* of the covenant.

An agreement that if the opinion of the defts'. engineer shall be that the plff refuses or unreasonably neglects to prosecute his contract such engineer may certify the same to the defts. and on his certificate the defts. shall have the power of determining that he has abandoned it;—is a *covenant* on the part of the plff, and gives to the deft. the power, upon the certificate being made, to put an end to the contract.

Such certificate does not make the contract *void* but only *voidable;* and the power of avoiding it may be *waived.*

Any discretionary power may be waived.

And though this power of annulling the contract is derived from a deed, or instrument under seal, it may be waived by *parol.*

The party having the power of establishing the forfeitnre, or of avoiding a voidable contract, must do it within a *reasonable* time, and in a *lawful* manner, or it is a waiver.

Any act.legally ·inconsistent with the exercise of the power will amount to a waiver.

A prospective agreement to refer all matters in dispute which may hereafter arise will not oust the jurisdiction of the courts over such matters.

And even in the case of a submission of *existing disputes* either party has the right to revoke the submission and prevent· the award: though he would be ·liable on his agreement to refer.

A contract may be declared on by setting out a counterpart executed by only one of the parties.

In a plea of confession and avoidance the plea admits all the material and traversable facts averred in the breach; they need not, therefere, be proved; but it does not admit the damage, which must be proved.

Judgment by default, or on demurrer, admits the cause of action, and establishes the plff's. right to recover; and, where the contract declared on is for a sum certain, as in debt, and the declaration either ascertains the amount or sets out an instrument from which the amount can be certainly ascertained by calculation, the judgment is also conclusive as to the amount.

But where the matter sued for sounds in damages, or is in its nature uncertain, such a judgment establishes no amount of damages, but it fixes the right to recover, and the cause of action need not afterwards be proved.

In covenant the damages are merely compensatory or remunerative, and cannot be exemplary.

And, though the violation of a covenant be with intent to injure the other party, the intent cannot be considered in estimating damages

The rule of assessing damages is, that whatever loss or damage naturally and immediately results from the wrong complained of, the wrong·doer is bound to compensate. ,

Interest on damages is discretionary with the jury.

In an action of covenant against a corporation a contract made and executed by a committee of the board of directors, but not under the corporate seal, is not evidence; though the authority of the committee be proved, and the contract actually recognized and acted upon by the company.

The answer of a corporation is evidence against them, though made in a different cause, and without oath.

The directions of an agent of a company in relation to their business, and his declarations at the time of giving such orders in relation thereto, or to their business generally, being part of the *res gesta*, are evidence against the company—but his general declarations, conversations or letters not immediately connected with or growing out of the discharge of his agency, are not evidence.

And the nature of his agency, and its extent, may be inferred from facts, and the connexion of his acts with the business in which he is employed.

A party calling for papers from the other side makes them evidence *if he inspects them.*

A director of a company, not being a stockholder nor a party of record, is a competent witness for the· company.

Depositions taken on leading interrogatories will be suppressed at the trial if exceptions have been filed, and the party not taken by surprise.

Service of interrogatories by copy left at the office of the attorney of the opposite party, is sufficient notice of the taking out a commission.

A witness allowed to write out his answers to interrogatories where he was unable, through sickness, to deliver them orally to the commissioners; and the depositions, thus taken, admitted in evidence.

The protest of an inland bill is not proved by the notarial seal, but the notary must be called: and this though it appear from the bill that it has been indorsed to a foreigner.

COVENANT. Narr. Pleas. Replications. Demurrers.

*Friday, November 29th* 1833. This case came up for argument on the demurrers to the *second* and *third* counts of the declaration; the demurrers to the *seventh* and *eighth* counts having been argued at the last term. *(See ante* 151.*)* The argument was conducted by *Frame,* Attorney General; *Bayard* and *Jones* for defts., the

demurrants; and *Clayton, Rogers, Read, jr.,* and *Ingersoll,* for the plff. It occupied six days.

The contract declared on is set out at length in the report of the former argument, *ante* 151, &c.

The declaration contained *eight* counts.

*First count:* On the lock contract, *(unimportant.)* On this count issue was joined on the plea of non est factum.

*Second count:* General plea of non est factum and issue.

*(First breach.)* The first breach assigned in the second count was on that clause of the contract which provides for the inspection and examination of the works during their progress, *(page* 152.*)* It was assigned in these words:—And protesting, &c. "the said John Randel, jun., in fact saith that the said works by the said John Randel, jun., in and by the said articles of agreement covenanted to be performed as afsd. were not during their progress carefully examined and inspected by the said Benjamin Wright, esquire, nor by any other competent engineer selected by the said party of the second part, to wit: at Newcastle county aforesaid.

*(Plea.)* To this breach the defts. pleaded plea No. 3, as follows: Actio non, &c., "Because they say that heretofore, to wit: on the 30th day of July, A. D. 1825, and long before and since, one Benjamin Wright (being the same person mentioned in the said articles of agreement by the name of Benjamin Wright, esquire, was the engineer in chief for the time then being in the employ of the said defts., to wit: at Newcastle county afsd., and that on the day and year last afsd. at the county afsd. the opinion of the said Benjamin Wright then and there so being such engineer in chief for the time then being in the employ of the said defts. as afsd., was that the said John Randel, jun., did unreasonably neglect to prosecute the said contract in the said articles of agreement made and contained, and that afterwards, to wit: on the day and year last afsd. at, &c., the said Benjamin Wright then and there so being such engineer in chief for the time then being, in the employ of the said defts. as afsd., did in and by his certificate certify his said opinion to the said defts.; and that afterwards, to wit: on the 30th day of Sept'r. in the year last afsd., they the said defts. did thereupon on said certificate determine the said contract to be by him the said John Randel, jun. abandoned, of which said certificate and determination the said John Randel, jun., afterwards, to wit: on the first day of October in the year last afsd., at the county afsd. had notice; by means whereof and by force of the premises the said defts. became and then and there were entirely exonerated from every obligation imposed on them by the said articles of agreement, except to pay for work then already done by the said John Randel, jun."

*(Replication.).* The replication to this plea was as follows:— Precludi non. &c. "Because he says that shortly after the making and executing the said articles of agreement, to wit: on or about the 15th day of April, A. D. 1824, to wit: at, &c., the said John Randel, jun. entered upon the performance of the work so by him contracted and covenanted to be performed in and by the said articles of agreement, and at great expense and labor progressed in the performance of the said works from day to day until the 1st day of Oct.,

A. D. 1825 inclusive, to wit: at, &c., during which time, that is to say, from the said 15th day of April until the said 1st day of October inclusive, the said John Randel, jun., did not abandon his said contract, nor did he refuse or unreasonably neglect to prosecute the same, and that from the 30th day of July, A. D. 1825, until the said 1st day of October inclusive, in the year last afsd., on which said last mentioned day, the said John Randel, jun., had notice of the said certificate of the said Benjamin Wright, and of the said determination of the said company in the said plea mentioned as is alledged in the said plea, the said John Randel, jun., without refusing or unreasonably neglecting to prosecute the contract in the said declaration mentioned, did with great expense and labor prosecute the said contract under the inspection, by and with the permission and by and under the direction of the said company, to wit: at, &c.; that between the said 30th day of July, A. D. 1825, and the said 30th day of September in the year last afsd., the said the Chesapeake and Delaware Canal Company did pay to him the said John Randel, jun., for work done under and by virtue of his said contract after the said 30th day of July and before the said 30th day of September, divers sums of money amounting to a large sum, to wit: the sum of thirty thousand dollars, to wit: at, &c., and did then and there, therein and thereby acknowledge the said contract to be in full force and effect: and the said John Randel, jun., further in fact says, that although he did not at any time after the making of the said certificate refuse or unreasonably neglect to prosecute his said contract, to wit: at, &c. yet the said work by him the said John Randel, jun., performed as afsd. in prosecution of the said contract between the said 30th day of July and the 1st day of October inclusive, in the year last afsd., was that portion of the work he had so covenanted to perform as afsd., which was less profitable and more disadvantageous to him the said John Randel, jun., than the work remaining to be done and performed by him the said John Randel, jun., in pursuance of the said contract after notice was given to him that the said the Chesapeake and Delaware Canal Company, had determined his said contract to be by him abandoned as is alledged in the said plea, to wit: at, &c. afsd., and that the work remaining to be done and performed by him the said John Randel, jun., in pursuance of the said contract after the said the Chesapeake and Delaware Canal Company, had as is alledged in the said plea determined his said contract to be by him abandoned, and after the said 1st day of October in the year last afsd. to wit: at, &c., was that portion of the whole work so by him covenanted to be performed in and by the said articles of agreement which was most profitable and advantageous to him the said John Randel, jun., and so the said John Randel, jun., in fact says that the said the Chesapeake and Delaware Canal Company did before the said 30th day of September in the year last afsd. at, &c. afsd. *waive* the said certificate of the said Benjamin Wright, and the power of determining on the said certificate that the said contract of the said John Randel, jun., had been by him abandoned, and so did approve, ratify and confirm the said contract, to wit: after the said 30th day of July, and before the said alledged determination of the said company that the said John Randel, junr's. said contract

was by him abandoned, to wit: at Newcastle county aforesaid."

*(Demurrer and Joinder.)* To this replication the defts. demurred *generally*, and the plff. joined in demurrer.

*(Plea No. 5.)* To the first breach assigned in the second count the defts. also pleaded as follows:—

Actio non, &c. "Because they say that heretofore, to wit: on the twenty-fifth day of March, A. D. 1824, at the county afsd., they the said defts. did appoint one Benjamin Wright, being the same person mentioned in the said articles of agreement by the name of Benjamin Wright, esquire, their engineer in chief, and did afterwards, to wit: on the twenty-sixth day of March in the same year at the county afsd., select him as their inspector of the said works covenanted to be performed by the said John Randel, jun., in and by the said articles of agreement, and the said defts. aver that the said Benjamin Wright remained in their employ, and was their engineer in chief, and remained and was the inspector of the said works selected by them as afsd., during their progress and until and after the said John ceased working upon the said Chesapeake and Delaware Canal, to wit: at the county aforesaid."

*(Replication.)* Precludi non, &c. "Because he says that the said defts. did not appoint the said Benjamin Wright, esquire, in the said articles of agreement. mentioned their engineer in chief *at the time* and in manner and form as is alledged in the said plea, and did not select him the said Benjamin Wright, as the inspector of the said works covenanted to be performed by the said John Randel, jun., in and by the said articles of agreement *at the time* and in manner and form as is alledged in the said plea, nor did the said Benjamin remain in the employ of the said defts., nor was he their engineer in chief, nor did he remain nor was he the inspector of the said works selected by them as afsd., during their progress, and until and after the said John Randel, jun., ceased working upon the said Chesapeake and Delaware Canal, to wit: at Newcastle county afsd., and this he prays may be inquired of by the country, &c."

*(Demurrer and Joinder.)* The defts. demurred generally and specially to this replication, assigning for cause that the *time* of appointing the inspector was not traversable. Plff. joined in demurrer.

*(Second breach.)* The second breach assigned in the second count was on that clause of the contract which provides that the inspector of the works should *estimate* the number of cubic yards of excavation and embankment. The substance of the breach was

"That the said Benjamin Wright nor any other competent engineer selected, &c., did not estimate the number of cubic yards of excavation and also of embankment," &c.

(Plea.) To this breach the same plea of *abandonment* (No. 3,) was pleaded.

(Replication.) The same replication of *waiver*, ut ante.

Demurrer and Joinder.

(Plea.) Also the same plea of appointment of inspector (No. 5,) was pleaded.

(Replication.) The same as before traversing the *time* of appointment.

Demurrer, general and special as before, and Joinder.

*(3rd breach.)* The third breach in the second count was assigned on the prevention clause of the contract, *(ante* 153.*)*

"That Randel was from the default of the canal company prevented from pursuing the due and best mode of executing his contract, &c., that the pecuniary damage sustained by him, &c., was, &c., yet that the said damage has not been certified by the engineer," &c.

Plea. The abandonment. Replication, Waiver. Demurrer and Joinder as before.

*(4th breach.)* On the same "prevention clause."

"That from the default, &c., plff. was prevented from entering upon lands for the purpose of executing his contract, that the pecuniary damage was, &c., yet said damage was not certified by the engineer, &c., although he well knew the premises and was fully aware of the extent of the damage," &c.

Plea. The abandonment. Replication. Waiver. Demurrer and Joinder.

*(5th breach.)* On the same "prevention clause."

"That from the default, &c., plff. was prevented from flooding lands for the purpose of executing his contract; that the pecuniary damage amounted, &c. yet said damage has not been certified by the engineer, &c., although he well knew," &c.

Plea. The abandonment. Replication. Waiver. Demurrer and Joinder.

*(6th breach.)* The sixth breach in the second count was assigned on that clause of the contract which relates to the time in which it should be incumbent on Randel to complete the canal.

The substance of the breach was as follows:—

"That the canal company on the 30th September 1825, did unlawfully and unjustly assume the power of determining and unlawfully and unjustly did determine that the said John Randel had abandoned his contract, and said company did on the 20th October 1825, prevent the said J. Randel from entering upon the lands of the said company for the purpose of executing the said contract; and so the said J. Randel saith that the said company did, &c., *take the time,* &c. (in the words of the contract.)

Plea. The abandonment. Replication. Waiver. Demurrer and Joinder.

*Third count.* 1st breach. On the afsd. "prevention clause."

"That plff. was prevented from pursuing the due and best mode, &c.. by the default of the company in these particulars; that they prevented him from entering upon lands for the purpose, &c., and unlawfully, &c., declared the abandonment; and did take the time within which, &c. That the pecuniary damage amounted, &c., yet said damage hath not been certified by the engineer, &c., although he well knew the premises, &c.

Plea. The abandonment. Replication. Waiver. Demurrer and Joinder.

*(2d breach.)* On the "prevention clause."

"That the company did take the time, &c. that the pecuniary damages amounted, &c. Yet the said engineer did not and would not certify, &c.

Plea. The abandonment. Replication. Waiver. Demurrer and Joinder.

*(3d breach.)* "On the prevention clause."

"That the company unlawfully declared the abandonment and prevented plff. from pursuing the due and best mode, &c. and from entering upon lands, &c. to wit: the lands on which the canal is located, and thereby took the time, &c. that the pecuniary damages amounted, &c. Yet that the said engineer although he well knew, &c. and was fully aware, &c. did not and would not certify, &c.

Plea. The abatement. Rep. Waiver. Demurrer and Joinder.

*(4th breach.)* On the "prevention clause."

"That the company prevented plff. from entering upon lands necessary to be occupied by him for executing the work and so took the time, &c. that the damage was, &c. Yet the engineer, &c. altho' he well knew and was fully aware of the damage, &c. did not and would not certify, &c.

Plea. The abandonment. Rep. Waiver. Demurrer and Joinder.

*(5th breach.)* On the covenant to pay for work done. (152.)

"That on the 15th December, 1825, Benjamin Wright, the engineer, afsd. certified the amount of work done at $224,291 51. Yet the company have not paid said sum," &c.

Pleas (No. 7 and 8, which were withdrawn.)

Plea (No. 9.) Payment on the 15th December, 1825, of $221,428 43, and as to the balance a set off of a bond for $15,000 due from plff. to defts. setting out the bond, &c., particularly.

Replication, traversing payment of the $221,428 43 at *the time* and in the manner pleaded; denying that plff. is indebted to defts. in said sum of $15,000 on the bond afsd. made at the time and in the manner pleaded, and denying that said bond is due and unpaid.

Demurrer general and special to this replication, because it traverses the *time* of payment of the said sum of $221,428 43. Joinder.

*(6th breach.)* On the same covenant to pay for work done.

"That the company, on the 30th September, 1825, declared the abandonment; that on the 10th June, 1826, there was due to John Randel, for work done, $ 350,000: yet the company have not paid," &c.

Plea (No. 10.) "That between the first and seventh of June, 1824, the company revised the schedule of prices; that a difference of opinion thereupon arose between the parties, and that Benjamin Wright, the engineer aforesaid, on the same day adopted and awarded the said revised schedule; that the work at the revised prices amounted to the sum of $224,291 51, which they have paid to plaintiff, to wit: on the 15th December, 1825.

Replication. Denying the revision at *the time*, &c. the award, &c.

Demurrer, general and special, because plaintiff has traversed the time of the revision, &c. Joinder in demurrer.

There were also other pleas (Nos. 11 and 12) to this breach, which were withdrawn.

*(7th breach.)* On the seventh breach of the third court issue was joined to the jury on the facts. *See post.*

*(8th breach.)* On the "prevention clause."

"That on the 19th of October, 1825, the company disposed of Randel's contract and relet it to Clement, Blackstock and Vanslyke, by reason whereof Randel was obstructed in the execution of the work, and was prevented from pursuing the due and best mode, &c., and from entering upon lands, &c., that the damage amounted, &c., yet the engineer did not and would not certify," &c.

Plea. The abandonment. Rep. Waiver. Demurrer and Joinder.

*(9th breach.)* On the "prevention clause."

"That the company on the 1st October, 1825, (although Randel was duly progressing, &c.) did unlawfully declare the abandonment; and did prevent him from pursuing the due and best mode, &c. and from entering upon lands, &c. to wit: the lands on which the canal was located; that by the default aforesaid, the damage was, &c.; yet the engineer, although, &c., did not and would not certify, &c."

Plea. The abandonment. Rep. Waiver. Demurrrer and Joinder.

*(10th breach.)* On the "time covenant."

"That Randel was duly progressing, &c. Yet the company on, &c., proceeded to dispose of the contract, and contracted with Clement, Blackstock and Vanslyke; Robinson, Carr and Dexter, and did prevent him from pursuing the due and best mode, &c., and so took the time to be less," &c.

Plea. The abandonment. Rep. Waiver. Demurrer and Joinder.

*(11th breach.)* On the "time covenant."

"That Randel duly progressed, &c.; yet the company did proceed to dispose of the contract, and did contract with Clement, Blackstock and Vanslyke, and did prevent him from pursuing the due and best mode, &c., and so took the time," &c.

Plea. The abandonment. Rep. Waiver. Demurrer and Joinder.

*(12th breach.)* On the "time covenant."

"That Randel was duly progressing, &c.; yet the company disposed of the contract, &c., and prevented him from pursuing, &c., and so took the time," &c.

*(13th breach.)* On the "time covenant."

Plea. The abandonment. Rep. Waiver. Demurrer and Joinder.

"That Randel was duly progressing, &c., absque hoc that he neglected, &c.; yet the company disposed of the contract and prevented him from pursuing, &c., absque hoc that the company lawfully declared the contract abandoned, &c., and so took the time," &c.

Plea. The abandonment. Rep. Waiver. Demurrer and Joinder.

*(14th breach.)* On the "time covenant."

"That the company did take the time, &c., to be less," &c.

Plea. The abandonment. Rep. Waiver. Demurrer and Joinder.

*Fourth count.*
*Fifth count.*  } The issues on all these counts were issues of
*Sixth count.*  } fact to the jury. *See post.*

*Seventh count.* Demurrer and judgment for plaintiff last term, *ante* 151, 172.

*Eighth count.* Demurrer and judgment for defendant last term, *Id.*

*Frame,* Attorney General, for the defendants—the demurrants:

I regret the range the discussion of these demurrers must take, but the intricacy of the pleadings and the great length of the record

in this cause, open up a course of argument which it will be our duty to pursue, though it may consume much of the time of this court. The questions which are to be presented in this argument arise on the pleadings belonging to the second and third counts of the declaration. The second count contains six breaches, the third, fourteen; all of which will be reached by these demurrers except the seventh breach of the third count, upon which issue is joined to the jury. I shall class them in five classes or five clauses of the contract.

1st. The inspection of the work.
2d. Estimating the work done.
3d. Certifying of damages by the engineer.
4th. Taking the time.
5th. Payment for work done.

First. On the clause in relation to inspecting the work and estimating the amount: the first and second breaches in the second count. I remark in the first place that though these demurrers are to the replications they run back according to established rules on the whole pleadings, and open defects in the narr, as well as in the replication. *Gould's Plead.* 404.

What is the breach? Not that the canal company did not select an engineer and inspector, but that the work was not in fact inspected and estimated by the engineer. There is a clear distinction between a breach that the company did not select, and a breach that their engineer did not inspect; which last is the plain meaning of the breach. And if this is doubted, and we are driven to construction it must be so considered, the rule being that the construction shall be made most strongly against the pleader.—1 *Chitty's Plead.* 522, 241. This being the breach the question is whether the company is liable for those acts or omissions of the engineer that are alledged as the breach. Does the contract bind the company not only to appoint an engineer and select an inspector but to see that the person so selected does actually inspect and certify the work? We say no. The canal company are not liable to Randel for any omission in this respect of the inspector appointed by them. There need be no difficulty about this. The contract is in writing. The intention of the parties to be collected from the words of their contract is to govern; the plain meaning of the words is to be taken. Looking to this rule, the first remark to be made is that the company did not so bind themselves by a plain and direct obligation. If it be there it is at least not there plainly and directly set out. Then how is it inferred? Have they bound themselves indirectly, by inference or necessary construction? How was this inspection to be made? Not by the company, but by another. Under the contract it could not be done by the defendants themselves, but must be done by a third person. Much force is derived from this circumstance to our position, that the company were not bound for the actual inspection of the work. Would it not be singular that they should bind themselves to the performance of an act, and at the same time put it out of their power to do it personally? What power had they to do it through another? They might appoint an inspector, but they could not make him inspect. The law holds no man to impossibilities;

and the court will not infer such an engagement from a contract without a plain and direct stipulation, or an obvious and necessary construction.

Another reason why the canal company did not undertake that this inspector should perform the duty assigned him. It involved the exercise of reason, science, skill and discretion. The parties showed they intended to commit it only to a person of skill and judgment, and they necessarily gave him a discretion in its exercise. Would it not be absurd to suppose that the company bound themselves to compel the action of this agent having a discretion which they could not control?

Again; it is clear that this agent was to be indifferent between the parties; not the agent of either party, but of both; it is therefore a reference to a mutual umpire, for whose action neither of the contracting parties was bound to the other. The intervention of this agent was to "prevent disputes," &c., was it likely to prevent disputes if the inspector was the agent, and under the control of one party? The reference might as well have been directly to the company. But the contract shows that neither of the parties designed to trust the other in this important matter; they looked out for some third person—an indifferent judge, to whom they both referred their rights. Randel so far yielded to the company as to give them the selection of the agent; there the yielding ceases; when selected he is the inspector and agent of both parties, and answerable equally to both.

The other side will contend that this is the covenant of the company, and not equally the covenant of John Randel; and indeed we must come to that if we are to hold the company answerable for his acts. Now is this true or is it not? First, How does the engineer get his authority to decide, and what makes his decision binding on both parties? The contract; the stipulation of both. Without this stipulation the engineer, as the mere agent of the company, might measure and estimate, but his report would have no obligatory force upon Randel. His power, in this respect, arises from the mutual covenant of both parties. Would it not be strange then to suppose that either party was bound to the other for the faithful performance of his duty, when that duty arises from the joint covenant of both and derives all its force from the stipulation of both? Again: For whose benefit was this inspection to be made? For the benefit of both, but chiefly for the company. They were chiefly interested in it. It was of the utmost consequence to them that the work should be carefully inspected. And yet it is contended that they have especially covenanted and bound themselves to the other party for the performance of an act which was chiefly for their own benefit. I conclude then that the canal company are not bound by this contract further than to appoint an engineer and select him as the inspector of works; in the performance of that duty he was the agent of both parties.

Third. Having considered the two clauses of inspecting the work and estimating the amount together, I come now to those breaches assigned on what has been called the prevention covenant. They are the third, fourth, and fifth breaches of the second count; and the

first, second, third, fourth, eighth and ninth breaches of the third count; and are assigned on this clause of the contract.

"And it is further agreed as aforesaid, that in case the party of the first part shall from the default of the party of the second part in any particular, be prevented from pursuing the due and best mode of executing this contract, or from entering upon or flooding lands for that purpose, the pecuniary damage sustained by him in consequence thereof, shall be certified by the engineer of the party of the second part, for the time being, and on his certificate, which shall be final and conclusive between the parties, the party of the second part shall make to the party of the first part, such reasonable compensation and allowance, as by the said certificate may be ascertained and fixed."

This clause was considered on the former argument, but the decision of the court went on a different ground, the defect of the count in not averring actual damage; we therefore do not design to controvert any decision of the court by making it again the subject of argument. Most of the remarks made under the last head, are equally applicable to this; the question here being whether the company were bound to see that the engineer certified damages arising from prevention, whenever they were sustained. We contend as before, that this is the covenant of both parties; a joint stipulation, and mutual reference to an agent deriving his power from both, responsible to both, and for whose acts or neglect, neither of the contracting parties is answerable to the other. It may be urged as it was urged, that this cannot be a reference because there is a general reference at the end of the contract, and this would make two references of the same subject matter. But this argument goes too far, for it would apply to other provisions of the contract, which are too plain to admit of a doubt. For instance, in the matter of revising prices the engineer is appointed umpire eo nomine, and the clause at the end referring all matters is no more inconsistent with a reference in this clause than in the revision of prices. The truth is, that these clauses make special matters of reference, and the last clause is general on all subjects of difference, and does not exclude the prior particular references. This occurs frequently: the slopes of the canal; the contingent reservation of ten per cent.; the revision of prices; the abandonment clause; the clause in relation to deviations; in relation to all these matters and others, a reference is made to the engineer as an umpire, referee or arbitrator, and the concluding general reference is no more inconsistent with the matter in hand than with all these clauses. It was urged on the former agreement that this construction would cut off all obligations on the part of the company, other than to pay for work done; and the abandonment clause was pointed out as recognizing other obligations than those to pay for work: so there are; there is one in this very clause—to pay the damages certified. There is also an obligation to pay the amount certified in case of deviation. These are sufficient to satisfy the allusion in the abandonment clause to other obligations than to pay for work done, and they destroy the force of the argument drawn from it. We therefore conclude that this is not a covenant on the part of the company; that the engineer shall certify damages, but a mutual covenant and reference to an umpire for whose neglect in this particular neither party

is answerable to the other. It was not a part of the duty of the engineer, as such, to certify these damages; his duty and his authority in this respect, grow out of the mutual agreement and contract of the parties.

Fourth. The next question is, that important one which arises on the clause which has been called the time covenant, and on which several breaches are assigned; the sixth of the second count, and the tenth, eleventh, twelfth, thirteenth and fourteenth breaches of the third count.

"And it is further understood and agreed as aforesaid, that the time within which it shall be incumbent on the said party of the first part, fully to perform and complete the said contract, shall not be taken to be less than four years from and after the first day of May next ensuing."

It may be contended, on the other side, that this question has already been decided on the former demurrers; but it is not so. We don't mean to question that decision. It amounted only to this, that the clause in question contained a covenant capable of violation, and that a breach thereof was sufficiently assigned in the seventh count. It decided nothing as to what constituted a taking the time; the breach set out no acts of taking time. The question now is what acts constitute a taking of the time within the meaning of the covenant, or rather, whether the acts set out in these breaches amount to a violation of that covenant.

The fourteenth breach is similar to the one already decided in the seventh count, and on that the plaintiff will be entitled to judgment; but this will not entitle him to judgment on the defective breaches. 3 *Saund. Rep.* 380.

Do the acts set forth in the remaining breaches constitute a violation of this covenant? They may be arranged in two classes: First, That the company unlawfully declared the contract to be abandoned, and relet it to other persons: Second, That they prevented Randel from pursuing the due and best mode of executing his contract, &c. Do these acts constitute a breach of this covenant? It would seem to me that argument must come from the other side on this subject—the statement of the question shows that no such legal conclusion follows from these acts, as that the company took the time within which Randel should be required to complete his contract to be less than four years. Does the unlawful determination of the company, that Randel had abandoned his contract, amount to a taking the time? &c. It is a non sequitur. The declaration of abandonment, suppose it unlawful, and the demurrer admits it, is not that Randel should not have four years, but that he had abandoned his contract. Then, as to the next act: that Randel was prevented from entering upon lands for the purpose of executing his contract; what kind of connection is there between the clause said to be violated and the act relied on as the violation of it? How does the preventing him from going on the land to do the work, necessarily amount to taking the time within which he shall do it to be less than four years? And if the acts do not separately amount, in law, to a violation of the contract they cannot together. The question is not here whether the party so prevented has not a remedy for such prevention (and if he had none, it

would not control a construction of the contract) but it is whether this wrong is a violation of the particular covenant; whether they have such a connection and relation as that one can constitute a violation of the other. Take the strong case stated on the record of an actual hindrance or prevention; an unlawful stoppage of the work by the company, is this taking the time within which it shall be incumbent on Randel to complete the work to be less than four years ? It is not a taking time to be less—of diminishing time; but of putting an end to a contract and dismissing a contractor. A wrong it might be; and a remedy he would have; but not on this clause of which it is no violation. It is a plain and familiar principle of law, that in any contract for executing work, the party employing enters into an implied contract with the employed to permit him to do the work and if he prevent him or even obstructs him, he has his action for damages—*Powell on Cont.* 251, 2. And such is John Randel's remedy on general principles applicable to all contracts not upon any covenant expressly contained in this contract: unless it be under the prevention covenant, where a special mode of redress and of ascertaining damages is agreed upon. And this sufficiently embraces the case; but to say that he is entitled to damages for such a wrong under the clause in relation to time, is to avoid his express stipulation, that for such a wrong he will seek damages only on the certificate of the engineer. Such a construction would do violence to the contract.

I come now to the question of *waiver* which grows out of the replication. The defendant has pleaded to all the breaches in the second count, and all in the third, except the fifth, sixth and seventh, the declaration of abandonment; to which the plaintiff has replied certain acts or facts which he relies upon as being a waiver of the right to declare this contract to be abandoned. The matter relied upon as a waiver is, that after the making the agreement, Randel went to work and duly progressed with his work until the first of October, 1825; that from the 30th of July to the first of October, 1825, he prosecuted the work under the inspection, with the permission, and by and under the direction of the company; that the company paid him for work done, in that interval, thirty thousand dollars, thereby acknowledging the contract to be in full force and effect: that the work thus done by him, was less profitable than that remaining to be done, &c. &c.

The first allegation is that Randel was duly progressing and did not neglect the work. Now I take it in the first place, that upon this question, it is of no importance how that fact is as the right to declare the contract abandoned, depended not on the fact of neglect, but on the engineer's certificate of neglect. The certificate is the only evidence of the fact, and Randel is estopped and concluded from denying it. You can't go beyond that certificate and enquire into its propriety; it is to be taken as conclusive of the fact of neglect, at least for all the purposes of this argument. That the certificate was given is admitted by the replication. I now ask whether the law would allow the company any time for consideration before they abandoned this contract; or must they act instantly on the certificate or give up the power. Can it be pretended that it was reasonable much less legal, that this company should act on this momentous

question without deliberation, without reflection? Yet the other side are driven to this position in contending for the waiver. The language of the contract shows that on the receipt of the certificate the company were to have the discretion to abandon or not—*may* declare the contract abandoned; and this discretion necessarily implies the allowance of such time for consideration as might be proper for its prudent use. They were not called on to act instantly, but reasonable time proportioned to the discretion and the magnitude of the question, was to be allowed. Then is the time here taken too long? Two months. Upon what principle can the court decide that it was too long? Looking at the nature of the work, the magnitude of the question, and the importance of its results, we submit that two months was not an unreasonable time for deliberation. And if the company were authorized to take this time for consideration, then all the acts complained of are justifiable and proper, the necessary consequences of this state of deliberation. Until actual abandonment declared the contract continued in force; Randel was bound to go on with the work and the company to pay—so that all orders given and payments made, are perfectly consistent with a subsisting power to declare the contract abandoned on the old certificate, if the time allowed for considering that certificate was not unreasonably extended. The want of notice to Randel, and the unprofitableness of the work, do not vary the case. The one did not change the powers or the discretion of the company, and the other was a necessary consequence of the contract. It returns to the question of reasonable time. Will they say the conduct of the company was fraudulent? No fraud is alledged on the record, and the court will not, as the law does not, presume fraud.

It is unnecesary for me to anticipate authorities but I have examined the books and find little on the subject of waiver except cases of landlord and tenant which are peculiar in themselves and stand on their own ground. They can have no analogy to this case. The contract of landlord and tenant is governed by principles applicable only to that relation. For instance, though a lease be expressly for five years and no longer, the tenant may hold longer, unless the landlord gives him three months notice to quit. Take the case of a covenant by a tenant not to assign the term; the assignment itself creates a forfeiture; but if the landlord with notice of the forfeiture accept rent it is a waiver; it re-establishes the relation of landlord and tenant. The assignment creates the forfeiture, the subsequent conduct of the landlord dispenses with it. Here the certificate of Wright neither put an end to this contract, nor created any forfeiture of it; the parties remained in statu quo; until an actual declaration of abandonment the contract was not forfeited. There is therefore no parallel or similarity between the cases. If after this certificate was followed up by the declaration the company had employed Randel, given him orders, and paid him as usual, it might, with some force, be relied on as a waiver of the forfeiture, but before such abandonment, all these acts are the necessary and proper results of a *continuing* contract, and can afford no evidence of a waiver. 3 *Co. Rep.* 64, 5. *Pennant's case.* 10 *East,* 13.

It remains only for me to notice the special demurrers joined on

the pleadings to the first and second breaches of the second count; and I shall do so briefly, merely calling the attention of the court to them. The breaches are assigned on that clause of the contract which provides for the inspecting and estimating the work. The plea alledges that the company appointed Benjamin Wright engineer, and selected him as the inspector of works, and that he continued to be such engineer and inspector. The replication traverses the facts and especially traverses the time of the appointment of Wright as engineer and inspector, and for this cause we have demurred. The precise time of the appointment is immaterial, it is alledged under a videlicet; neither material in itself, nor made so by the manner of pleading it. The proof of the appointment at any time before would support the allegation; yet we could not take issue on a replication putting the precise time in issue, and we had to demur. The party is not entitled to traverse immaterial matter.

If the traverse includes time when not material it is ill. 1 *Chitty's Plead.* 426: 3 *Saund. Rep.* 318, 19: *Note* 6. *Gould's Plead.* 405.

*Mr. Clayton,* for plaintiff.

The contract between these parties may be divided into two classes of covenants; first, covenants to pay for work done; and second, other covenants than those to pay for work done. This is not an arbitrary division, but such as the contract itself makes. In the abandonment clause the language is, that such determination "shall altogether exonerate the said party of the second part, from every obligation imposed on them by the said contract, except to pay, as aforesaid, for work already done." There are then other obligations in this contract besides those to pay for work done: and obligation arising from a sealed instrument means covenant. 1 *Co. Litt.* 172, a; 1 *Binn.* 254: *State use of Jenkins* vs. *Hamilton's adm'r.* C. C. P. *Kent county*: 2 *Mod.* 87. The clause declared on in the second count, sets out the agreement of the company to pay Randel certain specified sums for work done. This is a covenant to pay. The residue of the paragraph provides for retaining ten per cent. until the work is done, which is then to be paid over. This also is a covenant of the same class. So of the third and fourth clauses of the contract. It contains six covenants to pay for work. What are the covenants other than for the payment of work. There are two in the clause declared on in the first and second breaches of the second count, being the covenants for inspecting the works during their progress, and estimating the amount done. The counsel considered these together, and I will pursue the same course. The prevention covenant, covenants for semi-monthly and final certificates, and the covenant to allow Randel four years to do the work in, are other examples of these obligations other than to pay for work done.

Our learned opponents argue all these covenants into matters of reference, and otherwise get round them, but I ask, on their principles, where are these other obligations besides those to pay for work done? I point them to the covenant that on the completion of the work, the company's engineer shall grant to Randel a final certificate of the amount of work done, and I ask if it will be gravely contended that this also is a reference?—that Randel after doing work to

the amount of millions has referred it to an agent of the company to decide whether he shall have one cent. Without the certificate he can get nothing, and the company are not bound that their agent shall give a certificate for any thing. This is the result of the argument; and if this be not the covenant of the company that a certificate shall be given it rests in the power of the company to pay or not to pay even after the work is finished. Mr. Frame, pressed by the necessity of finding other covenants than those to pay for work done, attempted to point out two, both of which are manifestly to pay for work. But the broad terms of this clause are not to be satisfied by hunting up a possible obligation in some corner of the contract; the expression is broad and general, all obligations.

In taking up the contract and looking for these other obligations, the first one that occurs is the provision, that in case Randel should, from the default of the company, be prevented from pursuing the due and best mode of executing his contract, &c., the pecuniary damage shall be certified by the engineer of the company. How is this clause introduced? It is agreed *as aforesaid.* What is the agreement immediately preceding? A covenant by the company to pay the ten per cent., and also a covenant by the company that the engineer should give a final certificate. If there be any doubt on the words of an agreement they are always referred to the proper party. *Powell on Cont.* 241, 2, 3, 4. Even where the language is that of the covenantee, they will be thrown upon the other party, if he assents and the intent so requires; much more where both parties join in the words. The law looks, not to who speaks the words, but to the intent of the parties, and if the party who ought to be bound, assents to the words, it shall be construed his covenant. In contracts it is not material which party speaks the words if the other agrees. Words spoken by one may enure as if spoken by the other. *Chitty Cont.* 22; 1 *Plowd.* 141; *Browning* vs. *Beston; Johns. Cases in error,* 327.

How stands this covenant? Do you, from the language, gather that the company agreed that their engineer should certify? if so it is a covenant. The terms of a contract are to be used in their ordinary and popular sense. The rule is to do justice between the parties by carrying into effect their meaning and intent. 4 *East* 136; 1 *Chitty Cont.* 19.

Is justice to be effected by the construction of the other side? Was it, or not, the understanding that Randel should do the work and the company pay him for it: if so, it is idle to contend that Randel referred it to Wright, or any one else, to say whether he should be paid or not. Do you doubt that it was the understanding that he should be permitted to go on with the work without molestation or hindrance for four years, he exercising due diligence in the mean time; if such was the understanding, they have covenanted to this effect, and broken their covenant by driving him off within the four years.

The books show numerous cases in which the principle of construction to carry into effect the intent and meaning of the parties has been adopted in its fullest extent. As where the father signs the articles of apprenticeship of his son though the covenants are all those

of the son and master, the obligations proceed from the son and the words are his—yet looking at the intent of the parties they have been held also to be the covenants of the father. *Dougl.* 518; 5 *Cowen* 170; 8 *Mod.* 190.

An agreement that B. should pay A. a sum of money for his land is a covenant by A. to convey the land. *Agreed* is the word of both, and the court looks to the intent and does justice. A covenant to supply lime at the season of burning construed to be a covenant to burn and supply burnt lime, for such the intent. 1 *Saund.* 320; 1 *Leving.* 274; 1 *Sidf.* 423; 2 *B. & Ald.* 487; 1 *Wh. Selw.* 387; 6 *Bingh.* 644; 9 *B. &. Cres.* 505; 2 *Mod.* 266; *Otway & Holdip.*

In *Otway* vs. *Holdips* the court raised a covenant by construction because otherwise the party bound could avoid all liability. Here, if this be not a covenant by the company they could deprive Randel of all remedy. Mr. Frame contended that this engineer was an indifferent person. Look at the contract and see what manner of indifferent person this is. He is called the engineer *of* the company: the engineer *employed* by the company; *their* engineer. They could not speak of their servant in terms more strongly showing his obligation and subservience to them. He is their man; under their power, and responsible to them. And yet he is called an indifferent person. The duty was not even assigned to their engineer in chief who must be a man of science, and might be a man of character and responsibility, but it is the engineer for the time being, or resident engineer, frequently a common surveyor or subordinate engineer, who is put in and out at the pleasure of the company. Are they not, according to reasonable principles of construction, answerable, under their covenant, for this hireling servant? The narr alledges that Randel did work to the amount of $250,000, which the engineer well knew but would not certify for; yet it is contended that the company are not liable for this neglect of their servant though otherwise Randel is wholly without relief, and though it is *agreed* in the contract that this servant shall inspect the works and estimate and certify the amount. It was intimated last term that there might be a remedy for Randel in equity, though not at law. The rules of construction of covenants are the same at law as in equity. If then it be admitted that we have a remedy on this clause in equity we have it here. 1 *Saund. Rep.* 233, *n.* 1; 14 *Vin. Ab. Tit. Intent. Fearne on Rem.* 220, *4th Ed.*; 8 *Eng. Com. Law Rep.* 368; *Frazer, &c.* vs. *Houston, &c.*; 1 *Sidf.* 266; 2 *Modern* 292; *Chitty Cont.* 18, 19; 1 *Fonb. Eq.* 65; 3 *Ves. sen.* 692; 2 *Burr* 1108; 3 *Blac. Com.* 438; 1 *Leon* 324; 2 *do.* 122.

I crave attention to the distinction in this contract between the language of covenant and of arbitration. The contract is very artfully drawn. It cannot be denied that the draftsman knew perfectly well how to appoint an arbitrator as is done expressly in the concluding clause referring disputes to the engineer in chief, as a *judge* and *umpire* between the parties. And also in another clause where they wish to refer a matter to the engineer for the time being it is done so expressly, to him as *umpire*. They knew then how to make

an arbitrator; they have done it rightly where they intended to do it; yet where they have not done it the court is called upon to infer a reference which shall deprive one party of all the remedy he has under the contract and absolve the other from all liability, even the liability to pay for the work actually done. The language of the reference is that the engineer *may* do thus and so; he *may* certify the neglect of Randel; it is left to his discretion; the language of the covenants is that he *shall* be the inspector and *shall* estimate the work, and *shall* certify damages for deviations and prevention, &c. Again, the argument that this is a reference and not a covenant makes a double reference of the same subject matter for if it was intended to refer these matters to the engineer it is covered by the last clause of the contract. What wrong can be done to the company by construing this to be a covenant? If a covenant the company have still an immense advantage over Randel. They are bound to appoint an engineer and inspector, and to make him inspect and estimate and certify; but here their obligation ceases. Randel is bound by the certificate, however unjust; and it would be monstrous injustice to say, by construing this a reference, that the company were not even bound to give him that. On general principles the master is liable civiliter for the acts and conduct of his servant within the scope of his authority. The construction we contend for would hold the company responsible only as the general law considers them responsible. *Bac. Ab. Master & Servant.* R.

Establishing then that there is a covenant on the part of the company that their engineer should inspect the works during their progress and estimate and certify the amount done; and that there is also a covenant by the company that, in case Randel should be prevented by any default of theirs from pursuing the due and best mode of executing his contract, their engineer should certify the damages arising from such prevention, I proceed to the breaches:—

The third breach, second count, alledges that Randel was prevented, &c. on divers days and times; that the pecuniary damage amounted to $256,000 (all of which is confessed by the plea and demurrer), yet that the said damage has not been certified, (which is also confessed.) The fourth breach of the second count is similar, with the additional averment that the engineer knew of the damages. (This also is confessed by the pleadings.) The other breaches are similar varying only as to time.

How stand we then on the demurrers? The prevention, and damage and neglect to certify, all admitted; a wrong confessed; a duty omitted; a covenant broken.

So also is the covenant to inspect the works and estimate the amount of excavation and embankment clearly broken, and all the facts necessary to establish the breach confessed by the pleadings.

I recur to the principle that the law refers the obligation to him who is bound to do the act. It was the duty of the company to have the work inspected and measured. Mr. Frame argued that this clause was chiefly or entirely for the benefit of the company. Wonderful! Without the inspection Randel could not receive one cent for his work; the provision was wholly for the purpose of arriving at data for his payment; yet he has no interest in it! The

contract might also be declared abandoned for his neglect; was he not interested in the measurement? When able counsel resort to such arguments it manifests the difficulty of their case. The learned gentleman argued also from the words "to prevent misunderstandings and disputes" that this was a reference. Look at the language of the last clause which we agree is a reference; it is to prevent litigation in case of misunderstandings and disputes that an arbitrator is appointed; and this is the business of an arbitrator to settle, not to prevent, disputes. I seize on these words to show that it cannot be a reference. How were disputes to be prevented? Not by appointing an arbitrator, but by obliging the company to make their agent do his duty in inspecting and measuring and binding Randel to abide by this measurement. Here no dispute could arise. Randel might be wronged by the certificate, but his mouth was closed. A plea that the company's agent had estimated and certified this work would conclude the whole matter forever.

I now come to the covenant not to take the time within which Randel should be compelled to do this work to be less than four years. A contract must be so constructed as to give it some meaning. *Chitty C*. 19, 20. The construction is to be on the whole instrument. The company are authorized to declare the contract abandoned for negligence of the contractor: negligence, what is it? The want of due diligence; and this diligence must be taken in reference to time. Without any stipulation on the subject Randel would have have been allowed a reasonable time to finish the work, but here the contract ascertains the time and stipulates for the allowance of four years. The company covenant not to take the time to be less than four years, that is, to allow four years. But say they, that is inconsistent with the power of declaring the contract abandoned within the four years. Construe the whole instrument together and they both stand. The company, were bound to allow four years, unless, judging in reference to that time, the engineer should certify to them that the contractor unreasonably neglected his contract upon which certificate they might declare an abandonment within four years. We show a breach of this time covenant whenever we show that Randel was progressing with such diligence as to complete the canal in four years and that the company unlawfully drove him off.

There is also compatability between the clause allowing four years to complete the work and the prevention clause. A prevention may not amount to a total exclusion, and remark it is only prevention from pursuing the due and *best* mode: the one regards interruptions in the progress of the work the other a total suspension of the work itself. There might be many violations of the prevention clause without amounting to a breach of the time covenant.

It may be insisted, as it was last term, that this clause was designed merely as a defence to Randel in case the company should sue him for not completing the work earlier. Sue him, where? They contemplated no suits; they withdrew these matters from courts and juries, shunned the tribunals of the country as they still seek to shun them, and took the power of decision into their own hands. If Randel did not progress diligently he was not to be sued, but

Wright or some other tool of the company was to step in and certify the neglect and he was to be driven off at their will. It was not then meant as a defence to any suit but a measure of time in reference to his diligence and a covenant to allow time.

Are the breaches of this covenant well assigned? They are the sixth of the second count, and the tenth, eleventh, twelfth, thirteenth and fourteenth breaches of the third count. The fourteenth *is admitted by Mr. Frame to be well assigned;* it is like the seventh count on which judgment has been given for plff. The other breaches recite the facts from which it is concluded that the covenant is broken. The first breach contains two averments; that the company unlawfully abandoned the contract and prevented Randel from entering upon lands to execute his contract, and so took the time, &c. Mr. Frame seemed to treat the declaration of abandonment as another abstraction not affecting Randel nor having any relation to the taking the time; but the consequences of that declaration, which are stated, did affect Randel; it stopt his pay; drove him off; prevented him from going on with the work. The breach does not stop at the mere declaration; it relies on the driving him off and states the declaration of abandonment as the means. And this is a breach of the covenant. The tenth breach adds the reletting the contract to Clement, Blackstock, Vanslyke and Dexter; the eleventh to Clement, Blackstock and Vanslyke; the twelfth states a reletting generally, and the thirteenth traverses the abandonment generally and states the reletting. I submit that a violation of this covenant is well assigned in all these breaches.

I come now to consider the plea of abandonment and the replication of waiver. It is the third plea and applies to seventeen breaches.

The plea is that Benjamin Wright, the engineer of the company, being of opinion that Randel unreasonably neglected to prosecute the work, did, on the 30th July, 1825, certify that opinion to the company, and that afterwards, to wit: on the 30th September, 1825, the company did, on said certificate, declare the contract abandoned, of which Randel had notice on the first of October, by means whereof the said company were exonerated from *every obligation imposed by* said contract, except, &c.

The plea is a plea of confession and avoidance. Whatever is materially alledged in the breach, and not denied by the plea, is admitted. This plea admits that Randel was duly progressing, and did not neglect it in the interval between the 30th July and 1st October; no notice to Randel of the certificate is averred in the plea until sixty-two days after it was given, one-twenty-fourth of the whole time he was allowed to do the work: the question then is was the abandonment legal? The certificate they say is not to be questioned, but the abandonment on it must be legal or the whole is void. This certificate, as was well said by Mr. Frame, made the contract not void, but voidable only. The contract is, that on the certificate being given, the company *may* declare an abandonment, not that they *shall;* it is then after certificate, a voidable and not a void contract. Such a contract may be affirmed and the power to avoid it waived. Mr. Frame said there were some cases of leases, copy-

holds, &c., where a forfeited contract might be waived or re-established, but he said it was very different with a contract not actually forfeited. Precisely the reverse is true; and I trust we shall show a few other cases than those depending on the relation of landlord and tenant, or on any peculiar principles.

A lease may be set up by waiver while it is voidable, but not after it is avoided. If there be a clause of forfeiture for non-payment of rent, if the rent be not paid the contract becomes voidable, but not void until entry. Before entry the contract may be set up and the forfeiture waived by slight acts, because the law leans against forfeitures. If feoffor brings assize after condition broken, it is a waiver of the forfeiture. Acceptance, of rent after notice to quit, is a waiver of the notice. Acceptance of rent, after the lease is avoided, will not set it up, but it will where the lease is voidable only. 1 *Saund.* 22; *a note* 3; 1 *do.* 1042; 2 *Stran.* 297; 1 *Saund.* 287, *b. n.* 16; *Co. Litt.* 201, *b;* 202, *a; Harg. n. 3; Co. Litt. sec.* 341, *p.* 211, *b;* 6 *T. Rep.* 219; *Co. Litt.* 215, *a and note* 1; 2 *T. Rep.* 430; 1 *H. Bl.* 311; 4 *B. & Cres.* 606.

The replication shows that Randel worked to the amount of thirty thousand dollars, after the certificate, one-twenty-fourth of the whole time, that they paid him and treated with him all that time, as if no certificate had been given; they thereby acknowledged the contract to be in full force. The demurrer admits these facts and they amount to a waiver. The payment under the contract, and the acknowledgment of its being in full force, is not a conclusion or inference, but a traversable fact.

Acceptance of rent, with notice, after condition broken, and before entry, is a waiver of the forfeiture. In case of a continuing breach acceptance of rent is no waiver. If it appeared on the record that Randel continued to neglect after the certificate there might be no waiver, but the contrary is stated and admitted. Do the decisions, in the cases cited, go upon any reason peculiar to leases? The analogy is perfect throughout, and there can be no reason why a waiver in the one case, should not be in the other. The parties agree in those cases that in a certain event the lessor shall have it in his power to declare the lease forfeited, or to forfeit it by entry, &c., is it not so in this contract? If the forfeiture can be waived in the one case, why not in the other? 16 *East.* 53; 3 *Salk.* 3; *Cowp.* 804; 1 *Leon.* 262; *Cro. Jac.* 398; 7 *Petersd.* 111, *tit. covt. waiver;* 9 *B. & Cres.* 396.

But the law on this subject is not confined to leases: it is in the very nature of a voidable contract that it may be reaffirmed as well as avoided. The debt of an infant, though voidable, may be set up; a debt barred by limitation may be reaffirmed; a forfeiture created by the statute of frauds may be waived by payment or part payment. And if once reaffirmed it is not then to be avoided at the will of the party who waives the forfeiture. Any irregularity creating a forfeiture or loss of a man's rights, may be waived, as appearance to an irregular writ, payment or admission of a debt, &c. 8 *Com. Law Rep.* 270. So in cases of insurance the insured must abandon and give notice to the underwriter or he waives his right to abandon. The insured must elect whether he will abandon as soon as he re-

ceives notice of the loss and notify the insurer within a reasonable time. "This is a rule not peculiar to commercial law, but is in analogy to the principles of the common law." *Marshall on Insurance,* 509. We say here that on the certificate being given, the company were to elect whether they would forfeit the contract by a declaration and notice to Randel within a *reasonable time.* Was two months a reasonable time? Was it reasonable that they should keep him at work at reduced prices long enough to do one-twenty-fourth of the whole work. What would be reasonable time? Could they put this certificate up until Randel had nearly completed the work, and then spring upon him with a declaration of abandonment? Again: What is the principle in relation to the non-presentment of a bill or note? Its consequences may be waived by part payment, or promise with notice of the default. So neglect to give notice to the indorser releases him, but it may be waived. So in case of mortgage forfeited the mortgagee waives the forfeiture, by accepting payment of part. So in case of a bail bond forfeited, acceptance of appearance is a release of the bail. To all instruments known to the law, on which a forfeiture may arise a waiver may occur. *Chitty on bills,* 319, 302, 309; *Strange;* 6 *East; Powell on Mortgages,* 1077. 8, 18; 19, 421, 422; 3 *Taunt.* 78.

This is not a case of merely lying by and doing no act to waive this right of abandoning the contract, the whole conduct of the company towards Randel after the certificate reaffirmed the contract. The contract is that the company shall have the power to declare an abandonment *on* the certificate; that is, on occasion of the certificate, when it is given or within a reasonable time after. Can an abandonment sixty-two days after the certificate, be said to be on the certificate?

If this plea be bad to any one of the seventeen breaches it is bad to all. (Admitted by defendants counsel.)

As to the special demurrers:

I admit that where time is immaterial, it need not be traversed, and cannot be. The question is whether the time is material. They were bound to show when the inspector was appointed, for they were bound to have one all the time. The time of the appointment then is material. But I pass by this. The demurrer runs back on the first faulty pleading, and there plea is bad. The breach is that the company did not appoint an inspector, and that the work was not inspected and measured, the plea merely sets out the appointment of the inspector. It is therefore bad and settles the question as to the demurrers to the fifth plea.

The case cited from 10 East, was a conditional promise that the tenant might remain unless the landlord sold. He did sell and it was held no waiver of the previous notice to quit. It does not, in the least, impugn the authority of our cases. Pennant's case is law, and the other side may have the full advantage of it. . I intended to cite it, and would still, but for the lateness of the hour. It is pregnant with instruction on the subject of waiver.

*Charles J. Ingersoll,* for plaintiff.

In former days, before the light of liberty had shed its influence to the extent of establishing independent judiciaries and juries to try

the rights of parties, the world was ruled and over-ruled by the despotic sway of the nobility, a priviledged class of which the only representative that has come down to these enlightened times, is the existence of certain irresponsible bodies called corporations. Ten years ago, a period longer than the usual computation of human life, an artificial being of this character, called the Chesapeake and Delaware Canal Company, entered into an arrangement with John Randel, jun., in relation to digging a canal; and, in the foolish confidence of an honest man, our unfortunate client signed a contract with this company that gave them almost unlimited powers over him. He agreed to put his work and himself under the supervision and inspection of an agent of the company; to be paid according to his certificates for work done, and to be remunerated in damages by the same rule for preventions, and deviations, extra labour and all the impediments which might arise in the course of the work or which might be thrown in his way by the company themselves; and finally, he agreed that whenever the aforesaid agent of the company should certify that he unreasonably neglected to prosecute his work, the company might, on that certificate, declare his contract abandoned, and drive him off without appeal and without redress. It is true that something like a fixed rate of payment was agreed upon; some certainty of remuneration was delusively held out to his view; a *schedule of prices* was inserted in the contract; but it was accompanied by a cruel clause of revision which, in less than three months, they cruelly and unjustly enforced against him. Crippled though he was, he went on, for he had no choice. He called around him his friends; to a handsome private fortune he added the resources with which their friendship and confidence supplied him, and with a persevering industry absolutely astonishing he was about to overcome every difficulty, when this corporation, duped by their faithless and malicious engineer, sprung upon him an abandonment founded on a secret and false certificate. It was then that the true character of this artificial being developed itself. Our client petitioned for a just and fair investigation, but he was disregarded. He talked about his rights and was told that he had none: he spoke of the contract, but they denied that it contained any obligations for them. Exercising omnipotent power over others, this King Corporation claims the protection of infancy for itself; *it can't contract*. He points to a covenant to allow him four years to complete the work, but this, wrapt in the obscurity of intentional mystification, means nothing; it is a mere abstraction. He seeks redress at law; but he is told he sha'nt go to a jury; they demur. The court decides against them, and they demur again. At every step we are met with the stubborn determination not to try the merits of this cause; with the avowed and boasted purpose never to face our wronged client before a jury of his peers. This case presents then the interesting question, novel to be sure in this country, whether the forms of law can bring this great corporation to submit its controversy with an humble citizen to the investigation of the appointed tribunals of the country; whether justice *can* be administered to John Randel as against this infant Hercules through the medium of a jury of twelve honest men. We ask but a trial; we rely on the law of the land and the facts of our

case; we rely on a learned court and an intelligent jury for justice; and if we get it not here we know from long experience that we can never get it from any sense of justice residing in this soulless corporation.

The case as it is now before the court on the demurrers, presents the inquiry whether the clauses in relation to inspection, prevention and the allowance of time are covenants of the company; and whether our replication of waiver to their plea of abandonment is good in law. The contract throughout shows a dependence or subordination of the contractor on the engineer, and of the engineer on the company. In no less than five instances the engineer is expressly made the agent of the company; and throughout he is spoken of as their engineer, their servant. The company then are the principals. They were to provide the contractor with land to dig, and protection from interruption whilst digging. But this land belonged to others, and was to be bought by the company. Randel was proceeding with his force; could he wait and keep his men idle; purchase the land himself; or resort to a suit with the company for damages? The contract proceeds on a more sensible plan. The company agreed to protect Randel in the course of his work, or if he was prevented by their default from pursuing the due and best mode of prosecuting the work, *their* engineer should assess the damage, which Randel agreed to take. They call this a reference to arbitratoin. Did you ever hear of an arbitrator who was not at liberty to decide for either party? It is essential to the character of an arbitrator. Here the engineer is bound at all events to certify damage for Randel the amount of which he is constituted the assessor. Even this was not to be conclusive, but dependant on a final measurement or computation, it was a mere temporary rule of damage to facilitate the payments.

As to the waiver. The law on this subject is as well settled as the definition of a fee-simple. The principle is that every subsequent ratification amounts to a command; omnis ratihabitio, &c. It is a principle of the common law; the civil law; in the law of infants; insurances, agents, leases; of all the law of presentment and notice in relation to bills and notes; a familiar principle pervading the whole law. *Comyn on landlord and tenant* 330; *4 Barn & Cress.* 606; *Roscoe on Evid.;* 341; *6 Cranch* 268, 273; *5 Serg. & Rawle* 113, 115.

The principle then being universal that a party may waive his right to avoid a voidable contract let us apply it to this case. The plea sets forth that Wright certified on the 30th July, and the company declared the abandonment on the 30th September. The replication states a course of conduct in the company during this interval wholly inconsistent with any intention of abandonment; amounting to a giving up or yielding the right which on the 30th July they had to avoid this contract. Is this a waiver? What is a waiver? There is no magic in the word. Chief Justice Tilghman says it is to be collected from the conduct of the party; Mr. Webster, who has furnished us with a very good law book, gives as the definition of the verb waive "to omit to pursue." It is putting aside what a party is otherwise entitled to; the omission to take advantage of a

right, and the doing acts which are inconsistent with the having taken advantage of it. And courts of justice say that a man may readily waive a forfeiture for the law leans against forfeitures.

The plea does not state that Randel did neglect, only that the engineer certified that he neglected. Is this the contract? I deny it. There must by a faithful bona fide judgment of the company, that Randel did neglect. I don't say that such judgment must be right, but it must be bona fide. I contend that the contract is not that there may be an arbitrary and false certificate but a bona fide certificate. The word is certify. *Webster.* "To make known, or establish a fact." Can a certificate establish a fact which does not exist? There must be the honest judgment of the engineer on the subject, or it is no such certificate as the contract contemplated. But, say the gentlemen, he was only to certify an *opinion*. What is an opinion? *Webster.* "The judgment which the mind forms upon any matter or event." The judgment here was to be formed on the fact of unreasonable neglect, and I submit that this plea should have stated the existence of such neglect as the basis of the engineer's opinion and certificate. Was not this the meaning and intention of the parties? Surely it was. Certify the *same;* what does the *same* refer to? opinion or neglect; the latter evidently. Now it does not appear that such a certificate was ever made. The grammatical construction certainly refers "same" to the neglect of Randel, and not to the opinion which Wright might entertain of that neglect. But granted that I am wrong here, I come to the question of abandonment and waiver as it appears on the pleadings. On the 30th July the engineer certified the neglect, and on 30th September the company did, on said certificate, determine the contract *to be* abandoned. Is this the contract? It gives the company the power of declaring that Randel *has* abandoned. I stick not to the grammatical construction, but I look at the facts. Is it the same thing to say that Randel has abandoned his contract on the 30th July, and to determine the contract *to be* abandoned on the 30th September? To be, is future or at least present; it can't be past. Again: The declaration was to be *on* the certificate. *On* always means proximity; nearness. *Webster.* Here was an interval of two months; and what was the state of things in the mean time? Randel digging and working; Wright twice a month certifying the work to the company; the company accepting the certificates and paying the contractor; and yet they plead in effect, at least they must sustain the position, that *on* the certificate they determined that Randel had abandoned his contract on the 30th July. Randel must have been amazed to learn that he had abandoned the work in July when he knew that all August and September he had been delving in the mud, in the midst of autumnal fevers, paying five hundred men their daily wages, exhausting his funds and draining his friends; and submitting himself twice a month to the inspection of the "committee of works," who, armed with champaign and Cook's pills, ventured in this unhealthy region to see how fast a man could *complete* a work that he had *abandoned.* Surely he must have been in a trance all this time, or the abandonment is false and its operation fraudulent.

But they say they were to have a reasonable time. It is not so said in the contract. The contract says the abandonment may be *on* the certificate; that the company may *immediately* after relet the contract, &c. But if the law does give a reasonable time it must be in reference to the subject matter. Here was a great work requiring a large force and an immense daily expenditure; promptitude in exercising a right to dissolve such a contract was necessary; any delay would be unreasonable because destructive to Randel. In cases of insurance the law requires instant action; in all cases, promptitude and diligence. Can it be possible that two months can be considered prompt action or due diligence in reference to taking advantage of a forfeiture of such a contract as this.

*J. A. Bayard,* for defendants.

There are three leading questions in this case:—First. The construction of the contract in relation to the certifying of work done, damages sustained, &c. The principle I start with is, that in construing contracts the object is to do justice between the parties according to the intention they mutually entertained at the time the contract was entered into. *Chitty on Con.* 19; 1 *Saund.* 61, *n.* 1. I agree that every covenant is an obligation; but not that every obligation is a covenant. Covenants can only be by deed: obligations may be without deed. I do not agree, either, to Mr. Clayton's division of this contract into covenants to pay for work done and covenants other than to pay for work done. The contract makes no such division. The contract is to be construed from the whole and not a part. There are but two general covenants in it, the one to perform the work and the other to pay for it when fully completed. The others are all dependant on these, growing out of them, explaining, modifying or regulating details. This work was beyond the means of any individual to perform without being paid as it progressed, hence arose the provision for stated semi-monthly payments according to certain certificates. Randel was the claimant. The company had to guard against excessive advances and keep the payments within the work. Under these circumstances they made a mutual agreement that a scientific man should stand in the relation of an umpire or judge to certify the amount of work done, &c. He was invested with a discretionary power in the business: and made the judge between the parties. The covenant of the company was not to pay semi-monthly on the work being done, but on its being certified. The certificate is a condition precedent; and, without it, no pay was due. If no certificate was given, the contractor was estopped to say that any work had been done. The certificate was to be equally binding on the parties which created the mutuality of the reference. So of the clause referring it to the engineer to divide the ten per cent. reserved in case of Randel's death; his administrators could never have recovered any part of this ten per cent. without the certificate of the engineer: unless indeed there was collusion between the engineer and the company, the other party might in such case go into chancery and compel a certificate. So in the prevention clause. To prevent misunderstandings and disputes the parties agreed to repose in the judgment of the engineer and to refer it to him to assess the damages. The company were equally bound

with the contractor; and if the company was bound to pay $10,000 on a certificate though there might be but $5,000 amount of work done, where is the mutuality or justice, to say that the other side was not equally bound to take whatever was certified, and to take nothing but on a certificate? Wherever the skill and discretion of another is reposed on in a contract between two parties it makes a reference, and I defy the counsel to show a case where the decision of such an arbitrator has been overhauled except on the ground of fraud or irregularity; not on any ground affecting his judgment or discretion for this is reposed on by the parties. It has been contended that this prevention clause was chiefly for the benefit of Randel. It is not so. What was the implied covenant of the law in case of prevention? That they should pay damages without restriction; the law even goes so far as to entitle the party to damages without executing his part of the contract. 1 *Saund,* 60, *n.* 2. The design of this clause was evidently to restrain the general implied covenant. It was of vital importance to take the decision of this question of damage from the loose judgment of unscientific men and refer it to that of a man of skill and knowledge. And if this was the intention of the parties can the deft. be called on to pay according to any other assessment? The contract secures them the protection of the engineer's judgment: the parties mutually agreed to rely upon his opinion as to the amount of damages, and without that opinion the plff. cannot recover. If the engineer has not certified any damage it is conclusive evidence that no damage has been sustained. It is conclusive or the mutuality of the contract is destroyed.

It is admitted that the power to abandon the contract on the engineer's certificate of neglect is in the nature of a reference. Why more so than in the other clauses? Because the neglect is to be ascertained by the *opinion* of the engineer? So is the amount of work and of damage to be ascertained by his opinion. The deviation clause is still stronger. Can it be that the parties ever intended to have the damage arising from deviations valued by any other than a scientific man who alone from his skill in the business was competent to assess the actual damage? on his certificate only then can the plff. recover. If he refused to certify on proper grounds the plff. had no remedy; if on improper grounds, his remedy was only in equity, or against the engineer himself.

I care not if this engineer be the agent of the company. The agreement was to abide by his certificate. I can establish the position that if Randel had agreed to take what the company themselves should certify he could not recover otherwise than on the certificate. 1 *Maul & Selw.* 290, 2. The provision of semi-monthly payments is a qualification of the general covenant to pay on the completion of the work, and being a concession to the contractor it must be taken with its condition; the opinion of the engineer and his certificate. It would have been impossible for this company to have succeeded on any other principle than that the contractor should be in the power of their engineer. If in the various disputes that must arise in such a work there be no one to decide promptly and finally no company could execute it.

No express words are requisite to make a reference; and in con-

struing contracts the court will look to the condition of things in reference to which they are made. 1 *Maule & Selw.* 105; *Chitty on Cont.* 21. If the reference had been to an engineer mutually to be selected could there be a doubt? And does it alter the matter that it is referred to the company's engineer? If you refer a matter to the other party's servant, brother or father, it is still a reference, and binding. Apart from this contract Benjamin Wright was the agent and engineer of this company. Knowing this, John Randel agreed to take this person to act between him and the company on this subject. As engineer merely he held no power to do these things. He derives his power from the contract. He drops his character of agent of one party and becomes the appointed agent of both. And a reference would be valid to an arbitrator appointed by one of the parties.

(Examines the cases cited on the other side, and admits them to be right in the construction of the covenants on which they arise, but denies that they can vary his construction of this contract.) I don't deny that there may be implied covenants, nor that the language of a covenant may be referred to the party who, according to the intention of the parties, was to be bound; but the implication must be a necessary and apparent one, and the intention must be manifest. I admit also, that the rules of construction of covenants are the same in courts of law and equity, but I deny that both courts afford the same remedies. It has been argued that the person who drafted this contract knew well how to appoint an umpire, and it is thence inferred that in these clauses it was not so designed. Judging from the instrument itself I should say a lawyer did not draft it. The term *umpire* is used improperly; an umpire is a third person appointed to decide between two other judges or referees who differ in opinion. It is not so used here. The only peculiar force that the word *shall* has in this contract, has been imparted to it by the emphasis of counsel. In the umpirage clause the term is shall. It is of no more force than will, unconnected with the intent of the parties. There is nothing in the term itself to make a covenant.

I have no hesitation in admitting several of the positions taken by the other side. A master is liable for the acts of his servant within the scope of his authority: these acts are not within the scope of the engineer's authority as the agent of the company. They grow out of contract and appertain to him as the agent of both parties. The argument drawn from the words "to prevent disputes," namely, that an arbitration is to settle, and not prevent disputes, is fallacious. It is founded on the technical meaning of arbitration, a reference of existing disputes. But is it not competent to refer contemplated disputes; to appoint a referee to prevent disputes? It is done in all policies of insurance. An arbitrator must have the power to bind both parties. And so he has. The company was as much bound by the certificate of this engineer as Randel was. The demurrer admits all the facts well and sufficiently pleaded, and no more. If our construction of the contract be right, it is fatal to all the breaches of the third count, except the fifth, sixth, seventh and fourteenth.

The next question I shall consider is the inquiry what acts amount to *taking the time* to be less than four years within the meaning of

that clause of the contract. The court have already decided this to be a covenant capable of being broken, but not what acts will constitute a breach. The sixth breach of the second count alledges that the company unlawfully declared the contract abandoned, and prevented Randel from executing the work. I can't understand how this was a taking of the time, unless it appeared that it was done with that view. He may have been driven off for disobedience or neglect of orders; how can the court say without an averment of intention, that it was a taking of the time. The quo animo must direct the act to the intention for it is consistent with other objects than that of taking time. Reletting the contract is not a breach of this covenant; nor is the preventing Randel from pursuing the due and best mode of executing the contract. This last is a restriction of the general covenant; what would constitute a breach of it would not be a breach of the other, or they amount to the same thing. The act stated in the breach applies to the prevention clause. I admit that a general covenant is not necessarily restricted by a subsequent special covenant, but only where the reasonable construction requires such a qualification. 3 *Bos. & Pul.* 574, 5, 6. Here is a special covenant that in case of prevention the company shall pay on the certificate of the engineer. Suppose a prevention, is it a violation merely of the prevention clause, or does it pass by it and constitute a breach of the time covenant? That would make the time covenant ride over and expunge all the particular covenants. That covenant is indefinite in its terms. It points out not what shall be a taking of the time; and I contend that no act embraced within the special covenants can be applied to it. If it can, those special provisions are nugatory; and by resorting to the general you evade all the restrictions of the special clauses. The waiver. Are the matters contained in the replication of waiver a sufficient answer to the plea of abandonment? I notice first, some of the minor objections to the plea. The force of the word *on*. Mr. Webster may be good authority elsewhere, and even that is doubted, but here I might reply to the gentleman as Lord Ellenborough once did to an attorney who cited Walker's dictionary. Mr. Walker, sir; I never heard of him! On, he says, always means proximity, nearness. Why the argument the learned gentleman made yesterday was *on* a contract made ten years ago. Neither in the one case nor the other has the word any relation to time. The declaration was to be on the certificate as a foundation; and the company did proceed on the certificate after investigation to exercise the power. Do the matters replied avoid the plea? What are they? That Randel without neglecting, &c., went on to work in the interval between the 30th July and 30th September, under the orders of the company; that they paid large sums of money for work thus done; that this work was less valuable to him than the work to be done; that he had no notice of the certificate, &c.

At common law I contend that the principles of waiver are different in case of instruments under seal and without seal. If the forfeiture or right of forfeiture arises on a sealed instrument it cannot be waived or dispensed with by parol agreement. The only way you can waive such a right is by release, or by an act legally inconsistent with the forfeiture or right of forfeiture, and this after notice.

The affirmance of a voidable lease by parol, though on consideration, does not dispense with the forfeiture. Mere forbearance and lying by is not a waiver. Acceptance of rent after notice to quit affirms the tenancy. It is because the party can't stand in the relation of tenant and trespasser at the same time. The waiver of rights under process of courts can have no application, for these depend on the rules and practice of the courts, and proceed on equitable principles. Insurance cases are founded on the law merchant in reference to the convenience of trade; and arise upon instruments not under seal. So of bills and notes. As to the waiver of a forfeited mortgage, which was spoken of, I deny the case altogether, and deny that any waiver can take place by parol of a forfeiture arising on a sealed instrument. 3 *Co. Rep.* 64; *Pennant's case;* 1 *Saund.* 287, *n.* 16; 3 *Taunt.* 78; 3 *Salk.* 3; 6 *Term Rep.* 219. Parties cannot by parol vary a sealed instrument. 2 *Eng. Com. Law Rep.* 237; 4 *do.* 216.

The waiver must be by an act that creates a legal dispensation. The right to forfeit accrued from the certificate. The company were not bound to disaffirm; had a discretion. The mere forbearance was no waiver; whilst they forebore Randel had a right to go on and work, and the company to pay him, for the contract continued until actual declaration of abandonment. The forbearance, therefore, and all the acts alledged in the replication, were consistent with either the forfeiture or the waiver. If the company had given a written declaration to Randel, dispensing with the forfeiture and setting up the contract it would not be a waiver; for the books say you can't waive a forfeiture by deed by parol. Neither declarations nor acts then have waived. The payment for work was all proper, and legally consistent with the right to forfeit; they were bound to pay whether they declared the forfeiture or not. The contract continued. According to the argument of the other side the company had no right to let Randel work one day after the certificate; yet they admit that the certificate itself worked no forfeiture; and that after it the company have a discretion to forfeit or not. If they have the discretion they must have the means of exercising it prudently, and this requires investigation, deliberation and time. They took suitable time for this, and did no act in the interval that showed a determination not to take advantage of the forfeiture; nor any act legally inconsistent with their right of declaring the contract abandoned. The certificate gave the right to abandon without reference to time; and the only remedy for an abuse of it was in chancery. All consideration of injury to Randel, or abuse of the power of abandonment by the company, belongs to a court of equity and not of law, for equity can impose terms. 6 *Com. Law Rep.* 462, 466.

The special demurrers depend on the construction which the court may give to the inspection clause. We submit that the time of the appointment of the inspector is not material nor traversable.

*George Read, junior,* for plaintiff.

· The case is an unparalleled one in this state. It presents an acknowledgment on the record of every matter of claim on the part of the plaintiff, and yet a resistance to the recovery of any thing. The defendants admit that they have not measured or estimated the work; that they have not certified either the work or the damages arising

for prevention; they admit that they unlawfully drove the plaintiff from the work and forfeited his contract; that they retained and still keep ten per cent. on all the work done; and yet they say he is not entitled to recover any thing; that there is nothing in the contract to bind them; in short, that there is no law to be found in the land to bring them to a proper accountability. We shall see!

The contract gave to this company the power under given circumstances to declare the contract abandoned. It bestows *power* and not mere *right*. This implies discretion; the legal and proper use of the power. *2 Bac. Ab. 77, cov't. L.; 2 Johns. Rep. 395.* It strikes at once that as this was a power fully to prostrate and ruin the contractor, its exercise was to be strictly within its limits, and in conformity with the law. The doctrine of waiver does most materially connect itself with the exercise of such power; any illegal use of it is inconsistent with its existence and is a waiver. The principle was entirely mistaken by Mr. Bayard or confounded with a distinct principle. We hold that any power derived from the acts or omissions of another to avoid or forfeit a contract may be dispensed with or waived in any manner, either by word or act; and may further be destroyed by the very attempt to exercise it in an illegal manner. Mr. Bayard's principle is an entirely distinct one; that a sealed instrument can't be destroyed or waived but by an instrument under seal. True, but what would his sealed discharge be? Not a waiver but a release. They are entirely different. A release destroys the contract; a waiver of a forfeiture affirms it. The covenant can't be destroyed but by an instrument of like dignity; but a collateral power to destroy it may be waived, and the covenant set up, in any manner by word or deed. Keeping in view then that this power was to be exercised strictly and that it might be waived; inquire what are the facts of the waiver. The certificate was made clandestinely: no notice of it was given to Randel. Could any one suppose from the relation which subsisted between these parties in the interval between the certificate and declaration, that the company entertained any idea of abandoning? It was the state of things at the time of the certificate that authorized the abandonment. The present neglect. All the work done after was changing this state of things and rendering a new certificate necessary, if the certificate was designed as any evidence of the actual neglect. And who can say the parties did not so mean it? Delay therefore was inconsistent with the power. An altered state of things in relation to the work destroyed the certificate, for it became no evidence of existing neglect, and of course destroyed the power. Randel was sinking money for the benefit of the company, doing the unprofitable part of the contract. They, by their acts, induce him to go on as if no power of abandonment existed, i. e. as if no certificate had been given; they conceal it from him, induce him to work; derive benefit from that deception; produce injury and loss to him: this is a waiver. The ten per cent. reserved on work done was an actual gain—for this was forfeited on abandonment. How long were they authorized thus to tamper with his rights in the illegal exercise of a power of forfeiture which they were bound strictly to pursue? The truth of the certificate might at any time have been ascertained in three hours. And shall they take two

months? How much longer? Where will you stop? The correctness of a proposition is frequently tested by carrying it out; and this brings you to a case of such monstrous injustice that it cannot be true. If prompt action be not required by the contract there is no rule of action; and manifest injustice will arise.

I come now to the prevention clause. Does it contain a covenant? The word *shall* is a term of obligation. Who ever used this word in reference to the acts of another without covenanting for those acts? And further, it proves the control of the party contracting over the person whose acts are contracted for; it shows in this case that the engineer was the agent and under the control of the company, and they are bound for his acts. The covenant was for the mutual benefit of the parties. Randel was benefitted by the prompt payment which he was to get by means of these certificates; and it was greatly to the advantage of the company to have not only the work done, but the damages sustained, fixed by the certificate of their own officer dependant on and responsible to them, and of course having every inducement to take care of their interest. The amount of damage, &c. was referred to a person under the control of the company, to be fixed by his certificate; would it not avoid the whole intent of this arrangement to say that the company were not bound to compel this agent to make certificates? What advantage did Randel gain by referring the amount to the other party's servant if he did not obtain a security that the certificates should be made? The object of the concession was prompt payment; the means, certificates; if he did not secure these he yielded his rights for no corresponding benefit. And this is not the case of one covenanting for the acts of a third person; it is the case of a corporation which can act only by agents covenanting for the acts of one of those agents; it is a covenant to do the act itself through a particular agent for whom it is bound both on the principles of law and of the contract. This servant of the company has been dignified in the argument by the title of *Judge*. If this grave cause would allow of such pleasantry, we would suppose the application of such a title to such a person was designed to turn it into ridicule. One might think from the terms of respect paid to him that this distinguished individual carried in his pocket a commission from the Governor of your state, who only makes Judges, constituting him a high officer permanent in his functions and independent in his action, instead of the pitiful creature alluded to in this contract, dependent on the corporation for his existence and character as well as his bread. living only on their approving smiles and dreading their frowns as destruction. He was wholly under their control; they might say of him as Petruchio says of his gentle spouse "he is my house, my household stuff, my ox, my ass, my any thing." No such wild and forced construction can be put on this contract as would clothe this individual with a character so utterly inconsistent with his real nature as the making him an umpire and judge would be.

(Repeats and enforces his colleagues arguments on the time covenant. Cites 3 *Bos. & Pul.* 575. Replies to the authorities from 1 *Maule & Selwyn*. If a certificate had been given in this case to any amount, it would then be similar to *Price* vs. *Hollis*. If pleaded

it would be conclusive. In *Taylor* vs. *Brewer* (290) the resolution did not bind the committee to any thing. It was merely an engagement of honor. Cites 1 *Saund.* 33, *n.* 2, and 2 *ditto* 118, 119, 123, *n.* 4, to show that no special request of a certificate need be stated.

*Rogers*, for plaintiff.

The inspection clause. Mr. Bayard admits that this clause contains a covenant so far as that the company shall appoint an inspector; the pleadings admit it. By what reasoning does it appear to be the covenant of the company to provide an inspector any more than to secure an inspection and certificate. It was these that Randel was seeking to obtain as the means of payment, and for which he was yielding important rights. The argument on the other side gives him nothing; and it expunges from the contract all the covenants but two, including that on which the court has already given judgment. If the certificate is a condition precedent to the payment for work done, and the company are not bound to furnish certificates, then the covenant for semi-monthly payments is destroyed, and the company had it in their power to stop the work and drive off the contractor without abandonment. They might first compel him to neglect, and then compel him to abandon. He could not proceed without funds; and these semi-monthly estimates and certificates were the means by which he was to procure funds. If the contract secured him these, he knew that while he worked he must be paid; but the construction of the other side secures him nothing, and destroys the most important provisions of the contract. The idea of reference is equally inconsistent with the covenant for a final certificate, and with the concluding clause of umpirage. Was there to be a semi-monthly settlement of disputes between these parties before this arbitrator; or was it not rather a rule of payment according to estimates and certificates to be made by the company's agent. The operation which is supposed to have involved so much science and skill, consisted in taking the depth and width of the excavation with a rod, and making a few plain calculations. The damage on the prevention clause might easily be estimated by the number of days the contractor was delayed, and the force he had idle. Suppose the contract had been that the company should pay semi-monthly, according to their own estimates and certificates; would not this be a covenant on their part to make the certificates? The defendants being a corporation can act only by agents; and the provision here is substantially that they shall inspect and certify. It has been said these matters were without the scope of the engineer's authority. Why, what else was he to do? They were the very things for which an engineer was needed.

Cites on the construction of covenants. *Bac. Ab.* 77; 2 *Johns.* 395; 1 *Saund;* 8 *Com. Law Rep.* 368, 71; *Vin. Ab.*; 2 *Mod.* 266. An agreement to pay £ *for* a tract of land, is an implied covenant to convey the land. It was stated in a recital that a fine should be levied, and it was held a covenant to levy the fine. *Otway* vs. *Holdip.* Covenant to pay an award by a person to be appointed by the parties. Plaintiff declares that the defendant would

not appoint.  Construed a covenant, otherwise the defendant might defeat it.  Applies that authority to this case.

The abandonment and waiver.

What was to be waived here?  The right of the company on a given state of facts, to be ascertained by a certificate, to complete a forfeiture.  If the condition of things is changed the certificate can be no longer the basis of an abandonment, or if the company do any act after the certificate, inconsistent with taking advantage of it, it is a waiver.  Like a condition of re-entry and forfeiture on non-payment of rent.  The non-payment gives the right of re-entry; the act completes the forfeiture.  Any thing inconsistent with the intention to take advantage of the forfeiture, waives it.  On the certificate being given I lay it down that the company was bound by law to act upon it or not, to elect within a reasonable time.  The nature of the contract; the rights of the parties, and the continually changing state of the work, rendered this necessary.  The doctrine of compelling the exercise of a power in a reasonable time, runs all through the law, and attaches with peculiar strictness to forfeitures, which the law discourages.  There is a class of cases which peculiarly regard the injury done the other party in the mode of executing a power.  I cite 10 *Com. Law Rep.* 417.  Holroyds opinion.

I hold then that where the party having the power to take advantage of a forfeiture, delays or does any act in reference to the power which would injure the other party and benefit himself it is inconsistent with the legal exercise of the power, and dispenses with the forfeiture.  The injury to Randel by delay was manifest.  From the moment of the certificate he was working ten per cent. below the contract price; for the ten per cent. retained is forfeited by the abandonment.  The replication also states, and the demurrer admits that the work done in the interval was that portion of the whole work which was most disadvantageous and unprofitable to the contractor.  The company therefore gained a great advantage in lying by with a secret and concealed certificate until the contractor got through this unprofitable work, and then cutting him off by the abandonment from that which would have been profitable to him.  In addition the whole conduct of the company towards him after the certificate recognized and set up the contract, and was wholly inconsistent with any intention on their part to declare the contract abandoned.  We submit then, on the whole, that the canal company had not the power on the 30th of September, to declare on the faith and foundation of a certificate granted the 30th July previous, that John Randel had abandoned his contract.

*Mr. Jones*, for defendants, in reply.

Much has been said about our admissions under the demurrers as establishing fraud and hardship, and it has even been argued that the admissions necessary to be made in order to raise the legal questions are to be taken as so many confessions of fact, and operate to take away that very defence which they were made to set up.  Admissions!  How?  Why they are mere hypothetical concessions, argumenti gratia, depending in truth on the decision of the demurrers for their force.  Thus a party may be estopped by his deed to set up a defence which his plea shows to be a very good defence, but for the

estoppel, yet his demurrer, according to the argument on the other side, admits the sufficiency of the defence notwithstanding the estoppel, and in fact destroys that defence which it was the very object of the admission to set up. The plaintiff's counsel give an undue weight to these admissions. They establish nothing. They present simply a question of law to the court, whether on certain facts which are admitted only for the purpose of stating the question, the plaintiff has set out a proper claim or the defendant a sufficient defence.

The contract may be divided into two great provisions, all the rest are subsidiary, affirmatory, restrictive or explanatory: First, to do the work: Second, to pay for it. The great purpose and object of the other clauses are to enforce the faithful performance of these two covenants. Was it competent for these parties to stipulate not only that one should do and the other pay, but for an exclusive and conclusive rule by which the rights of both might be ascertained and definitively fixed without further redress? If there be any principle settled this is settled. The question then is not what it was competent for the parties to agree upon, but have they contracted to this effect. Otway and Holdip, 2 *Modern* 266, has been cited. The ground of that decision is that the *party prevented* the execution of his covenant by not naming an attorney. Here it is not that the company prevented the inspection and ascertainment of the work, damages, &c., but that another person did not certify, or more generally still, that no certificate has been made. *Taylor and Brewer,* 1 *Maul. & Selw.* has been explained by supposing that it was not a legal obligation to pay but a mere promise referable to the honor or discretion of the party. It does not so appear from the case. The quantum of remuneration is left to the liberality of the committee, but there was a legal obligation to make some remuneration. Yet an action could not be sustained without an award fixing the compensation which was a condition precedent.

Breaches are assigned on five clauses of this contract. To all seventeen of the breaches the defendants have pleaded in bar the certificate of neglect and subsequent declaration of abandonment. The questions then are, first, on the construction of the contract; and, secondly, whether the breaches are well assigned. I shall consider the three clauses of inspection, prevention and deviation together. Do these clauses make the company responsible for the conduct of the engineer in doing acts which he is authorized to do by the mutual agreement of the parties, and for their common benefit? The averments are that the engineer did not do these acts, or that they were not done. In no part of the pleading is it intimated that this default of the engineer was occasioned by the defendants. The broad question therefore is whether the company are bound for his acts. They call him our engineer, our servant, our agent. Admitted. But is he exclusively our agent in reference to these matters? Our servant may be the mutual agent of John Randel and ourselves if the contract between us makes him so. If he is our agent, exclusively, it follows that what he was to do as our agent we could do without him. The rule is universal; what a man can do by his agent he may do himself. It would follow, therefore, that the defendants in this case were authorized to inspect and estimate and certify, which is

contrary to the terms of the contract. It is *agreed* that the works shall be inspected; the agreement of both, a mutual covenant equally binding on both. How can it be that either party is peculiarly bound? It may be, as in *Otway and Holdip*, that there is an implied covenant that neither party shall do any act to prevent the mutual agent from doing his duty; but in such case the pleadings should aver a prevention. The breach assigned on the prevention covenant is an attempt to have the damages ascertained, in a mode different from the contract; without certificate. It avers that Randel was prevented, and that damages arose, which were not certified. Was the engineer ever called on for a certificate? He was not bound to give a certificate but on a claim of damage. If he was called on and refused would the breach be good? I say not; for he is the judge of the claim; and his refusal to certify is a judgment in the case that nothing is due. Prima facie the absence of the certificate is fatal to the claim of damage. But if it is contended that the engineer has not refused, but merely neglected to certify, then Randel breaks his covenant by coming into court instead of looking to the engineer for redress in the mode agreed upon. I conclude then that these breaches are founded on a plain misconstruction of the contract, and are bad.

What acts amount to a violation of the clause which the court have considered a covenant in relation to time? I can easily imagine a breach of that covenant, but not by the acts here relied on. If the company had asserted the right to make the contractor complete the work in less than four years, and without any certificate turned him off, at a shorter period it would be a breach. But an abandonment on a certificate can have no such effect. It has no relation to the time clause. It is admitted that the plea is good if well pleaded; that is, if the declaration of abandonment was regular on the certificate, it is a good answer to all the breaches to which it is pleaded. But it is objected that the plea itself shows the abandonment to have been irregular, by reason of the delay and the conduct of the company after certificate. In point of law and on principles of special pleading that interval does not appear. The time stated in the plea does not tie the defendants down, on the trial they might prove an abandonment on the 31st of July or any other time. It does not therefore legally and conclusively appear from the plea that the abandonment was on the 30th of September. The time is laid under a videlicet. We are not even bound to prove that the certificate was on the 30th of July. But the replication does state an interval of two months between the certificate and abandonment, and this opens a consideration of what we are authorized by the contract to do; whether this power of abandonment is restricted as the plaintiff contends, and if, by the terms or meaning of the contract, the abandonment must necessarily be an act following immediately on the certificate; an act of instantaneous and continuous succession. Have we, in short, exercised this power as by the contract we were authorized to use it, or so irregularly and illegally as to destroy the right to exercise it at all?

Has the word *on* the force attributed to it by the argument on the other side. On, simply means in reference to the certificate; founded upon it as a basis or authority. Suppose the determination is to

be in a reasonable time; What is a reasonable time? How settled. It must be governed by the contract and the character of the work. Not like cases arising on bills or notes or policies of insurance. But there are terms in this contract which show that this immediate action was not necessary. It gives the *power* of abandoning—an abiding, continuing power not to be divested but at the will of the company. To say that this power must be exercised instantly is to take it away in the very breath in which it is given, and to destroy that discretion which the contract confessedly gives to the company. That discretion cannot be exercised without allowing time to deliberate and decide prudently. Our construction of the contract is more liberal to the contractor than theirs. According to their construction the company was obliged to destroy Randel the moment the certificate was given. The certificate was as an accusation or charge of negligence made against the contractor by the engineer before the company; the interval between it and the abandonment was properly occupied with investigating its truth and into the necessity of putting an end to the contract, in hearing the contractor's defence. Whilst this investigation was going on the contract ex necessitate continued; working under it and paying for the work necessarily followed, and there was every inducement for Randel to work more diligently, whilst the company were deliberating on his conduct as contractor; yet by a solecism in argument these acts are assigned as a waiver of the power on the part of the company to declare the abandonment.

Of what is this a waiver? Of the contract, the certificate, or the power to abandon. I can readily understand how a party can waive a right on consideration or for an equivalent. No such thing here. Why is the receipt of rent by landlord a waiver of notice to quit? Because it treats the party as a tenant, and not as a trespasser. Have we accepted or done any thing here inconsistent with full power to abandon? We have accepted his services and he payment for his work, but how? In execution of a subsisting contract. The certificate here did not create any forfeiture. In the case of leases, the non-payment of rent or other conditions broken constitute the forfeiture. The entry or ejectment are mere remedies for the forfeiture. The tenant becomes a trespasser from the moment of condition broken, and the acts which dispense with the forfeiture operate as an estoppel in pais, because they treat him not as a trespasser, but as a tenant.

The question of waiver is a matter of law for the court, and is not to be left to the jury. If there be a doubt in relation to the facts, the jury may find them under the direction of the court, and the court will pronounce whether they amount to a waiver; so a dictum of Justice Mansfield in            Taunton can by no means be admitted as law.

(The argument on these demurers occupied six days.)

*Chief Justice Clayton* delivered the following opinion of the court.

CLAYTON, CH. J. To put the true construction on the contract between John Randel and the Chesapeake and Delaware Canal Company, it will be necessary to look through the whole instrument, to see its general nature and design, in order to discover what was the real

meaning and intention of the parties; and when we have gathered from it that intention, it must be the rule of our decision. No settled form of words is necessary to create a covenant. Any words in a sealed instrument by which a party manifests an intention to become bound to another to do or not to do an act, either by himself or a third person, if the act be possible, and not immoral or unlawful, will make a covenant, and the law will hold him to his undertaking, however inartificial the words may be which he has used, and covenant will lie.

*(Inspection clause.)* The plaintiff on his part covenants to construct and make a certain portion of the Chesapeake and Delaware Canal, and the defendants on their part covenant to pay him the stipulated prices. This is a work of great magnitude, requiring great labor, the employment of vast numbers of men, and great capital. It is an undertaking which no contractor in this country, with our limited fortunes, could hope to accomplish, relying on his own funds. Hence the necessity of the stipulation in the contract for speedy and frequent payments during the progress of the work, and hence the necessity of fixing upon some mode by which the amount of these stipulated payments should be ascertained. The very existence of the plff. as a contractor depended on the fulfilment of this part of the contract. Delay was ruin: it would necessarily in its consequences work a forfeiture of the contract. It may not be needless to remark that the plaintiff did not hold himself out to the defendants as a man capable of accomplishing the task which he had undertaken upon his own capital. The contract shows that they were aware of his inability in this respect, and they were aware of the necessity of furnishing him with money as the work proceeded. It is readily seen from this, how important it was to the plaintiff that the defendants should agree with him to select a person who should examine and inspect the work during its progress, and estimate the number of cubic yards of excavation and embankment, and certify such estimate, upon which only could the plff. demand his semi-monthly payments for work done. It is true that the two clauses connected with this subject, and which seem naturally to belong to and form a part of each other are disjoined, having interposed between them the proviso in relation to the ten per cent. and the clause relating to the revision of prices. Connect these two clauses relating to the *same matter of contract*, and they read thus: "And the party of the second part (the defts.) agrees to pay the party of the first part, his executors, admrs. and assigns, for completely performing this contract, the sums which are stated as the cost thereof in the said estimate of the party of the first part, under the conditions and provisions expressed in the annexed schedule, *payments to be made every fortnight* according to the said schedule for the work which the engineer of the company shall certify to have been actually done by the party of the first part." "And the said works, during their progress, shall be carefully examined and inspected; and to prevent misunderstanding and disputes it is hereby agreed that Benjamin Wright, Esquire, or some other *competent engineer*, to be selected by the party of the second part, shall be the inspector of the said works, and shall estimate the number of cubic yards of excavation, and also of embank-

ment, and his estimate thereof, when certified to the party of the second part, shall be final and conclusive between the parties."

It was said in the argument by the counsel for the defendants, that this latter clause was introduced into the contract for the peculiar benefit of the canal company; but we think that no sufficient reason was assigned for arriving at this result. The canal company, being a corporation, cannot act of itself, but must act through its agents. The plaintiff having undertaken to execute a work for them upon their own lands, any agent whom they might appoint for that purpose, had a right to go upon the lands to inspect the work, estimate the number of cubic yards of excavation and embankment, and certify such estimate to his employer. No agreement of the parties was necessary to legalize such acts or to give any such power. It existed independently of any contract. So far at least no contract was necessary; so far it was not beneficial to the company. It is true the assent of Randel was necessary to make the certificate obligatory and conclusive upon him. But if this had been an *express* covenant on the part of the defendants, drawn in as strong language as could have been used to make it their covenant only, by which they engaged to appoint an inspector who should examine and inspect the works, should estimate the number of cubic yards of excavation and embankment; should certify that estimate, and that the certificate should be conclusive on the parties, by sealing the instrument he would have given his assent as strongly as if he had in express terms agreed to it. We have shown how infinitely important it was to the plaintiff that his work should be inspected in its progress, and its amount estimated and certified. We have already seen by the first clause of the contract, just quoted, that the company, in *express terms*, covenant to pay *every* fortnight for work which the engineer of the company shall certify to have been actually done. We do not lay much stress on the words "which the engineer of the company *shall* certify;" but we do attach much importance to the positive and sole covenant of the company that they will pay *every* fortnight for work which *their* engineer shall certify to be done. If there was nothing else in this contract, an ordinary man in forming his opinion of this clause, and not choosing to exercise his subtlety and ingenuity, would not hesitate to say that as the company had engaged to pay every fortnight for work actually done, and as the delay of payment would not be honest, would be contrary to good faith, and might be ruinous in its consequences to the other party, they at the same time meant to engage that their own engineer should perform this service. For we deny that the engineer, or any other servant of the company, in the outset, and before he had taken upon himself this especial duty of inspecting, estimating and certifying, would be liable to the plff. for not performing this duty. At the same time we do not wish to be understood as denying the position, that where one gratuitously undertakes a trust, he is responsible for the faithful execution of it. Besides, it does not appear on this record that Wright, or any other person, ever assumed this trust; of course no one could be responsible. Here is a wrong without a remedy, unless the company is responsible. But Benjamin Wright, or some other competent engineer, to be selected by the company, is to

be the inspector. One may be a very competent engineer, and yet not be very competent to respond in damages to a party aggrieved.

The next clause commences with a positive and express engagement that the works shall, during their progress, be *carefully* examined and inspected. It has been admitted in the argument that the company were bound to select an inspector. Who makes the undertaking here that the works, during their progress, shall be carefully examined and inspected? Not Randel, for the other side has the selection, and they may not choose to select. So far, these covenants are all on the part of the company. Then come the words "and to prevent misunderstanding and disputes, it is hereby agreed that Benjamin Wright, or some other competent engineer to be selected by the party of the second part, shall be the inspector of the said works, and shall estimate the number of cubic yards of excavation and of embankment, and his estimate thereof, when certified to the party of the second part, shall be final and conclusive between the parties." It was admitted in the argument at the bar, that by virtue of this clause the company did covenant to select an inspector. It is obvious, however, that the words "and to prevent all misunderstanding and disputes *it is agreed,*" which it is contended in relation to other matters in the clause, constitute a mutual and reciprocal agreement between the parties in relation to the same thing, affording no right of action to either against the other, under any circumstances, equally apply to the selection of an inspector as to the other matters in the clause; and if it can be fairly collected from the words used, that it was the intention of the company to covenant for the selection of an inspector, it may be as fairly collected that they intended to bind themselves for his performance of his duty. Suppose the words to be the words of *both* parties, still they may be taken distributively, and used as the words of each as far as the sense of the parties and the true meaning of the contract shows that each meant to bind himself to the other, either to abide its terms or to perform its stipulations. For what purpose did the company bind themselves to appoint an inspector? They had the power to do so independently of the contract; why covenant to do it? Does this not show that it was intended for the benefit of Randel? Why else should he insist upon it as a matter of contract? It was all-important to him. His existence as a contractor depended on the inspector's examining the works, estimating the number of cubic yards and certifying the amount; for without his certificate he could not demand a cent for work done, and upon frequent and punctual payments depended the execution of his work, and his continuance as a contractor. If the words in this clause are to be considered as the words of both parties, we think we have a right to distribute them to each as the nature of the undertaking, and the intention of the parties show that each meant to bind himself to the other. The intention of the parties fairly collected from this contract seems to us to be this: the canal company, on their part, agreed with Randel that they would appoint an inspector, that he should examine the works, that he should, at least once a fortnight, estimate the number of cubic yards of work, and that he should certify the amount; and Randel, on his part, agreed that the certificates of this agent of the company should

be conclusive evidence against him. To the canal company this was a most favorable agreement. They had the selection of the person; and the only restriction upon them, in this respect, was that he should be a *competent* engineer. He was the creature of their will, removable at pleasure, and dependent upon them for his compensation. Their undertaking was not much, the risk was nothing; they only engaged that this agent of their own creation should perform the duty assigned him by this agreement. To Randel this was of essential importance. It is true when this agent once undertook the trust confided to him, when he assumed and attempted to perform the duty of inspecting, estimating and certifying, he was responsible to the plaintiff for the faithful and honest execution of the task. The certificate when given, however false, dishonest or malicious, the plaintiff had agreed should be conclusive evidence against him, and, perhaps, his only remedy for this wrong would be a suit against the inspector. Still if the inspector would not or did not perform this duty in some way, the company were liable to the plaintiff on their covenant.

*(Prevention clause.)* The next clause to be considered is in the following words: "And it is further agreed as aforesaid, that in case the party of the first part shall, from the default of the party of the second part, in any particular be prevented from pursuing the due and best mode of executing this contract, or from entering upon or flooding lands for that purpose, the pecuniary damage sustained by him in consequence thereof, shall be certified by the engineer of the party of the second part for the time being, and on his certificate, which shall be final and conclusive between the parties, the party of the second part shall make to the party of the first part such reasonable compensation and allowance as by the said certificate may be ascertained and fixed."

It was remarked upon with much earnestness by the counsel for the defendants, that the words, "and it is further agreed as *aforesaid*," refer to the next immediately preceding clause in the contract which commences "and it is further agreed *between the parties;*" and they contend that this clause should be construed in the same manner as if the words, "between the parties," were added to the word "aforesaid." Granted; and what is gained by it? Every covenant is an agreement between the parties to the instrument, for there can be no covenant or agreement except between two or more persons; one undertaking that a thing shall or shall not be done, and the other assenting that it shall or shall not be done.

Most of the remarks which we made on the clauses already considered are equally applicable to the one now under consideration. The present is more strongly marked. It is so clearly a covenant that we cannot see how any one can doubt it. The persons who framed this clause, who assented to it, and who affixed to it the seal of the corporation, must have meant something by it, and if they were reasonable men they must have intended that that something was a reasonable thing. What is it as their counsel now contend? It is that if John Randel, from the default of the canal company, shall be prevented from pursuing the due and best mode of executing his contract, or from entering upon or flooding lands for that purpose,

*the pecuniary damage sustained by him* in consequence thereof (assuming damage to be sustained by their default) they will make reasonable compensation and allowance for, *if* their engineer for the time being will certify. This is the construction given to this contract by the defts. Is it a reasonable construction? Can such have been the intention of the parties? Can such intention be collected from the language used? If from the default of the company the plff. receives injury, the pecuniary damage sustained by him will be paid by them, *if their* engineer will certify! Now what is the real language of the parties? That in case the plff. shall from the default of the defts. in any particular be prevented from pursuing the due and best mode of executing the contract, or from entering upon or flooding lands for that purpose, the pecuniary damage sustained by him in consequence thereof *shall* be certified by their engineer for the time being, and on his certificate, which shall be final and conclusive between the parties, the defts. shall make to the plff. such reasonable compensation and allowance as by the said certificate may be *ascertained* and *fixed.* No language can be stronger or more clearly show the intention of the parties than this. The company undertook for the engineer, that he should ascertain and fix, and certify, the pecuniary damage sustained by the plaintiff in consequence of their default, and when thus ascertained they would pay it. Any other construction renders the clause nugatory. It assumes that pecuniary damage has been sustained by their default, but it is not to be paid unless upon the certificate of their engineer, and hence the necessity of engaging that the engineer should ascertain and certify the damage. Without this the plff. would confessedly be wronged without a remedy. This ought not to be allowed unless the clear and manifest intention of the parties, to be collected from the language of the contract, forces this construction. The language used does not; on the contrary, it forbids it. Common sense forbids it. Any other construction leaves the plff. aggrieved without remedy; for we must repeat that *he* had no redress against the engineer for refusing to take upon himself the office of ascertaining and certifying the damages. Besides, what persons, when entering into an instrument of writing, ever think of looking to any other than the parties to it for redress in case of its violation.

It is scarcely necessary to show the high importance of this provision to the plff.; one without which he could not get along with his undertaking; one without which he was remediless, however great and serious his loss; one without which his entire operations may have been suspended; with five hundred or a thousand laborers, and as many carts and horses in his employment, all thrown idle on his hands; and yet he is to knock in vain at the doors of this corporation for compensation, unless he comes with the certificate of their engineer in his pocket, when no one was under any obligation to him to make this certificate. We forbear making any further remarks on this clause, because we *did decide* at the last term that this was the covenant of the defts. and that they were answerable to the plff. for a violation of it, if such violation has occurred; and we think that the counsel ought not again to have brought it in question. (*Ante* 153.)

The next clause is that in which it is agreed that the time within

which it shall be incumbent on the plff. fully to perform and complete the said contract shall not be taken to be less than four years from and after the first day of May next ensuing the date of the articles of agreement. This clause was fully considered at the last term, and the court, in giving judgment upon it, assigned their reasons at some length for the determination to which they had come. It will not be necessary, therefore, now to repeat those reasons. We will merely state the conclusion to which we came: that this was a covenant on the part of the canal company to allow the plff. four years from the first of May fully to complete his contract; and that consequently any positive act of disturbance (we do not mean acts of non-feazance, but some effective application of power) by which the plff. might unlawfully or unjustly be driven off by the defts. or obstructed in carrying on the work for any length of time, would be taking the time to be less than four years. They covenant to allow him four years from the first of May to complete the work; and he, on his part, impliedly covenants to finish the work in that time. If a suit were brought against him on this implied covenant for not finishing the work within the stipulated time, it would be a good defence to the action if he could show that he was prevented from doing it by the acts of the company; and if they unlawfully interrupt him, so that he cannot and does not complete the work within the time, they do not allow him the time agreed on, but take it to be less than four years. The other clause, which provides against the plff's. being prevented from pursuing the best mode of executing his contract by the default of the company, looks to rather a different state of things. It is more general and comprehensive in its terms, and seems to have intended to provide in a more especial manner against the acts of third persons, although the words "if he shall be prevented in any particular" might seem to comprehend most of the cases that might arise. The acts of third persons to which we allude are such as these: where persons through whose lands the canal might pass, and from whom no title or license had been obtained by the company, might obstruct and resist the plff. from entering upon their lands to execute the work; this would be such a prevention through the default of the company as would make them liable on this covenant. So any positive act of obstruction of their own would be a breach of it, for it would be by their default.

It has been said that these are not covenants upon which an action would lie, but mere submissions to arbitration. We think otherwise; for it has scarcely a feature of a submission to arbitration. Without noticing the strangeness of the notion that one party should agree to submit *all* his rights to the determination of a person to be selected at pleasure by the adverse party, it is sufficient to say that at the time this contract was entered into, no differences or disputes *had* or *could have* arisen; the most that could be contended for by the defts. is, that it is a prospective agreement to submit future differences as they might arise. And we understand the law to be settled, that a prospective agreement to refer all matters in dispute which may *hereafter* arise cannot be shown as a defence to an action for the recovery of such disputed matter; for the superior courts will not suffer themselves to be ousted of their jurisdiction by the private agreement of the parties. 1 *Wils.* 129; 8 *T. Rep.* 139; 2 *Ves. Jr.*

129; *Mitchel vs. Harris; 2 Bos. & Pul.* 131; *2 Atk.* 569; *2 Bro. ch. cases* 336; 1 *Saund. Pl. & Ev.* 177, 179. This is not the case of a reference actually depending, or of a reference made and determined. Even in the case of a clear submission of *existing disputes* either party has a right to revoke the submission. It is true he is answerable on his agreement to submit; but after the revocation this would be no defence in an action to recover the disputed matter. His only liability is on his agreement to abide by the reference; if he violates that agreement it is not a defence to an action for the thing disputed. We agree so far that if the engineer or inspector had given his certificate, that that certificate, by the agreement of the parties, was conclusive evidence on both; and that in regard to work done, or for other matters within his competency to certify it was the only species of proof substituted by the agreement of the parties for all other; but if he neglected or refused to certify, then the company became responsible to the plaintiff for all the damage which he had sustained by this neglect or refusal, or for want of this certificate.

*( The waiver.)* To the plaintiff's replication to the defendants' third plea they have put in a general demurrer; and the question submitted to the court is whether the facts stated in this replication are sufficient in law. It is not necessary now to state these facts, because they are sufficiently understood. The plea to which this is an answer alledges that Benjamin Wright, on the 30th of July, 1825, and before and since was the engineer in chief for the time being of the defendants, and that on that day he was of opinion that the plaintiff did unreasonably neglect to prosecute his contract, and that afterwards, on the same day, he did in and by his certificate certify his said opinion to the defendants, and that on the 30th of September following the defendants did, thereupon, on the said certificate, determine the said contract to be abandoned by the plaintiff, of which said certificate and determination the plaintiff had notice on the first of October, by means whereof the defendants were entirely exonerated from every obligation imposed on them by the said articles of agreement, except to pay for work already done. The replication in answer to this confesses these facts, but attempts to avoid them by the matters which it discloses, and concludes by alledging a waiver of the certificate and a ratification of the contract. The question then is, did the company waive the certificate and ratify and confirm the contract?

It was insisted at the bar, that as the power to declare the abandonment on the certificate of the engineer was founded on or derived from a deed, it could only be dispensed with or waived by matter of as high a nature as that which gave or secured the power, that is to say, by an instrument under seal, or by some act of the defts. legally inconsistent with the power secured. With regard to the first proposition, we think it untenable on principle. It is true that when a duty accrues by the deed, and is ascertained *at the time* of the making of the writing, as by covenant or bond to pay a sum of money, in that case the duty, which is certain, takes its essence and operation originally and *solely* by the writing, and therefore it must be avoided by matter of as high a nature. But where no certain duty accrues by the deed, but a *wrong* or *subsequent default*, together with the

deed, gives an action to recover damages for such wrong or default, such wrong or default may be discharged by parol, and accord with satisfaction would be a good plea. As if a tenant covenants to repair a house, and an action is brought against him for not repairing, the covenant does not give the plff. *at the time of making it* any cause of action; but the wrong or default in not repairing the house, together with the deed, gives an action to recover damages for want of reparation. The action is not merely founded on the deed, but on the deed and the subsequent wrong, which wrong is the cause of action, and for which damages shall be recovered; and in every action where compensation is demanded by way of damages, such right of action may be discharged by parol. So here the power claimed is not founded on or derived solely from the deed. It arises from matter subsequent to the deed, the neglect of the plff. to prosecute the work, and the consequent certificate of the engineer. The deed originally and of itself does not give the power to declare the abandonment; but the certificate, coupled with the deed, does. This certificate then may be waived, or dispensed with by parol, and there is no unbending rule of law to forbid it. The first proposition having been shown to be incorrect, we think the second is equally fallacious and unwarranted by authority. According to the counsel's idea of legal inconsistency, what act of the company would be legally inconsistent with the power to declare the abandonment after certificate, short of lying by and witnessing the entire completion of the work? That surely would be a waiver of the certificate, because the power derived from it never after that could be exercised. Whether waiver be the most appropriate term that can be used for the occasion is a matter of but little importance, so that we understand the notion intended to be conveyed by it. It matters not whether the thing in controversy be said to be yielded, abandoned, resigned, foregone, waived, or lost; we are equally understood when using either of the terms. The books use the word waiver when speaking of subjects like the present. The principle runs through the law, and is applicable to a variety of cases in addition to those mentioned at the bar. It may not be necessary to mention them here, because it would lead to much prolixity. It is manifest that whenever a discretionary power is given, as in this case, from the nature of the thing itself, it may be waived, or not exercised at all, for otherwise it would not be a discretionary power, to be exercised or not, as the party might think best, but an obligation which he could not dispense with. This certificate, then, or the power to take advantage of it, might be waived. What acts will amount to a waiver? Whenever one person has an election to do or not to do, an act in which the rights and interests of another are concerned, he is bound to make his election so as to be least prejudicial to the rights and interests of that other; and if by his unreasonable delay the rights of that other become implicated and he receives injury, who ought, in justice, in good faith, and in law, to bear the burthen or sustain the loss—the party injured, or he who has caused the injury by his own negligence? Common sense and the law, which is founded on the highest good sense, say the defaulter; that he who is innocent and in no fault shall not be prejudiced by the negligence of the other; that whenever the right of election is

attempted to be so negligently exercised that a manifest and irreparable injury must follow, the law interposes and says you have waived your right to elect; you cannot now exercise it without manifest injustice; you are therefore concluded, and shall not exercise it at all. What is the state of the case here? The facts upon which we are called on to give our opinion on this demurer are to be found in the replication to the defts. third plea. On the 30th of July the engineer certified his opinion to be, that the plff. had unreasonably neglected to prosecute his contract; that on the 30th of September following the defts. declared the contract to be abandoned, and that on the first of October they gave notice to the plff. of this declaration of abandonment. The other facts stated in the replication, material to be here considered, are these: that during all the time between the 30th of July and the 1st of October the plff. was diligently prosecuting his contract, and did with great expense and labor prosecute the said contract, under the inspection, by and with the permission, and by and under the direction of the said company; and that during that period the defts. paid for such work divers sums of money; that the work thus performed was less profitable and more disadvantageous than the work remaining to be done; and that the work remaining to be done after the 1st of October was that portion of the whole work to be performed which was most profitable and advantageous to him. These facts are admitted to be true by the demurer. This is the naked conduct of the defts. not explained or excused by their pleading. With the certificate of the engineer in their possession from the 30th of July to the 30th of September, not a word of it is whispered to the plff. while he is laboring on the canal during these two months at reduced prices, prosecuting his contract at great expense, and, as he alledges in his replication, under the immediate inspection of the company, they never inform him of the certificate till the first of October, when notice is given him that they have declared his contract to be abandoned. What evidence the defts. may have it in their power to produce is not for us to inquire on this demurer. We can only look to the record and gather the facts from it. It may be observed also, that by the agreement of the parties, ten per cent. was reserved for contingencies, no part of which was to be paid to the plaintiff till the entire completion of the work; and in case of the forfeiture of the contract he was never to get any part of it; so that upon all the work performed during those two months ten per cent. is gained by the defts. and is consequently lost by the plff.; or at least his claim to it is forfeited.

We have said that the defts. might waive the benefit of this certificate. What acts of theirs will amount to a waiver? If they had kept the certificate in their possession till within a short time of the entire completion of the work, no one would say that they had not waived it: the injustice in that case would be too glaring not to strike every one. We are not to measure the extent of the injury, nor to enquire whether it be great or small. And what is the injustice on the other side? If the plff. still continued unreasonably to neglect his work, and so often as he did neglect the work, the engineer was at hand to certify the fact. But it may be that on the 30th July the plff. did unreasonably neglect to prosecute his contract; and yet on

the 30th of September might have been prosecuting it with vigour; so that the engineer would not then have given his certificate.

The defendants after getting the certificate were entitled to a reasonable time to determine whether they would take advantage of it or not. Yet we think that a delay of two months, when that delay is not explained or excused, was not a reasonable time. We are therefore of opinion that the certificate and the consequent power of declaring the abandonment, have been waived."

*Harrington, J.*, applied the principles of this opinion to the pleadings in the case, and gave judgment for the plaintiff overruling the demurrers to the first, second, third, fourth, fifth and sixth breaches of the second count; and the fourth, eighth and fourteenth breaches of the third count:

And judgment for the demurrants, the defendants, on the first, second, third, fifth, sixth, ninth, tenth, eleventh, twelfth and thirteenth breaches of the third count.

## MONDAY, *December 9th,* 1833.

The demurrers having been disposed of, the cause proceeded before a jury; who were empánneled and sworn to try the issues joined, and to assess the damages on the seventh count, on which judgment was given at the last term, and an order made in the nature of a writ of inquiry for a jury attending at this court, to inquire and return the damages, costs, &c.

The jury were John Clark, James Roberts, Baymon Deakyne, Thomas Morrison, George B. Meteer, Israel Garretson, Thomas Robinson, Jacob Whiteman, John W. Evans, Arthur J. Whiteley, James C. Mansfield and George Foote.

The issues in fact, which were numerous, may be ascertained from the following synopsis; referring to the pleadings as stated more at length, ante, &c.

First count. On the lock contract. Plea, non est factum; issue.

Second count. General plea to the count, non est factum; issue.
First breach. On the inspection covenant.
Plea No. 4, (same as 3.) The abandonment. Rep. Waiver. Issue.
Second breach. On the covenant for estimating the work done.
Plea 4. The abandonment. Rep. Waiver. Issue.
Third Breach. On the prevention covenant.
Plea 4. The abandonment. Rep. Waiver. Issue.
Fourth and fifth breaches. On the same covenant; varied. Same plea, replication and issue.
Sixth breach. On the time covenant. Same issue.

Third Count. General plea to the count, non est factum. Issue.
Fourth breach. On the prevention covenant.
Plea 4. The abandonment. Rep. Waiver. Issue.
Fifth breach. Non-payment of work certified.
Plea 7. Payment. Rep. and Issue.
Seventh breach. Non-payment of work certified.

Plea 13. The revision of prices and payment according to the revised schedule. Rep. That the revision was obtained by fraud and covin. Rejoinder and Issue.

Eighth breach. On the prevention covenant.

Plea 4. The abandonment. Rep. The waiver. Issue.

Fourteenth breach. On the time covenant. Same issue.

Fourth count. Single breach on the inspection clause.

Plea 16. The appointment of an inspector. General traverse and issue.

Plea 20. Ditto with averment that he did inspect, &c. General traverse and issue.

Plea 21. The abandonment. General traverse and issue.

"  22. The abandonment. Rep. The fraud and covin. Rejoinder and issue.

Fifth count. Single breach, that no estimate of the work was made, &c.

Plea 17 like plea No. 16 to fourth count and same issue.

"  20, 21, 22. Same as to the last count and same issues.

Sixth Count. On the inspection clause.

Plea 18. Non est factum. Issue.

"  19. Same as No. 16 to fourth count and same issue.

"  20, 21, 22, same ut ante.

To prove the execution of the contract, plff. gave in evidence the deposition of John Fritz, one of the subscribing witnesses. He also offered in evidence the deposition of Paul Beck, jr., who was not a subscribing witness, but at the time of its execution, a member and director of the canal company. The evidence was objected to.

*Mr. Frame.* The testimony of Paul Beck is irregular, for he is examined to the execution of the contract which ought to be proved by the subscribing witnesses, and also to the effect or contents of the contract which must be proved by the contract itself. The execution of the commission is irregular. No commissioner named on our part. The interrogatories are leading and have been excepted to for that reason. Third interrogatory. Did or did not the company say so and so? It suggests the answer; inquires not for facts but conversations. Did you not understand the director by such language to mean so and so? The inquiry should be for the words and the jury are to construe them. The interrogatories not only leading and inquire for conclusions, but they go into matters not relative to the cause, the private feelings of Wright towards Randel. This is purely a civil suit; an action of covenant; it is not a case for vindictive or exemplary damages; nor is it a case with which the ill-feelings or malice of the parties, and especially of Benjamin Wright, has any thing to do. Question. Whether witness ever heard Benjamin Wright or the directors say the prices were revised for a *particular* purpose? Now, what purpose is this for but to insinuate a fraudulent motive, either in the company or in Wright, and to aggravate the damages by showing malice. It can possibly have no reference to any issue but that on the seventh breach, third count, which is whether the certificate of revision was obtained from Wright by any fraud practiced *on him by the company.* Now this inquiry does

not tend to prove that issue, but that Wright was connected with the company in defrauding Randel; a particeps fraudis.

*J. M. Clayton.* The commission issued in this case on the 28th of May, 18— to Charles J. Ingersoll, Thomas Janvier and Thomas J. Wharton. The record shows that on the 24th of May the defendants named Thomas J. Wharton as their general commissioner in Philadelphia. Beck's evidence proves that he was a member and director of the company. He can prove the seal and the execution of the contract from his knowledge as a member of the board, and his testimony is the admission of a party. 1 *Stark. Ev.* 123. The interrogatories are not leading further than is necessary to direct the mind of the witness to the subject of inquiry, and this is proper. Then as to the relevancy of the testimony. The inquiry on the seventh count is what damage we have sustained by reason of their having taken the time, &c.; any act exhibiting a settled purpose on the part of the company to drive Randel off is important in ascertaining the damage. The revision of prices was the first great step tending to this object; and the object itself is essential to be disclosed. The issues on the fourth, fifth and sixth counts. Plea twenty-one alledges that Wright was of the *opinion* that Randel neglected, &c., and did certify that opinion. The replication flatly traverses the whole of the plea. The opinion is an essential part of it; and any thing that proves it was not bona fide his opinion proves the issue. On the replication of waiver the jury are, under the direction of the court, to try the question of unreasonable neglect. Is it not material in the proof of this issue to show that the company and their agents embarrassed the contractor in every way in their power, *with the view* of making him abandon the work? The revision according to the contract was to be made, if at all, for the purpose of conforming the prices to the labor; now, if this testimony shows that it was not made for this purpose, but to ruin Randel and drive him off, is it not relevant? But on general principles I contend that all the acts and declarations of this company and its agents, in reference to the subject matter of this suit, are evidence against them.

*Ingersoll.* This is an action of covenant broken; we are to prove the breach. If in doing so a malicious motive is developed, we can't help it; we are not to be prevented from proving a breach of contract because malice is mixed with it, nor from proving their conduct and acts because they are fraudulent. The opinion of Wright in giving the certificate of neglect is in issue; the bona fide opinion: malice disproves that opinion. As to the 7th count, the jury sets as an inquest of damages merely; the court act merely as moderators, as the sheriff in England in executing a writ of inquiry. I doubt, then, in relation to that part of the case, whether the defts. have the *right* to object to this testimony.

*Bayard,* in reply. These interrogatories shew an *intention* to lead the witness; to put in his mouth the very words he is desired to depose to. They further call for the *understanding* of the witness, his conclusions and inferences. As to the certificate, it is admitted that Wright acted as an umpire or arbitrator in giving it; and the courts of law cannot investigate the conduct of an arbitrator in reference to

36

an award of matters in pais. The opinion of the engineer is of no importance, for it is not traversable; the certifying the opinion bound the parties, whether it was so or not. The certificate of neglect is the proof of the fact agreed upon by the parties, and neither it nor the opinion is enquirable into. We do not contend that an act constituting a breach cannot be proved because it is malicious, but only that declarations, or even acts not amounting to a breach, cannot be given in evidence for the purpose of inferring a malicious intention to break the covenant.

On examining the interrogatories, the *court* were of opinion that many of them were leading, and suppressed the deposition on this ground, without deciding, at present, the other questions raised in arguing the objections. Written exceptions had been filed to these interrogatories, and the plff. had full notice of the objection.

The plff. now offered the contract in evidence, as sufficiently proved by Fritz's deposition. It was objected to, not on this ground, but for a variance from the contract declared on.

*Frame.* The contract declared on purports to be a contract between two parties: John Randel of the first part, and the Chesapeake and Delaware Canal Company of the second part, entered into by both, executed by both, that is to say, under the hand and seal of R. and under the corporate seal of the company and hand of its president. The contract offered in evidence is not signed or sealed by Randel; it is an unexecuted, incomplete contract. The conclusion of the paper itself shows that it is incomplete. "In witness whereof the parties have," &c.—showing that the contract was designed to be executed by both parties.

*J. M. Clayton.* We have not professed to set out the original contract; that is in the defts. possession, and we could not get hold of it. But we had a copy, and more than a copy, a *counterpart*, executed by the canal company, under its corporate seal and the hand of its president. And we have not even assumed to set this out by its tenor, but only in substance. We have declared on certain articles of agreement concluded and agreed upon by and between John Randel, Jr. of the first part and the Chesapeake and Delaware Canal Company of the second part, "the counterpart of which said articles of agreement, sealed with the corporate seal of the said the Chesapeake and Delaware Canal Company, and signed by the president thereof, the said John Randel, Jr. now brings into court, the date whereof is the same day and year aforesaid."

The court overruled the objection and admitted the contract in evidence; whereupon an exception was prayed and granted.

Plff.'s counsel offered in evidence an answer in chancery of the canal company to the bill of Clement, Blackstock & Co. They produced the bill to lay a foundation for the admission of the answer Objected to.

*Bayard.* This answer is in another case and between other parties. It is not on oath, and does not fall within the rule of evidence which applies only to a statement of a party on oath. The answer of a corporation is like a bill—the mere statement of counsel 2 *Stark* 29; *Roscoe* 25; 1 *Mad. ch.* 212.

*Clayton.* This is the first time I have heard that an answer of a corporation was not a statement of the truth, but the suggestion of counsel. It avails them as the answer of an individual *on oath;* is sufficient to dissolve an injunction when it denies the equity of the bill. The answer of a peer is not on oath, but on honor; yet it is evidence against him as if on oath. Its admissibility as evidence does not depend on its being sworn to, but as the *admission* of the party. A *bill* is evidence when the party is connected with it by proof. It is treated as the suggestion of counsel, unless the complainant's privity is shown, and then it is evidence against him as his admission. So an answer is evidence as the admission of the party, whether sworn to or not. 4 *Wash. Rep.* 601; 2 *Bay. R.* 10; *Angel & Ames* 396; 1 *Gilb.* 4; *Peake* 53; 1 *Stark* 285, 8; 1 *Phil. Ev.* 283; *Cowp.* 591; 2 *Com. Dig.* 307; 1 *Vernon* 117.

"A bill filed against a corporation to discover writings. The defts. answer under their common seal, and so, not being sworn, will answer nothing in their own prejudice. Ordered that the clerk of the company and such principal members as the plff. shall think fit answer on oath, and that a master settle the oath." This explains the meaning of *Mad.* 213.

*Bayard.* Notwithstanding the authority of *Gilbert*, it is now the established doctrine that the bill is the mere allegation of counsel, and not evidence. The answer of a corporation stands on the same ground. The members or officers cannot be supposed to have individual knowledge of all the matters to which their answer may necessarily extend; it does not therefore imply the certainty of an individual answer. It is this knowledge of the party, confirmed his oath, which makes such an answer evidence. At all events, an express privity of the company ought to be shown; that is, that they examined and adopted the answer.

*Jones* objects to the evidence on general principles; it is res inter alias acta and irrelevant to this cause. It is remarkable that an instance of the admission of such an answer cannot be shown. The case in *Cowper* depends on the relation of mother and child.

*The Court.* The objection that it is res inter alias, &c. is not available; the authorities on that subject are conclusive, for that applies to all the cases. An answer is evidence, not because it is on oath, though this may give it greater weight, but as an admission of the party. The answer of a peer is evidence against him, though not on oath. The honor of a peer and the seal of a corporation are substitutes for the oath. Their answer thus filed gives them all the benefits of an answer on oath, and should subject them to its liabilities. It is true that where the answer is under seal it may not be sufficient evidence in case of a bill for a discovery, for there is no obligation on them to make the discovery, and therefore a clerk or individual member is allowed to be sworn. This appears to be the meaning of Maddock; if it goes further we cannot give that authority our sanction. Whether a *bill* is evidence is still a mooted question. Gilbert and Starkie are for it, and Peake and Phillips are against it. The opinion of Phillips is founded on a case in 7 Term Reports, 3 which is little more than a dictum of Lord Kenyon.

The answer was admitted and read.

The plff.'s counsel called on defts. to produce certain papers which they had been notified to produce. The defts. counsel offered the papers as *evidence*, but not merely for the inspection of the plff.

The court said that if the plff. *inspected* the papers called for it would make them evidence; but not if he merely called for them without using or inspecting them. 1 *Stark. Ev.* 360; *Roscoe* 6.

Certificates for work done prior to 30th July, 1825, produced and read:

| No. | Date | | Amount | Signed |
|---|---|---|---|---|
| 1, | 28th May, | 1824, for | $17,727 80 | signed by B. Wright. |
| 2, | 23d June, | " | 16,582 99 | ditto. |
| 3, | 3d July | " | 6,365 73 | ditto. |
| 4, | 17th July, | " | 3,496 59 | signed by Henry Wright. |
| 5, | 31st July, | " | 6,303 22 | B. Wright. |
| 6, | 16th Aug. | " | 9,924 51 | ditto. |
| 7, | 28th Aug. | " | 10,782 81 | ditto. |
| 8, | 13th Sept. | " | 8,383 65½ | ditto. |
| 9, | 9th Oct. | " | 7,175 15 | H. Wright. |
| 10, | 23d Oct. | " | 6,397 28¾ | ditto. |
| 11, | 6th Nov. | " | 3,127 81 | ditto. |
| 12, | 20th Nov. | " | 2,636 57 | ditto. |
| 13, | 4th Dec. | " | 2,543 80 | ditto. |
| 14, | 18th Dec. | " | 3,123 32 | B. Wright. |
| 15, | 1st Jan. | 1825, | 3,226 16¾ | H. Wright. |
| 16, | 15th Jan. | " | 3,773 33 | ditto. |
| 17, | 29th Jan. | " | 3,882 36½ | ditto. |
| 18, | 12th Feb. | " | 2,948 51½ | ditto. |
| | | | Force stated equivalent to 450 men. | |
| 19, | 26th Feb. | " | 3,318 91½ | ditto. |
| | | | 415 men, 91 teams: equal to 688 men. | |
| 20, | 12th Mar. | " | 4,065 55 | H. Wright. |
| | | | | 90 teams |
| 21, | lost, | | 5,643 73 | |
| 22, | 8th April, | " | 4,781 75½ | B. Wright. |
| 23, | 23d April, | " | 6,837 88 | H. Wright. |
| | | | Force, 581 men, 141 teams, &c. | |
| 24, | 7th May, | " | 5,697 04½ | H. Wright. |
| | | | 416 men, 139 teams, equal to 851 men. | |
| 25, | 21st May, | " | 7,821 38½ | H. Wright. |
| | | | | 437 men, 174 teams. |
| 26, | 4th June, | " | 8,598 02½ | H. Wright. |
| | | | 159 teams, equal to 900 men. | |
| 27, | 18th June, | " | 5,852 00 | H. Wright. |
| 28, | 2d July, | " | 5,518 04 | D. Livermore. |
| | | | | 342 men, 92 teams. |
| 29, | 16th July, | " | 4,549 60½ | H. Wright. |
| | | | 355 men, 117 teams, equals 600 men. | |
| 30, | 30th July, | " | 959 52½ | H. Wright. |
| 31, | 13th Aug. | " | 7,818 22 | D. Livermore. |
| | | | | 385 men, 110 teams. |
| 32, | 27th Aug. | " | 7,923 70 | D. Livermore. |
| | | | | 403 men, 109 teams. |
| 33, | 19th Sept. | " | 2,259 02 | B. Wright. |

No. 34, 24th Sept. 1825,     5,295 68          H. Wright.

338 men, 71 teams, equal to 551 men.

Whole amount of work certified, $214,661 20½, to Sept. 24th, 1825.

To 30th July, 1825, $183,764 58 ⎰ Difference, $40,526 93
To 15th December,   224,291 51 ⎱

The final certificate for work done was called for, produced and read. Final certificate, dated 15th December, 1825, $224,291 51. B. Wright.

The plff. offered in evidence the lock contract declared on in the first count of the narr. The contract was executed by R. Wharton and R. M. Lewis, a committee on behalf of the company; but not under the seal of the company. He also offered proof of the execution by the committee, of their authority, and of its acceptance and adoption by the company. He called on defts. to produce the authority of the committee under the notice to produce papers. The authority being produced, appeared to be a resolution of the board, but not under seal.

The whole evidence was objected to and rejected; the instrument offered not being under seal.

Deposition of William S. Randel offered and objected to. As a foundation for the objection, defts. offered in evidence the depositions of Absolem Townsend, S. Dewit Bloodgood, Stephen Fondre and Wm. M. Cushman, taken upon a commission which was issued for the purpose of impeaching the deposition of Wm. S. Randel. Defts. depositions read by consent, saving all just exceptions.

The commission on which Randel's deposition was taken was issued to Absolem Townsend and S. Dewit Bloodgood of the state of New York, or either of them, commissioners for plff. and Ebenezer Baldwin, commissioner on the part of defts. The answers to all the original and most of the cross interrogatories were authenticated by the signature of all three commissioners; the residue, and most of the documents referred to were signed only by Townsend and Bloodgood, some by Townsend, Bloodgood, and Isaac Hamilton, who had been substituted for Baldwin by agreement. The commissioners employed a clerk. It appeared from the defts. depositions that the commissioners commenced taking Randel's deposition by propounding the interrogatories to him, and their clerk wrote down his answers. He was sick of a pulmonary consumption, and it soon became apparent that he could not bear the exertion of speaking so much. Baldwin, the defts.' commissioner, said that if this mode was continued Randel would sink under it, and proposed to permit him to write down his answers at his leisure as his strength would permit. Townsend and Bloodgood insisted on going on as they had commenced whatever might be the consequences; but Baldwin apprehending they would be fatal to the deponent, refused to go on. Plff.'s commissioners then assented to the plan proposed by Baldwin. After the answers were written they were read over to Randel, who was too weak to read them aloud, and he corrected them. In the course of the examination Baldwin became sick, was seized with mania a potu, and his friends carried him off. Hamilton was substituted in his place.

*Bayard.* The commission is personal to the commissioners, and

does not authorize them to employ a clerk to write down the answers; it is a power that cannot be delegated. Much depends on the manner of putting down the witnesses reply; and we can't guard this, at best, defective mode of taking evidence too strictly.

Second. The witness was permitted to give depositions prepared and written by himself. This is entirely irregular and inadmissible especially in such a case as this. The witness here is the plaintiff's own brother; had been his sub-engineer; may have been at the time in the habit of constant intercourse with him. It is no answer to us that the commissioner named by us proposed this plan; he is not our agent but the agent of the court. Any irregularity in him is as fatal to the execution of the commission as the irregularities of the other commissioners. He is like an arbitrator named by the party, but appointed by the court. The commissioner cannot receive a deposition prepared by the witness. Depositions will be suppressed if prepared by plaintiff's attorney, and not taken down by the commissioner from the witness. The execution of this commission obviously took many days, and yet it does not appear that there was any adjournment. If the commissioners separate without an adjournment the commission is lost. This commission is a joint one to Townsend and Bloodgood, or either of them, for plaintiff, and Baldwin for defendants. Such a commission must be executed by all the commissioners or it will be suppressed. This was never returned by Baldwin; and only in part executed by him. *Peters' C. C. Rep.* 88; 3 *Wash. C. C. Rep.* 109; *Beame's orders in ch'y.* 187; 1 *Newland's Ch. Pr.* 275; *Ambler*, 252; 15 *Vesey* 380; *Gilbert's Forum* 127, 9; *Newlin Ch. Prac.* 265; 3 *Wash. Rep.* 31; 1 *do.* 43, 144; 4 *do.* 187.

*Clayton.* William S. Randel's deposition has been returned near three years; opened, published, and a copy actually taken by the defendants. During the life of the witness no objection was made to the execution of this commission, and no exceptions have been filed since. Now if we are to be bound here by the rules of chancery practice, let us have all of them. In that court no objection can be taken to depositions unless exceptions are filed to apprise the other side. And there is good reason for this rule. If, even after publication in this case, exceptions had been filed objecting to the execution of this commission, we might have taken out another and procured this important testimony. But here they lie by with copies of our depositions in their possession; make no objection to them until the principal witness is dead and the trial comes on, when they spring upon us the depositions of Cushman, a discarded clerk of Randel's, and others in order to destroy this testimony. Let us look a little at the execution of their own commission. It has been read reserving objections. The chief man employed in its execution is Henry D. Gilpin, the solicitor of the company, their agent and in their pay. This is fatal to their own commission and the foundation of their objections fails. 2 *Mad.* 413. I don't deny that a joint commission must be executed jointly. How is the case here? A commission to A and B for plaintiff, and to C for defendants. The three commissioners go on together and nearly complete the commission, when C gets drunk and goes off, and the defendants agree

to substitute another person, who finishes the taking the deposition. If plaintiffs's commissioners attend they may proceed ex parte if the defendants' commissioners wont come. 1 *Har. Chy.* 324.

The mode of taking the deposition was at the suggestion of the defendant's commissioner, and it was justified by the circumstances of the case. There can be no rule of evidence that will entirely prevent the taking of testimony, or require the violation of every principle of humanity, as would have been done by compelling the witness here to deliver his testimony orally. The rule is that where the witness prepares his answer it will be suppressed unless he die, or it becomes otherwise impossible to get his testimony. In such case the rule is dispensed with, and it would be equally dispensed with if this was the only mode of procuring the testimony originally. In 15 *Ves.* the deposition was prepared by the *agent* of the party, and suppressed on this ground chiefly. That and *Mad.* also were *before* publication. As to the deposition being taken by a clerk. So are all depositions taken in New York where they practice on the English rules. Defendants' commission impeaching this was executed by a clerk. To say that a clerk shall not be employed would be to prevent the execution of such commissions as this; for professional men would not do the labor; or if they would, the expense would prevent their being employed. The commissioners have certified the oath of the clerk; they certify also their own qualification, including the oath of the *substituted* commissioner. Though strict in relation to depositions, the courts have gone far to sustain them in case of the death of a witness. Where a witness died after his examination in-chief, and before cross examination, the court refused to suppress his deposition. 2 *Mad.* 413; 2 *Sch. & Lef.* 158.

*Rogers.* There was no rule in the Court of Common Pleas in relation to the manner of executing commissions to take depositions. This commission was issued out of that court from whence the cause has been transferred to this. If then, in the absence of any rule in that court, we are to refer ourselves to the English rules in chancery, we should take them all. Is this matter of objection according to these rules properly before this court? Should not the defendants have filed exceptions, or articles of impeachment? If they would impeach a witness they must file articles before publication. So if they object to the mode of executing the commission, they were bound to file exceptions to give us notice. Irregularity in the taking of depositions cannot be objected to at the trial. Even in the English courts the same strictness is not observed in relation to commissions executed *out of*.England. The rules yield to the necessity of the case. There is no certain rule how far evidence may be taken from notes. 13 *Ves.* 511; 2 *Atk.* 190; 1 *Eq. Ca. Ab.* 102; 2 *Coxe* 205; *Har. Ch'y.; Amb.* 252.

*Ingersoll.* The foundation of all their objections is the commission issued 21st July, 1831, to H. D. Gilpin and others. If this foundation fails the objections fail. It was executed by their attorney and agent, and is not admissible. It is not before the court. But what is the paper attacked? A deposition returned, published, copied three years ago. The deposition of a man in consumption who lived twelve months or more after it was taken, but is now dead.

During all his life no exceptions filed. A commission was taken out it is true, to inquire into the mode of taking this deposition, but we knew not whether it was executed. It was kept by defendants in their pockets until yesterday. The witness was dying; he had to be indulged with writing out his answer. The absolute necessity of the case is sworn to by the commissioners. And we know that in this terrible disease the patient may have a sound mind and considerable bodily energy, without being able to talk much. What did Chief Justice Marshall say in the case of a ship which went out of her way to save a man's life and forfeited her insurance? That the law of humanity was above the law merchant or commercial law, and it should not work a forfeiture. To this law the rules of courts ought to yield.

States a fact in relation to one of the cases cited by Mr. Bayard from Washington's Reports. He was of counsel in that case and well recollected that the Dutch brokers, after the interrogatories were read to them, had leave to go to their books for the prices of teas, and to make calculations on these statements.

*Frame,* in reply. Are we too late? I defy the counsel on the other side to show a case in this State where exceptions have ever been filed in a court of law to depositions, or articles of impeachment exhibited. The practice of chancery in this respect does not and cannot apply to the courts of law. Were they surprised? No. A commission was issued in July, 1831, to investigate the manner of taking these depositions; our interrogatories then gave them notice of the matters we considered exceptionable; and they filed cross interrogatories.

*Jones,* on the same side.

Is our commission irregular? If H. D. Gilpin was our secretary and his appointment as a commissioner wrong, their own argument proves that it is too late to make the objection. Where are their exceptions? But I distinguish between personal and other objections to commissioners. After joining in a commission without objection it is too late to object to the commissioner on personal grounds. I deny, however, that the fact of the commissioner being our secretary is a good objection.

Second. There is no authority given to the commissioners in this commission to appoint a clerk. The appointment was void and his acts void. *Delegatus non potest delegare.* The taking of depositions in England is under very restricted rules. There is a publication day after all the testimony is closed. Eight days are allowed for excepting; the exceptions are referred to a master and heard. These are all preliminary to the trial; and can't apply to courts of law. They do not even apply to those courts of chancery with which I am acquainted. At law a deposition is a substitute for a witness at the bar; and entitled to no greater favour. All exceptions that can be taken to the one, may to the other. W. S. Randel was examined in October, 1829; he died in October, 1830. It was not until April, 1831, that his deposition was opened. How could we take exceptions to it before? Our commission which issued shortly after May term, 1831, was notice to the other side of our intention to attack this deposition. A witness is not allowed to speak from writ-

ten statements made by himself or another; can the court extend to this *defective* substitute for an oral examination a privilege not allowed to a witness at the bar? Will it dispense with a rule in the one case that would be enforced in the other? And the worst of all memoranda is a former deposition given by the same witness, as was the case here, for this deposition is little other than that given by the same witness in the case of Randel *vs.* Wright.

*By the Court.* The leaning of courts for years past has been in favor of the admissibility of evidence leaving its credibility and weight to the jury, unless there exists some flat and insuperable objection to its competency. If there be matters either extrinsic or intrinsic to throw suspicion over it or detract from its weight, it is better that the jury should consider the testimony with the objections than entirely to exclude the former.

Our courts have no settled rules on the subject of executing commissions to take depositions; we have usually referred to the rules of chancery as a guide, so far as those rules could apply in common to both courts, and so far as they were applicable to the case in hand. But neither in this court nor in chancery are these rules of practice of such an unbending nature as not to yield to circumstances. The practice of taking depositions itself is a departure from the rules of the common law: it was introduced by necessity, and only adopted in cases where you cannot procure or compel the oral evidence of witnesses, either by reason of age, sickness, or being out of the jurisdiction of the courts. In such cases, ex necessitate, the next best kind of evidence has to be taken, or the whole lost. And if the whole system of evidence can be changed by necessity, and written evidence substituted for oral testimony, why may not the same necessity authorize the taking a deposition written out by the witness himself, when it is impossible for him to speak it, that the commissioners or their clerk may write it down? Take the case of a man deaf and dumb; such a man as Mr. Howell, of Kent, a gentleman of intelligence and great shrewdness, who is employed in the active concerns of life, and can read and write, but has never spoken; entirely deaf and dumb: suppose his testimony to be important in a cause, can there be any rule of evidence that would prevent a resort to the only means by which it can be procured? We think the good sense of the matter will dictate such an application of rules of evidence as shall effect and not defeat their object. Let testimony be guarded by proper rules; but when those rules would destroy that which they were designed to preserve and protect, bend or modify them so as to get the testimony. And if it comes subject to the objection of not having been taken with the usual checks, let it be considered with the objection, and let it detract from the weight or importance of the testimony.

The general rule is that a witness shall not be permitted to bring his deposition ready prepared: like all general rules, it must have its exceptions. The subsequent death of a witness has even been considered a good reason for reading depositions thus irregularly taken. If ever there was a case in which a prepared deposition would be allowed, this is such a case. The witness was languishing in a dread-

ful disease, which would certainly prove fatal, and whose violence would be greatly excited by conversation; indeed the depositions prove a case of absolute inability to speak to the extent required by the length of the answers; the attempt was made, and was only abandoned when it became apparent that the witness would sink under it, and then at the urgent request of the defts.' commissioner. The deposition consists, moreover, of many and long mathematical calculations, which could not possibly be made orally, or thus communicated from the witness to the commissioners.

We think, also, that the other objections urged against this deposition are not sufficient to authorize its suppression, and we direct generally that it be read, reserving the right to exclude hereafter such portions of it as may appear improper.

That part of the deposition which related to the lock contract was objected to and struck out. So of all those parts relating to damage arising from deviations from the original line of the canal, and alterations in the form, slope and dimensions of the banks, towing paths, &c. The court doubted whether this was a covenant on the part of the company that the engineer should certify the damage arising from deviations. Unconnected with the other parts of the contract they would say it was not. The language is very different from that used in the inspection and prevention clauses. But there being no breach assigned on this deviation clause, the testimony relating to it was rejected without giving a positive construction to this part of the contract.

The defts. objected to certain orders, verbal and written, given by Wright, the engineer, to Randel, in relation to the work, and proved by this deposition. The court said that any orders given by the agent of the company to Randel in relation to the work were evidence, and also any declarations made by him at the time of giving such orders in relation thereto, or to the work; but that any other declarations of this agent, or his letters to the company, were not evidence, not being a part of the res gesta, or connected immediately with the discharge of his duty as engineer. On this principle the deposition was purged of improper matter and a part admitted.

A great many of the answers were entirely rejected as containing improper testimony, either wholly or to such an extent that it could not be disconnected from that part which might have been admissible; some of the answers were corrected and partially admitted, and others entirely admitted. In this way the deposition, consisting of twelve hundred pages was argued, examined, and marked for admission or rejection.

In admitting the answer to the 68th interrogatory, the court took a distinction between deviations and orders of the engineer to the contractor to make the banks of particular materials, or in a particular manner; such as scalping or mucking under the bank, ordering upland earth from a distance, &c. Randel covenanted to conform to such deviations from the *line* of the canal, and alterations in the *form, slope,* &c. of the banks, &c. The canal company covenanted not to prevent him from using the due and best mode of executing the work. He was therefore to be allowed to use the best mode of executing as well that part of the work on which deviations should

be made as the other parts which remained as originally located. In either case, if he was prevented by the default of the company, they were liable under the prevention covenant. The contract specifies that the banks shall be made of the adjoining excavation, and we have not been able to discover any clause which authorized the engineer to order the earth for this purpose to be brought from the distant upland.

The answer to the 113th interrogatory was objected to, because it did not appear that the directions mentioned in that answer by Henry Wright to Randel, to pay Woodbridge certain sums of money for building a sluice, were within the scope of Wright's authority as first assistant engineer. The court admitted the evidence. We do not know certainly the extent of this engineer's authority. It is general in its nature, and may be inferred from facts, and the connexion of his acts with the business in which he was employed. It is proved here that Wright undertook the making of a sluice at the mouth of Extine's drain, and that he employed Woodbridge to work on it. It is further proved that the committee of works were present and inspected the work without objection. These are facts from which the jury may decide whether Wright's orders on Randel to pay Woodbridge for the work were within the scope of his authority.

*Adam Diehl,* sworn.

The St. George's marshes were embanked in 1797—8. Section No. 3 of the canal line passes through Higgins' and Newbold's marsh. It was all mowable land, not obstructed by water; dry, except in time of freshets. It was all enclosed within the general embankment. The back water was discharged by means of four sluices, which were all but one near the mouth of St. George's creek. The sluices were sufficient to discharge the water, except in time of freshets. After the canal was commenced this marsh was inundated. To get rid of the water they cut Extine's drain and put in it a sluice, which, instead of answering the purpose designed, let the water in from the river. It was put in the wrong place, and blowed out. The whole of the cranberry marshes were inundated in the fall of 1824, by water let in through Extine's drain. The canal could not have been cut through section 3 in the fall of 1824. It would have cost more to pump out the water than to cut the canal.

*Daniel Newbold,* sworn.

The marshes on section No. 3 were usually dry. The guard bank being thrown on the south side of the canal, cut off the usual vent through the sluices at the mouth of St. George's creek. Extine's drain was cut as a substitute but failed; it let in more water than it let out. An aqueduct under the canal was attempted, but this also failed. Randel could not have excavated No. 3 in the fall of '24 at four times the cost under other circumstances, in consequence of its being inundated for want of a drain. The company did not get possession of the ground for sections one and two until late in 1825.

Deposition of *Jeremiah Brainard* read, in part.

The plff. offered in evidence certain depositions taken under a commission to Thomas Janvier and others. Objected to for want of notice of the taking out the commission. The plff. called Benjamin Janvier and proved that a copy of the interrogatories had been left at

the office of Mr. Bayard, but not handed to him personally. The court held this sufficient.

In consequence of the death of Mrs. Robinson, the mother of one the jurors, and of the approach of Christmas, the court adjourned over for one week.

THURSDAY, *December* 26, 1833.

The plff. gave in evidence an account rendered by the canal company to Randel for work done, dated 10th January, 1826; also certain contracts entered into between Randel and his sub-contractors, Timothy Grindley; Reybold and Clarke; Joseph Cragg; David Johnson; Jared Leavenworth; Clarks, &c.; Woodward; M'Martin and others; Tripp; Blackstock & Co.; Eaves & Co.; Caulk & Co.; Clark & Co.; Daily & Co.; Sexton & Co.; Brooman; Sutton; Fisher & Co.; &c., &c.

*Paul Beck, Jr.,* whose deposition was rejected at an earlier stage of the cause, now appeared and was sworn.

Proves the seal of the company and the execution of the contract. Was formerly a director of the company; resigned. Question. Why did you resign? I resigned because from the acts of the board toward Randel, it was manifest to me his ruin was inevitable; and I did not choose to be accessary to it. Question. What acts do you allude to? I specify the allowance on one occasion of $600 for work amounting to $3000: I speak, however, of the tendency of their whole conduct. I believed that the board was governed by Wright, and that he had determined to ruin Randel.

*Hugh Lee,* sworn. Livermore, Dexter and myself measured the work on which Wright's final certificate was given; Wright measured no part of it. Our mode of measurement was not calculated to produce a correct result. I did not know how to do it scientifically, nor do I believe the others did. Our orders were to keep the company on the safe side. *(Cross examined.)* I carried the rod; not the level.

The plff. having offered evidence to prove that Benjamin Wright, the engineer in chief, had caused false measurements to be made of the work done by plaintiff and had given false certificates of the amount of labour and materials, the objection was made to the admission of such evidence, that by the express terms of the agreement declared on, the measurements and estimates and certificates of the engineer were final and conclusive, and that the plff. was now estopped to aver the fact that they were false.

*Clayton* for the plff. argued that the second count of the declaration contained breaches assigned on the covenant "carefully to examine and inspect the work," which breaches of course averred that the work was "not carefully examined and inspected;" that the defts. had not traversed these breaches, but had pleaded only the general issue of non est factum and the plea of abandonment which was a special plea in bar, confessing and avoiding the matters alleged in these and all the other breaches in this count; and that the plff., of course, could not be estopped to show the very fact which the defts. by their own pleadings had admitted.

*Bayard* for defts. said there was a plea traversing the breach that the work was not carefully examined and inspected.

*Clayton* replied that the plea referred to was a plea to the fourth and sixth counts only, and that the defts. had, in pleading, entirely overlooked the second count in this particular.

There being no plea traversing these breaches in the second count of the declaration, the evidence was admitted.

The plff. further gave in evidence parts of the deposition of Elisha Putnam and Jeremiah Brainard; the other part having been ruled out.

Also, the record of sundry proceedings in the nature of writs of ad quod damnum on the part of the company against sundry persons, the owners of land through which the canal passed, for the condemnation of those lands.

And he here closed his case.

Mr. Bayard opened for the defendants by a general statement of the character and tendency of the testimony which would be offered.

He then gave in evidence Randel's estimate of the cost of the canal and a statement of the actual cost, the former being $788,464 28, and the latter $1,100,303 35: also the report of the engineers Totten, Bernard, White, Wright, Randel and Strickland, recommending this route. The canal was commenced on the 15th April, 1824.

He produced sundry receipts for payments to Randel on account of work done, and compared them with the certificates, showing a balance due on the certificates, as admitted, of $794 05.

Benjamin Wright's certificate that Randel unreasonably neglected the work, dated 30th July, 1825. Minutes of the board of directors at a meeting held first August. Adjourned to the afternoon. Wright's communication was referred to a special committee to consult counsel. On the 5th of August this committee made a report. On the 12th of September Randel, by letter, acknowledges that he received notice of the certificate of Wright on the 10th of September. And asks a copy of the specifications and reasons. On the 13th of September the board refused this request by a resolution communicated to Randel. The defts. here offered in evidence a report of a committee of the board, on which this resolution was founded, setting forth the facts and reasoning on which the board went. The court rejected the report, unless the facts stated in it were proved aliunde. The statement of the committee is no evidence of those facts, and the reasoning of the committee on such assumed facts is inadmissible. This opinion was excepted to. On the 19th of September the board again met. Randel appeared and asked for time to prepare his defence. On the 30th of September the resolution declaring the contract abandoned was adopted, and notice was given to Randel on the first of October. The defts. offered this resolution in evidence, together with a preamble setting forth the facts and reasons on which it was founded. The court admitted the resolution and rejected the preamble, unless the facts were proved aliunde. Exception taken.

Defts.' counsel read an agreement between the canal company and Henry Wright as first assistant engineer, and Daniel Livermore as second assistant engineer; the former at $4 50, and the latter at $3 50 per day.

Judgment on bond of Randel and Sutton to the defts. for $15,000. Sundry credits endorsed.

Proved proceedings in relation to Daniel Newbold's land, sections No. 1 and 2. The habere facias on which the company obtained possession was issued 21st April, 1825.

*Caleb Newbold, jr.* sworn.

Was a director of the company from 1823. Was a member of the committee of works. Verbal orders were frequently given to Mr. Randel, in the summer of 1824, to proceed with the work, which he did not comply with. He promised, but did not comply to the extent promised. Has no recollection of Randel's proposing to put brush under the bank: the bank made of the light horse dung mud was good for nothing; burnt up. Randel made a bank to Wilson's point, designed as a temporary embankment, for which he received a specific sum; it broke when the water was raised in it. No. 1 was not excavated to bottom when R. left it. The bottoms of sections 1, 2 and 3 had to go about four feet below low water. Don't see what advantage section 2 could have been to Randel as a drain for section 3. He must have had a sluice in at the lock. The water was finally pumped out of section 3 and discharged by St. George's creek. Thinks the excavation on section 5 could not have been done at 25 cents per yard. The revised prices were fairer than the original scale to both parties.

*(Cross-examined.)* Is not an engineer. Can't say as to what precise extent Randel failed to obey the orders of the committee of works. He promised to put on and keep on 120 men; did not keep that number on. The resolutions of November, 1824, ordering him to go to bottom, &c. were in consequence of these failures.

The defts.' counsel now offered in evidence a contract of Messrs. Reybold & Clark with the canal company for the excavation of sections 2 and 3, a part of Randel's contract, to show that the work finally cost more than Randel's estimate, and more than he had contracted to do it for. Objected to.

*J. M. Clayton.* The evidence is inadmissible, whether it be true or not that the canal cost more than Randel's estimate. He was not to be paid by that estimate in the aggregate, but by the cubic yard. If the amount of excavation exceeded the estimate, the price necessarily exceeded it. The report of the board shows that the banks sunk on section 3 to the depth of 100 feet, filling up and raising the chamber of the canal by the lateral pressure of the sinking tow path, so that this part of the canal was in fact excavated several times. For this additional labour Randel must have been paid as well as Reybold & Clarke, and the final cost of the canal by no means proves or disproves the issue here, the amount of Randel's damages. Again the increased cost of the work arose from deviation; it was in fact another route, a different canal from that on which the estimate of Randel was founded. Reybold and Clark stipulated also to do the work from one to two years earlier than Randel was bound to perform it in. If the time be materially shortened, we know that the price must be materially increased.

*J. A. Bayard.* I agree that Randel was to be paid by the cubic

yard, and that the cost of the work would be increased by increasing the amount of excavation; but our object now is to prove that he could not have done it at the contract *rate* per yard, whether the quantity be more or less. If the cost of the work was increased by a different mode of execution, it is a matter proper to be considered. The evidence tends to show that the cost per cubic yard of the work done by Reybold & Clark was more than Randel's estimate and contract, and that he did not sustain any damage by the abandonment of his contract.

*Clayton.* The defts. may show that practical men could not do the work at the rate Randel contracted to do it for; but they cannot show it by a contract with others for a canal differently located, more expensively constructed, and to be completed in half the time. You might as well inquire the cost of the great wall of China to prove that Randel could not have dug this canal at his contract rates.

*The Court.* The contract of Reybold and Clark is offered in evidence with a view to show that Randel could not have made money if he had been permitted to go on to the completion of his contract. The contract offered is confessedly in some respects in relation to a deviated or different work, and its stipulations are essentially different from the plaintiff's contract; how then can one prove, with any certainty, any thing in relation to the other? If the contract offered was for the same work it would not itself, in an action between other parties, be proper evidence to prove that such sum was or was not compensation for the work, nor how much could be lost or gained by it, but the parties themselves to such contract should be brought to testify as to the actual cost. Evidence rejected; and excepted to. On the same ground the court rejected contracts with Dexter, Hurlock, Flannagan & Carr, and others.

*John K. Kane,* sworn on the voire dire. Is a director of the canal company, but not a stockholder. Was a small stockholder until within a short time. Sold out his stock with a view to giving testimony in this cause. Objected to.

*Clayton.* He is a party on the record.

*Bayard.* He is not interested in the event of the suit; not even liable for costs, as he is not a member of the corporation. In truth he is not a party of record. The title of the suit and of the company is "The Chesapeake and Delaware Canal Company;" i. e. the members of the company, the corporators, and not the officers of the corporation. A secretary of a company, who is not a stockholder, may be examined on the ground of no interest; so may a director, if he stand in the same disinterested condition.

The court admitted him. The general rule which incapacitates a witness regards his interest in the event of the suit, or his liability for costs, rather than his character or connexion with the parties. Thus a trustee, if a party on the record though not interested in the suit, is no witness because he is liable for costs. So of a next friend, &c. Here the witness has no interest; he is not even a party to the record, and if he were, he would not in this case be liable, for he is not a member of the corporation. It is a new question, started perhaps for the first time in this State, and it can seldom occur any

where, for the directors in these companies are almost always stock-holders also.    As at present advised we do not see that any rule of evidence prevents this director from giving testimony.    *Angel & Ames on corporations,* 393.

*John K. Kane,* sworn.    Gives a history of the revision of prices, and of the certificate of negligence and resolution of abandonment. Was at the canal in the summer of 1825.    It had been a subject of frequent complaint to Randel that he did the work irregularly and on parts most convenient and profitable.    This was the cause of the order to go to bottom.

After the company received Wright's certificate of the 30th July it was referred to a committee with directions to consult counsel. They did so, and reported on the fifth of September.    The board then directed Randel to be notified of the certificate.    About the twelfth they received a letter from Randel asking a specification of charges.    This letter was referred to a committee with directions to consult counsel.    In pursuance of advice received from counsel the board notified Mr. Randel that they would proceed on the 19th September to determine what they would do in relation to the certificate, and that they would then inform him of the points to which he might direct his answer.    On the nineteenth Randel attended.    The chairman stated to him the objections of the board to his conduct as a contractor.    He took notes; asked for time to prepare his reply; named thirty days,—four weeks; the board fixed ten days.    Randel again met them on the twenty-ninth and presented his defence in writing.    They adjourned to the next day; and then adopted the resolution of abandonment.

*( Cross examined. )*    Mr. Smith came before the board on the nineteenth, and desired to read Randel's defence.    He represented Randel as being much indisposed and unable to attend; but we did not think his appearance indicated such a state of ill-health.    He was languid.    Mr. Gilpin read a part of his defence for him.

*Nathan Boulden,* sworn.    Knew Wm. S. Randel.    His habits were irregular.    Saw him once lying in the office asleep or drunk with a quantity of bank notes in the crown of his hat.    John Randel was sometimes dilatory in his payments; his credit not always good.

Mr. Bayard read in evidence the original estimates of the cost of the canal; and also the award of Benjamin Wright on the revised schedule of prices.

*Daniel Livermore,* sworn.    Is an engineer; commenced in 1819; came to this canal in 1824.    I measured a part; about one-half of section four, and all of section five that was embraced in Mr. Randel's contract.    The semi-monthly statements of work done were made by counting the number of men and teams while at work.    The check rolls would probably show a larger number; and the count might be a little below the number actually employed, for if any were accidentally absent they would be omitted.    The counts, though perhaps a few short, were sufficiently accurate for general purposes.    Describes at length his mode of measuring. . Thinks it as accurate as any that could have been used.    Had to be governed frequently by the eye, as it was impracticable to measure.

*(Cross examined.)* Boating would have been cheapest on section four, but it was not practicable to any extent. The slips would have prevented.

*Philip Reybold,* sworn. We offered Carr eighteen cents per yard for doing section three, and calculate water as mud. We continued the work during winter. Costs something more, but men could be got. All the water on this section was thrown over the bank and not drained through sections one and two. Section two conld not have been excavated at fifteen cents; our contract was twenty cents, and I think we lost money at it. The springs were abundant and it had to be bottomed under water. Sections one and three could not have been done at twelve and a half cents. Section two was of no use as a drain for section three. I did not think that Randel's workmen managed well; they were too much in mud and water.

*(Cross examined.)* Reybold and Clark have still a small claim against the company for an aqueduct, some four or five thousand dollars. The material of the tow-path was brought three or four hundred yards, and not of the adjoining excavation. We were never paid for our work by the yard; it was impossible to estimate it thus. Henry Wright was not a dormant partner with us.

*Joseph Carr,* sworn. Section five could not have been done for twenty-five cents per yard.

*(Cross examined.)* We cleared about 27,000 dollars on our contract.

*William J. Hurlock,* sworn. Worked on section four. It could not have been done at fourteen cents. Got twenty cents from two points, and sixteen cents from another point. Can't say whether I made 12,000 dollars by my contract; don't think I made fifteen thousand.

*Henry Cazier,* sworn. The first season Randel let out the work to contractors; he afterwards worked it himself. His contractors were good. On some parts his workmen were dilatory. The plan was not a good one.

Mr. Bayard read a letter from Randel to the canal company, stating· his claim at 54,000 dollars, dated January 2, 1826. He stated, however, that this did not cover his whole demand.

The defendants closed their testimony.

Plaintiff, in reply, called

*Hugh Lee,* sworn. Has calculated the original surface levels of the canal. Describes at length his mode of measuring and calculating. Livermore's plan is not correct. Has frequently heard Livermore speak very disrespectfully of Randel whilst engaged in the measurement.

Clayton for plff., offered in evidence two drafts for $1000 and $4000, respectively, drawn by John Randel in favour of Sutton, endorsed and discounted at the Philadelphia Bank; and protested on the ninth July. Objected to as irrelevant.

*J. M. Clayton.* The evidence is in reply to Boulden and others who swore that Randel was dilatory in his payments, and neglected his work for want of means. We here show the reason. That he·

38

was crippled in his resources by the negligence of the company; by their not paying him promptly. The certificates already in evidence show that on the second of July there was due Randel $5518, which was not paid, as the receipts show, until the eleventh. In the mean time these drafts were protested and Randel's credit injured.

Doctor Sutton was called to prove the dishonour of these drafts. He admitted on the voire dire that he held certain obligations of Randel payable on the determination of this suit. The court, on inspecting the papers, held him a competent witness, saying that he was not interested in the event of the suit, as the obligations were payable at all events, whether the suit resulted one way or the other.

The admissibility of the drafts finally turned on the question whether they were inland or foreign bills. If foreign the protest is proved by the notarial seal. Mr. Ingersoll said it is now settled by the supreme court that bills from one state to another were foreign bills. After the matter was considerably debated, it was found that these drafts were dated in Philadelphia, and made payable there; the court therefore rejected them without actual proof of the protest. It appeared that after the endorsement these drafts had been in the hands of S. H. Hodson, cashier of the Bank of Smyrna; but the court said this did not change their character as inland bills.

*Dr. Sutton,* sworn.

Had a sub-contract from Randel on section 3 for 12½ cents; about three-fifths of that section. Could make money at it. I was prevented by Wright from doing the work properly.

*Robert Keddy,* sworn.

Livermore measured my work of eight rods. I was dissatisfied, and complained to Wright. We agreed that it should be re-measured by J. Fairlamb. He made it 4040 yards more than Livermore.

*Dr. Gemmel,* sworn.

Question. Did you at any time hear Benjamin Wright give Henry Wright orders to make false certificates of Randel's work? State precisely what the orders were. Objected to and argued at length. The court permitted the question to be put. Here is a controversy between Livermore and Lee, two engineers, as to the correctness of the measurement of Randel's work. He proposes to prove that it was intentionally wrong; wrong by the direction of the company, given by their chief engineer to his subordinates. The testimony is not admissible to show malice in the engineer; his malice or fraud is no ground of damage as against the company; but it is admitted to show the incorrectness of the measurements, the falsehood of the certificates, and the consequent damage to the plff.

*Witness.* I did hear Benjamin Wright give directions to Henry Wright to make short and false estimates and certificates of Randel's work. He said he would ruin Randel's credit and break him up.

Question. Did Henry Wright or Benjamin Wright at the same time say that if Randel was treated as other contractors, or permitted to go on, he would make over $200,000 by his contract? Objected to and rejected by the court as a mere opinion of Wright, not on oath.

*Witness.* I also saw a letter from a director of the company to H. Wright, approving of his conduct in relation to Randel, and request-

ing him to persevere in it. Wright showed me the letter, and immediately burnt it. He said it was from Mr. ――――, and it was signed ――――, and with two initials, I think ―. Have never seen him write, and don't know positively that it was his hand writing.

*Question.* State precisely the contents of that letter. Objected to, and rejected by the court. Afterwards, the director being present, the witness was, by consent, permitted to state the contents of the letter.

*Witness.* He advised Henry Wright to continue the course he had been pursuing towards Randel, and he would eventually break him up. The letter was short and sweet. I do not know Mr. ――――'s christian name. The signature was individual, and not as secretary or director. I heard Philip Reybold and Henry Wright talking about taking away Randel's contract and giving it to Reybold, four or five weeks before it was abandoned.

*The Director,* sworn. I never wrote the letter spoken of by Dr. Gemmel, or any such letter. I never by word or writing authorized any one to believe that I wished any thing done towards Mr. Randel that was not strictly just and legal. I never wrote confidentially to H. Wright during Randel's contract. I wrote him one or two letters afterwards of friendly caution in relation to his own habits and the estimates for Clement. I swear positively that I never wrote the letter; because, had I been capable of such an outrage of every principle of honesty and fairness, it must have made an impression on my mind that time could not erase. I neither had motive nor feeling towards Mr. Randel which could have prompted such an act of injustice.

*John Kizier,* sworn. Was acquainted with the cutting on No. 5, the deep cut. The sub-contractors made money at 25 cents. Describes the manner of boating the earth from section 5 to section 4. The excavation, boating and depositing on the tow path cost about 15 cents.

Plff. gave in evidence a resolution of the board dated 23d September, 1825, appointing Messrs. Gillaspie and Jones to go to the canal and ascertain the state of the work. He then offered a paper in the handwriting of Dr. Gillaspie, and signed by him, purporting to be notes of their examination, or a rough draft of a report. Gillaspie is dead.

*Bayard.* This is a private memorandum of Dr. Gillaspie, not communicated to his colleague, nor to the board.

*Clayton.* They are the notes of the committee; a journal of their joint proceedings. A report was not made to the board, because they abandoned the contract without waiting for a report. They appointed a committee to test the truth of Wright's certificate of negligence, and decided without hearing the evidence.

*Ingersoll.* Admitting that this is the individual act of Doctor Gillaspie, it is an act in the discharge of his duty as agent of the company, acting under a resolution of the board. The notes were made in the capacity of committee-man, a part of the res jesta, and are evidence. 1 *Stark. Ev.* 52.

*Bayard.* The duty was assigned to two. The separate notes of

one are not in conformity with the authority; and if it appeared that they both concurred in them, as they were never communicated to the company they cannot affect it. The fact that no report was ever made is conclusive.

The testimony was rejected.

*John Sutton*, sworn. Counted Randel's force on the 13th July, 1825. On section No. 3 there was an average force of 267 men, 50 horses; on No. 5, 301 men, 186 horses.

Plff. produced a model of the monument erected by the company at Summit Bridge, and proved the inscriptions, which were as follows:

*South front.*"—This tablet is erected by the proprietors of the Chesapeake and Delaware canal, to commemorate its completion, on the 17th of October, 1829, and to stand as a testimonial of their gratitude to James C. Fisher, president, and Thomas P. Cope, John K. Kane, Robert M. Lewis, Isaac C. Jones, Robert Wharton, Thomas Fassit, John Hemphill, Ambrose White, and William Platt, directors of the company. Secretary and treasurer, Henry D. Gilpin; engineer in chief, Benjamin Wright; engineer resident, Daniel Livermore; superintendent, Caleb Newbold, jun."

*East end.* "The construction of this canal was begun on the 15th of April, 1824, by Silas E. Weir, the chairman of the first committee of works, whose zealous and efficient services to the company terminated, with his life, on the 14th day of May, 1828. He was succeeded by Robert M. Lewis, under whose active supervision the work was continued and finished. In its progress through the eastern level large sections of embankment sunk 100 feet below the adjoining surface, and the bottom of the excavation rose 40 feet above its natural position. On the deep cut more than 375,000 cubic yards of earth slipped from the regulated slopes of the sides, and passed into the chamber of the canal. These and many other difficulties having been overcome, the water was introduced on the 4th of July, 1829, and the final accomplishment of this great national work was celebrated on the 17th of October of the same year, at which time the navigation was opened."

*West end.*—"Length of canal, 13⅞ miles. Width at water line, 66 feet. Width at bottom, 36 feet. Depth of water, 10 feet. Depth of excavation at summit, 76½ feet. Extreme width of section at surface, 366 feet. Excavation from deep cut, 3,500,000 cubic yards. Length of locks, 100 feet. Width of locks, 22 feet. Length of summit bridge, 247 feet. Height above bottom of canal, 90 feet. Total cost, 2,250,000 dollars, of which 450,000 was paid by the United States, $100,000 by the state of Pennsylvania, $50,000 by the state of Maryland, $25,000 by the state of Delaware, and the residue by citizens of Pennsylvania, Maryland and Delaware."

Plff. also produced models of the tide lock, with guard gates, &c. and of the hopper boats used in boating the earth.

The depositions of Townsend and Dewit were offered to sustain the character of Wm. S. Randel, and admitted, and the deposition of Josiah F. Clement was rejected.

*George W. Smith, Esq.* sworn. Gives a history of the proceed-

ings of the board previous to the declaration of abandonment. I called as the friend of Mr. Randel, and requested to read his defence and comment on it. They refused. They also refused to permit me to read it without comment. I stated that Randel was ill, had been cupped on his head and neck; that he was then attacked with coma. He was unable to appear and make his defence. They still refused to let me appear for him. I remarked that they treated him with neither justice nor common decency. Mr. ——— came round and said in a violent manner, you will please remember that remark, Mr. Smith! I told him I should remember it, and that I held myself responsible to him for it. He said, no, sir, not to me, but the board. I replied, to him or any member of the board. I heard no more of it. Before it was known that Wright had given the certificate, I heard various rumors at the canal that the contract was about to be taken from Randel; there was quite a riot, and the work suffered much hindrance in consequence of these rumors. I called on some of the members of the board and represented this state of things, and from conversations with them I became satisfied the rumors were unfounded. This was after the certificate was given. I returned to the canal and endeavored to quiet the apprehensions of the workmen and others, and I unfortunately subjected Mr. Sutton to loss. I am confident that John Randel did not know of the certificate until it was officially communicated to him.

Mr. Smith was asked if he did not think his mind was under some degree of bias from the influence of ardent feelings in favor of his friend the plaintiff.

Answer. If a thorough abhorrence of the unjust and cruel conduct of this company towards John Randel, and a perfect conviction of his wrongs, be a bias, I have it. As his friend I have labored for years, and shall still labor, to bring this company to justice. I desire, and Randel need want, nothing more. I have devoted much of my life to the study of engineering, and in visiting the principal canals in this country and in Europe. I am not a practical engineer, but have studied the subject for my pleasure; it is my hobby. Describes the construction of the Caledonian canal, the use of hopper boats and dams, the banks in Holland to keep off the water of the Zuyder Zee. They are made of a light, spongy substance, slightly mixed with earth, similar to our horse dung mud, laid upon brush. Sand will not do. A mountain of sand would not keep out water. Has examined the horse dung mud of the St. George's marshes; it will make a bank, and a good bank; it is the proper material. The height of the guard banks as increased by Wright has been the subject of much ridicule among scientific men; it is perfectly absurd. It was destroyed by its own weight. The original height would have kept the water in the canal.

The testimony on both sides closed January 3d, 1834.

The case was argued at great length before the jury by *Read, jr., Rogers, Ingersoll* and *Clayton,* for the plff. and by *Bayard* and *Jones,* for the defts.

In the course of the argument the court was requested to charge the jury on a great number of points, among which the most important were the following:

On the part of the plaintiff:

First. That there are five covenants on which the plff. has sued; the covenant to pay for work as certified by the engineer of the company for the time being; that the works during their progress should be carefully examined and inspected; that the number of cubic yards of excavation and embankment should be faithfully estimated by a competent engineer; that if by the default of the company Randel should be prevented from pursuing the due and best mode of executing his contract in any particular, or should be prevented from entering upon or flooding lands, the engineer of the company should certify the damage: and, that the time allowed to Randel to do the work should not be less than four years from the first May, 1824.

Second. That the defts. by their demurrer to the seventh count have confessed that they did not allow Randel four years to do the work, and the jury are bound to assess the damages for the breach of that covenant whether he did or did not unreasonably neglect the work *because the defts. have not pleaded the abandonment to that count.*

Third. That the true standard of damages to be recovered on that seventh count is not the mere profit that Randel would have made on the *whole* contract had he been allowed to finish it; but the *loss he incurred* by being illegally driven from it: that in order to ascertain the *loss* the jury must estimate the profit on the work *remaining* to be done after the first October, 1825, and add to it all the loss fairly arising from the illegal dismissal of Randel; and particularly his loss of time, the derangement of his affairs and business, the ten per cent. on the $224,000, earned by him before the first of October, 1825, and ten per cent. on the work remaining to be done, and the injury to his professional reputation if any necessarily occurred from the manner of his dismissal.

Fourth. That it stands confessed of record by the defts. plea of abandonment to the five first breaches in the second count, and to the fourth and eighth breaches in the third count; first, that the works during their progress were not carefully examined and inspected; second, that neither Benjamin Wright nor any other competent engineer selected by the company did estimate the number of cubic yards of excavation and embankment; and that the jury are bound to consider these confessions on the trial of the replication of waiver to the plea of abandonment. Third, that the defts. have confessed, by this plea, all the material allegations in the third, fourth and fifth breaches of the second count, and the fourth and eigth breaches of the third count, and especially the following: that Randel "was from default of the company, on divers days and times between the 26th of March, 1824, and the 20th of October, 1825, prevented from pursuing the due and best mode of executing his contract, and that the pecuniary damage sustained by him in consequence thereof, was the sum of $256,000; and that the said pecuniary damage was not certified by the engineer of the company for the time then being:" that from the default of the company the plaintiff was "on or about the third day of October, 1825, *prevented from entering upon lands,*" &c.; that the pecuniary damage was $256,000, and that said damage was not certified by the engineer *although he*

*well knew the premises:* that Randel was prevented from *flooding lands,* &c., and that the damage amounted to $256,000, which was not certified, &c.: that the said company on the 19th of October, 1825, did prevent Randel from entering upon lands which were necessary to be occupied by him for the use of the work, and so took the time to be less than four years, &c.: the pecuniary damage resulting from which default was the sum of $256,000, which was not certified, &c.: and that the company did, on the 19th October, 1825, dispose of the contract to Clement, Blackstock and Vanslyke, and thus obstructed Randel in the performance of the work and prevented him from pursuing the due and best mode of executing it; that the damage arising from this prevention was $256,000, which the engineer of the company did not certify, &c.; all of which confessions and admissions in the pleadings the jury are bound to consider in trying the issue arising on the replication of "waiver" to the plea of "abandonment."

Fifth. That under the covenant to pay for work done as certified by the engineer, *for the time being,* the plff. is entitled to recover all such sums of money as are contained in the semi-monthly certificates of Henry Wright and Daniel Livermore and Benjamin Wright while acting as engineers *for the time being,* although those sums should be excluded from the final estimate made by Benjamin Wright on the 15th December, 1825.

Sixth. That the covenants carefully to examine and inspect the work, and to estimate the number of cubic yards of excavation and embankment, mean that the company bound itself to Randel that those works should be honestly and justly measured, and when so measured should be honestly and justly certified, and that therefore under these covenants the company is responsible in damages to Randel for the work he did, whether certified or not, and not only for the value of that work at the *time it was done,* but for all the injurious consequences necessarily resulting to Randel from not *justly* measuring, certifying and *paying* for the work at the time when it was done, according to the terms of the contract.

Seventh. That the resolution of the fourth of November, 1824, directing that no certificates should be given for work done on section No. 3, if the contractor do not go to bottom, unless otherwise ordered by the engineer, renders the company responsible for exemplary damages arising from prevention on that section; because the said resolution is arbitrary, cruel and oppressive, and contrary to the terms of the contract it professes to delegate to the engineer the power to withhold certificates for work done, and thereby renders the company responsible for the acts of prevention of the said engineer in regard to that section, whether arising from malice or mistake.

Eighth. What acts of the company would amount to a waiver of the certificate of Wright of 30th July, 1825.

That it is not necessary for plff. to prove the want of notice of that certificate it being immaterial to the issue; but if proved, that it is *per se* a substantive ground of exemplary damage.

Ninth. That the resolutions of the 19th and 24th of July, 1824, whereby Randel was notified that no part of the harbor should be

begun until a new contract for it should be defined and executed were unjustifiable and not warranted by the terms of the contract.

Tenth. That all other orders directing Randel to work on any part of the contract against his own judgment, and counteracting his own plans of operation, or preventing him from pursuing his own mode of executing his contract were not warranted by the terms of the contract; and that the jury are bound to assess all damages arising from such orders.

Eleventh. That the revised schedule was not and could not be retrospective in its operation.

Twelfth. That the contract provides that the banks of the canal should be constructed of the best earth the adjoining excavation would give, and that whether that excavation afforded a material unfit for said banks or not the plff. was entitled and was bound to use it.

Thirteenth. That the plff. was to be paid by *the cubic yard* for his work; and that for all slips from the regulated slopes of the canal the plff. was to be paid as well as for other excavation by *the cubic yard.* So of all earth pressed up in the chamber of the canal by the sinking of a bank or other such cause.

Fourteenth. That the covenant of Daniel Newbold, dated the 4th of August, 1823, did not entitle the canal company to the possession of section No. 2, nor did they get possession of these lands until put in possession by the writ of habere facias possessionem; and that the issuing of that writ is an admission by the defendants that they were not in possession at that time.

On the part of the defendants the court was requested to charge the jury on the following points:

First. On the covenant to pay for work certified.

That on the fifth breach, third count, the final certificate is conclusive as to the work and price certified; and the amount not paid is fixed by agreement at $2,863 05, with interest from October first, 1825.

That on the seventh breach the replication of fraud being specially traversed and issue joined, the only fact for the jury to determine is whether the award of Benjamin Wright revising the prices is a genuine paper and not obtained from him by the fraud of the defts.; and that the payment for work certified is admitted by the pleadings as to this breach, and the verdict on it must be for defts. unless the jury find that the defts. obtained the award from Wright by fraud practised on him.

Second. The covenants to inspect and examine the works and certify the amount of excavation and embankment.

To the fourth, fifth and sixth counts the defts. have pleaded the appointment of Wright as inspector, and also the declaration.

That the final and other estimates and certificates of Benjamin Wright having been given in evidence, the issues on these counts are proved and the verdict must be for the defts. That these pleas being a bar to those counts it is not necessary to consider the other pleas to the same counts.

That as to the first and second breaches of second count.

Defts. have pleaded the certificate of abandonment and plff. replied the waiver on which issue is joined, and that if that issue is found

for the defts. there must be a verdict for defts. on these breaches, and if against them, that though the verdict must be for the plff. the admission on the record of want of inspection or estimates, entitles the plff. only to nominal damages.

That the actual damage, if any, must be proved by the plff. That the only legal damages recoverable under these breaches is for the excavation and embankment proved to have been done. That as the plff. has given in evidence the certificates of the engineer they are conclusive as to the amount of work done. That if not conclusive they are at least prima facie evidence of work done, and plff. must not merely falsify them, but prove that work was done more than was certified. That this being an action of covenant it lies on the plff. to prove the amount of damage, and that the mere proof of loss without proving the amount, or facts by which the jury can estimate the amount, will not authorize more than nominal damages on this or any other breach. That the damages in this action are neither exemplary nor vindictive, and that the jury cannot exercise an arbitrary discretion in assessing damages, but can allow only such damages as the plff has actually proved either positively or by proof of facts from which the quantum of damages may be estimated.

Third. The prevention covenant.

That on the breaches assigned on this covenant, the third, fourth and fifth of second count, and fourth and eighth of third count, the verdict must be for the defts. if their plea of abandonment is sustained; and, if not, that only nominal damages are admitted by the pleadings; and that plff. must prove actual damage sustained. That he must prove acts of prevention; and that orders of the engineer or defts. though illegal, assented to by the plff., are no ground of damage and cannot be considered by the jury for that purpose. That upon the breaches on this clause specifying no particular act of prevention the defts. have admitted no specific act, and that until the jury are satisfied by the proof of some act of prevention and of damage, and the amount thereof, they can only give nominal damages on these breaches.

That the amount of damages is in no case confessed by the pleadings.

That in determining the question of waiver the jury cannot take into consideration any matter previous to the certificate of July 30th, 1825, whether proved in the cause or admitted by the pleadings.

Fourth. Covenant as to taking time.

That the sixth and fourteenth breaches are traversed, and there is no admission as to them.

That the seventh count containing a general allegation of taking the time without stating any specific act by which they so took the time, no act, and only nominal damages are admitted by the demurrer; and that if the declaration of abandonment was legal and the certificate not waived, no other act has been proved in the cause which the jury can consider in assessing damages on this breach, and they must therefore be nominal.

That in assessing damages the intention of a party in breaking a covenant cannot be considered with a view to increase the amount.

That the only measure of damages which the jury can take in assessing the damages on alleged breaches of this covenant is the pro-fit plff. would have made after the first of October, 1825; that if the jury believe that the plff., had he been permitted to proceed in his work, would not have bettered his pecuniary affairs more than when the contract was abandoned, they can give only nominal damages, even if the certificate of abandonment was waived.

That in giving damages on any breach assigned in the declaration, the jury cannot consider either any alledged loss of reputation to plff. or other matters than such as directly flow from the breach as alleged and proved.

That any deviation made by the defts. from the line of the canal or the construction of the works generally as reported by the plff. cannot be insisted upon as a ground of damage in this action, nor can the jury consider any such deviation for the purpose of allowing damages.

That the provision contained in the contracts of plff. with his sub-contractors, directing them to obey the orders of the engineer-in-chief of the defts. did not impose on the engineer a duty to give orders to the sub-contractors to go to bottom on section 3 so as to constitute a default of defts. by reason of the omission of such orders, but that the order to go to bottom being given directly to the plff. it was his duty to attend to its execution by his sub-contractors.

That the prices, when revised by the award of the engineer, June 5th, 1824, necessarily operated on work previously done; and that the claim of the plff. to the sum alledged to be due at 16 7-10 cents for the first ten feet allowed at that price in the certificate of May 29th, 1824, and afterwards reduced to 14½ cents per cubic yard in the certificate of June 23d of the same year, is not good in law.

The argument in chief before the jury, in the course of which the foregoing points were made, commenced on Saturday, January 4th, and closed on Tuesday, January 21st, 1834; when

*Mr. Justice Harrington* charged the jury, in substance, as follows:

Gentlemen of the jury:

The period has at length arrived in the progress of this cause when you are to become the chief actors in it. Hitherto your part has been one rather of patient attention; now it must be one of laborious investigation, of judicious and enlightened decision. Upon you, after all, devolves the responsible duty of administering justice as between these parties. The law has made you the exclusive judges of the facts in issue, of the credibility of witnesses, and of the weight of their testimony. It has wisely concluded that "twelve judicious and impartial persons, inhabitants of the bailiwick, lawful men of fair characters and standing indifferent between the parties," would be more likely to arrive at the truth and dispense with greater certainty and impartiality the principles of remunerative justice than any other tribunal which the wisdom of man has yet devised. Occupying this distinguished position, it can surely need no remarks from us to enforce the obligations you are under, not only in reference to the parties in this cause, but to the public, in sustaining the character of that

tribunal which they regard as the highest safeguard of their rights. Nor is it so much our purpose to comment on your duty as to discharge what is appropriately our own, by directing your particular attention to the leading points in the case before you, and applying to them the principles of law, so far as legal principles are connected with them, or will conduce to a more perfect understanding of the subject.

We are trying, gentlemen, an action of *covenant:* an issue of *breach* of covenant: an inquiry into *loss* and *damage* arising from breach of covenant: and a claim of *compensation* in damages *for* breach of covenant. This simple statement of the nature of the action describes your whole duty. It circumscribes the range of your inquiries; it points out the nature of the complaint, the issue to be tried, the result to be sought for, and the manner and the rule of ascertaining that result. It embraces an inquiry into legal rights growing out of contract; into alledged wrongs from the violation of those rights; damage and loss resulting from such wrongs, and compensation therefor. The rights of the plff. are to be ascertained from the contract; the violation of them from the acts of the defts.; and the damages are to be proportioned to the injury and loss resulting from such acts. There is no *malice* here as a ground of damage; no inquiry into character, either private or professional, as a ground of damage; no vindictive or exemplary damages whatever. The question is of contract rights; of acts, not motives, violating those rights, and of actual damage arising from such acts. Let us not be misunderstood on this subject of malice. Malice in itself is not a ground of damage, because without an act it violates no covenant: it may prompt the act, and in that view may be considered in proof of the act; but then the act itself, and not the malice, is the ground of damage, for the consequences of that act are equally injurious to the plaintiff, and no more injurious, whether it was founded in malice or not. Could it be said that if the defts. had violated their contract with Mr. Randel and done him injury through ignorance or innocent mistake, or from motives the most friendly to him, they would not be liable in this suit to compensate him for that injury without reference to their motives? With what propriety, then, shall we look into motives with a view to increase the damages? We have said also that vindictive or exemplary damages are not to be given in this action. By exemplary or vindictive damages is meant something over and above the actual loss or damage accruing to the plff. by reason of the defts.' conduct, and which in certain actions of *tort* the jury are permitted to give, to an unlimited amount, for the sake of public example and warning to others. But it is not so in actions on contract, or, at least, in this action of covenant, which is merely for *compensatory* or *remunerative* damages. The jury are to make the plff. whole: to *weigh out* to him, as it were, from the scales of justice, remuneration and compensation for his wrongs. We shall hereafter speak more particularly of the rule and measure of damages in this action, and refer, perhaps, to some specifications of alledged injury and loss.

"There is one thing, and perhaps only one, about which both the parties agree in this cause: that for all the work which the plff. per-

formed in pursuance of his contract, and for which he has not been actually paid by the defts. he is entitled to recover in this action. You will therefore consider and determine from the evidence which has been laid before you what that sum is, by ascertaining the value of the work done, and the payments which have been actually made towards it, and whatever may be the difference, that must necessarily be your verdict on this part of the case.

Having ascertained thus much, your next inquiry will be, is the contract in relation to all other matters in litigation at an end? You must be fully aware by this time that there is a clause in this contract which declares that if the engineer-in-chief for the time being shall be of opinion that the plff. has unreasonably neglected to prosecute his contract, he may certify the fact to the defts. and that they on his certificate may declare the contract to be abandoned, and thus discharge themselves from all its obligations, except to pay for work already done. This is a very important inquiry, and demands your serious attention.

The defts. plead that on the 30th of July, 1825, Benjamin Wright, the engineer-in-chief of the company for the time being was of the opinion that the plff. had unreasonably neglected to prosecute his contract, and that on that day he did, in and by his certificate, certify his opinion to the defts., and that on the 30th of September following the defts. did thereupon on the said certificate determine the said contract to be abandoned by the plff., of which said certificate and determination the plff. had notice on the first of October, by means whereof the defts. were entirely exonerated from every obligation imposed on them by the articles of agreement, except to pay for work already done. The replication of the plff. in answer to this confesses these facts, but avoids them by the matters which it discloses. These matters, so far as it is material here to state them, are: that during all the time between the 30th July and the first October the plff. was diligently prosecuting his contract, and did with great expense and labor prosecute the said contract, under the inspection, by and with the permission, and by and under the direction of the company; and that during that period the defts. paid for such work divers sums of money; that the work thus performed was less profitable and more disadvantageous than the work remaining to be done, and that the work remaining to be done after the first of October was that portion of the whole work to be done which was most profitable and advantageous to him; and concludes by alledging a waiver of the certificate and a ratification of the contract. To this replication the defts. rejoin, and by that rejoinder put these matters in issue.

The facts which have been given in evidence to you in support of this issue are these. On the 30th of July, 1825, Benjamin Wright, the engineer-in-chief for the time being as is alledged, certified his opinion to be that Randel had unreasonably neglected to prosecute his contract; the directors took this certificate into consideration, and resolved to take the advice of counsel: they did so, and obtained that advice. This certificate was not made known by the directors to Randel until the 10th of September following. He then asked for a specification of the charges of unreasonable neglect. This was refused him, and a day, perhaps the 19th of September, was given him

to be heard in his defence. On that day he appeared before the board, and was informed, orally, by the chairman, of the charges against him, and the 29th of the month was appointed for a hearing. In the mean time, on the 23d, the following preamble and resolution were adopted:

"Whereas, a letter of this date was read by the chairman of the committee from a member of the board, stating, on the authority of George Washington Smith, who has just returned from the canal line, that the men in Mr. Randel's employ are deserting in detachments, in consequence of a report that his contract has been declared abandoned, and that he is allowed only ten days from Monday last to prepare for his departure, which report being untrue and calculated to be injurious both to the interests of the contractor and this company;

Therefore, resolved, that committee No. 3, now on duty, be requested to proceed as soon as practicable to the line of canal for the purpose of ascertaining the present state of the work and taking such measures as they may in their sound discretion deem necessary; which was unanimously adopted.

Ordered, that a copy of the preamble and resolution be furnished to committee No. 3."

On the 29th, the day appointed for hearing Randel, he was ill, and his counsel requested that he might be heard in his defence, or that he might be permitted to read his defence. This was refused, and they required that he should personally attend them. He did so, although from ill health he was unable to complete the reading of his defence, and it was read by the secretary of the board. No determination took place on that day, but on the day following the contract was declared to be abandoned, and on the first of October notice of this determination was given to the plff.

"It is clear, that wherever a discretionary power is given, as in this case, from the nature of the thing itself, it may be waived, or not exercised at all; for otherwise it would not be a discretionary power, to be exercised or not as the party might think best, but an obligation which he could not dispense with. Here, when the company had received the certificate of the engineer, certifying the fact that he was of the opinion that Randel was unreasonably neglecting his contract, that contract gave them the power on that certificate to declare the contract to be abandoned; but it did not compel them to do so, but left it optional with them to do so or not. This certificate, then, or the power to take advantage of it, might be waived. Whenever one person has an election to do or not to do an act in which the rights and interests of another are concerned, he is bound to make his election so as to be least prejudicial to the rights and interests of that other; and if by his unreasonable delay the rights of that other become implicated and he receives injury, who ought, in justice, in good faith, and in law, to bear the burthen or sustain the loss—the party injured, or he who has caused the injury? Common sense and the law, which is founded on good sense, say the defaulter: that he who is innocent and in no fault shall not be prejudiced by the negligence of the other; that whenever this right of election is attempted to be so negligently exercised that a manifest and irreparable injury must follow, the law interposes and says, you have waived your right

to elect; you cannot now exercise it without injustice; you are therefore concluded, and shall not exercise it at all. The facts are before you in evidence, on which an opinion must be made up on this matter of waiver. From the 30th of July to the 10th of September no notice was given by the defts. of the existence of this certificate of the engineer to the plff. During these six weeks he was laboring on his contract with a force equal to 7 or 800 men, and as he alledges, and of which you will judge, at low and reduced prices, under the revised schedule, and certainly under the inspection and the direction of the company, and receiving certificates and pay during that time. You will judge whether the work thus performed by the plff. was less profitable to him than that which was to follow; whether the defts. were getting an advantage by having the work thus performed at reduced prices. Consider, too, that by the agreement of the parties ten per cent. was reserved for contingencies, no part of which was to be paid to the plff. till the entire completion of the work, and in case of the forfeiture of the contract he never could demand any part of it; so that upon all the work performed during these six weeks or two months ten per cent. is gained by the company, and is consequently lost by the plff., or at least his claim to it is forfeited if the contract has been rightly declared to be abandoned. Has this delay of the defts. produced an injury to the plffs? If it has, its extent is immaterial, nor is it necessary to inquire whether it be great or small. If the company has gained an advantage by their own *unreasonable* delay, and Randel has sustained an injury by it, the company has waived the certificate and the power to declare the contract abandoned, and of course that contract is still in force. This is the opinion of the court.

If the certificate and the power to declare the contract to be abandoned were at any time waived, no subsequent acquiescence of the plff. could create a new forfeiture of the contract. Nothing short of an additional certificate of the engineer that the plff. was unreasonably neglecting his contract could work a forfeiture of it. The right to take advantage of a forfeiture may be waived, but it is a new principle to assert that a forfeiture may be created by a simple acquiescence. Such a doctrine would lead us to believe that Randel must have resisted his expulsion from the canal with force; and yet no one would say that because he quietly went off he therefore yielded his rights. The moment the company declared against him and would no longer treat him as a contractor nor pay him for his work, his perseverance would have been folly in the extreme. It is what neither the law nor common sense required of him."

Having explained to you the nature of this action and the important preliminary question of waiver, we will now take up the contract and examine its covenants, and, together with the pleadings, present to you the issues to be tried, and the breaches on which damages are claimed.

There are five covenants upon which the plff. has sued:

First, on the covenant of the company to pay the plff. for work done by him at the rates specified in the contract, semi-monthly, to the amount certified by the engineer of the company.

*(5 B. 3d count.)* There are two breaches assigned on this covenant, the 5th and 7th of the 3d count.  The first alledges that Benjamin Wright, on the 15th of December, 1825, certified that the plff. had done work to the amount of $224,291 51 which he avers has not been paid.  The defts. plead payment, and you are to try on this breach whether the defts. have paid this sum or not.  This is a narrow question, and you will take up the certificates and receipts, and see what is due to the plff. on this part of the case.  The defts. admit, as we understand, that the sum of $2,863 05, with interest from the first of October, 1825, is due and unpaid; but the plff. contends that a much larger sum is due for work done and certified; and his counsel have attempted to point out to you several instances in which work certified for in the semi-monthly certificates is omitted in the final certificate of the 15th December, thus establishing, as they contend, that the work certified for in the detail amounts to a much larger sum than is certified in the aggregate.  Whether this be so or not, it is for you, gentlemen, on a careful investigation and examination of these certificates, to determine.  You will first ascertain what sum is due on the final certificate, and if the previous semi-monthly certificates show a greater amount of work done by the plff. he is entitled to recover the value of that work, if not strictly under this breach, certainly under other breaches, which we shall presently advert to.  These certificates are evidence of the matters contained in them, and whether made by Benjamin Wright, Henry Wright, or Daniel Livermore, as agents of the company, if they establish that the plff. has done more work than is included in the final certificate, it is a proper matter for your consideration in fixing the amount of your verdict.

*(7 B. 3 count.)* The jury will observe that the price of the work as fixed by these certificates is graduated according to the revised schedule of prices; the other breach on this covenant to pay for work certified avers that the value of the work certified to be done was $350,000, taking the prices fixed originally by the contract, and not the revised schedule.  To this breach the defts. plead that Benjamin Wright revised the schedule of prices, as by the contract he was authorized to do; that by this revised scale the work amounted to only $224,291 51, which they have paid.  The plff. replies to this plea, that the said revision was obtained from Wright by the fraud and covin of the company; to which they rejoin, that the revision was not obtained by any fraud or covin practised by *them* on *Wright.*  The issue therefore for you to try on this breach is, whether you are satisfied by any evidence in this cause that the revision of prices was obtained from Benjamin Wright by any fraud practised upon him by the canal company.  If the fraud be not proved, the verdict on this breach must be for the defts.; for here the pleadings admit the payment for work certified, and only put in issue that the defts. obtained a revision of the prices by fraud and covin.

Should your verdict for the defts. on this breach establish the validity of the revised scale of prices, that scale will become the principle on which you are to ascertain the value of the whole work, with the single exception now to be noticed.  The revision of prices was made between the first and seventh of June, previously to which

the engineer had certified for work done the sum of $2,395 43, according to the original scale of prices, over and above what the same work would have amounted to by the revised scale, and the engineer in subsequent certificates deducted this sum as an excess of payment; thus applying the revised schedule to previous certificates, and giving it a retrospective operation. We are asked to say to you whether this application of the revised prices was a legal and proper one according to the contract of the parties. That contract was, that the company should pay Randel for completing his work the sums stated as the cost thereof in his estimate, under the conditions and provisions of the annexed schedule, with a provision, that in order to secure the company against *future* delinquency, and at the same time to enable the contractor to make progress in his work, it should be competent to the parties, at any time between the first and seventh of June next, to revise and remodel the schedule, and *change* the rate of payment. If this power of revision had been continuous from the date of the contract to the seventh of June, we should have been inclined to think that a revision made during that time would run back on the whole work, for this would have made the contract scale merely provisional and constantly liable to revision; but under this contract, fixing a distant period when the contract shall as it were open and become liable to revision, it does appear to have been the intention of the parties that the scale fixed by the contract should be the actual price for all work done down to the first of June, when these prices were to become liable to revision and alteration as to future work. The provision was undoubtedly introduced to be exercised only as experience, derived from actual progress, should teach that the prices first fixed were either so high as to endanger the company for future delinquency of the contractor, or so low as that he could not make progress in the work. In either case the parties had a right, not within a given period from the date of the contract, but at a fixed period after that date, to revise and *change* the contract rate of payment. Our view of this contract then is, that the parties intended to apply the contract scale to work done before the period of revision; and that the company could not give the revised scale a retrospective operation as they did by deducting the excess from subsequent certificates. The withholding of this sum of $2,395 43 from certificates made after the 7th of June was not in our opinion authorized by the contract; and the plff. is entitled to recover that sum, with interest, from the time it was deducted from the amount of his certificates.

Second and third. The next covenant on which the plff. has declared is the covenant that the works during their progress should be carefully examined and inspected, and that an estimate should be made of the number of cubic yards of excavation, and also of embankment, by Benjamin Wright, esquire, or some other competent engineer to be selected by the company. The pleadings separate this covenant into two clauses, dividing the covenant for inspecting the works from the covenant to estimate the amount of work done; but for the purpose of presenting the issues to you on this occasion we shall consider them together. The obligation of the company, you understand, was to have the works carefully examined and inspected

during their progress, and an estimate made by a competent engineer of the number of cubic yards of excavation and embankment. The breaches assigned of this obligation (being five in all) are, that the works were not inspected during their progress by Benjamin Wright, or any other competent engineer appointed by the company, nor was the amount of the work estimated.

*(1st and 2d Bs. 2d count.)* The single plea to the two first breaches on this covenant (being the first and second breaches of the second count) is the plea of "abandonment;" that is to say, that the company legally put an end to this contract, as by the terms of it they were authorized to do; and that the consequence of that abandonment was to absolve the company from all obligations under it, except to pay for work done. To this plea the plff. replies, that the company "waived" the power to abandon the contract, or, in other words, exercised it in such an illegal manner that it did not absolve them from any of their obligations assumed by the contract, among which is the one now under consideration. That branch of the case has already been explained to you, and you are first to determine, in the trial of this issue, whether under the charge given you of the legal doctrines embraced in this question of waiver, the proof in the cause satisfies you that the company have waived this power of abandonment. If you are of opinion on the law and evidence that the defts. have not waived this power, there is of course an end to this part of the case, and you can assess no damages on this covenant, nor indeed upon any of the covenants in the contract, except the covenant to pay for work done. If, however, you should be of opinion that the company did so waive their power to declare the contract abandoned, you are then to inquire whether these covenants to inspect the work and estimate the amount have been broken; and, if they have, what damage resulted to the plff. from such violation of the covenant. And here we are required by the plff.'s counsel to charge you that the state of the pleadings implies certain admissions by the defts. that these covenants have been broken. You observe, gentlemen, that the plff. alledges in his breach that the works were not inspected by Wright, nor by any other competent engineer appointed by the company, and that neither Wright nor any other competent engineer appointed, &c. did estimate the number of cubic yards of excavation and embankment. The defts. instead of denying these allegations, rest their defence on the plea of "abandonment;" of course, if that plea fails them, as it will if the jury sustain the "waiver," the pleadings on this part of the case do admit that the company have not caused the works to be inspected, nor the amount thereof to be estimated; and the only question that remains for you to consider is, whether this failure on the part of the company was injurious to Mr. Randel, and what amount of damage he sustained from such injury. For that damage you must refer yourselves to the proof which the plff. has laid before you, as it is incumbent on him to satisfy you on that subject by proof of the amount of his loss or of facts from which you may fairly estimate the amount. But you are not confined on this breach to the mere value of excavation and embankment proved to have been done, nor are the certificates of

40

Benjamin Wright, Henry Wright and Daniel Livermore conclusive of the amount of work done. To give these certificates such an operation would be to contradict the record admissions of the defts. and to set up certificates *not pleaded* as conclusive evidence of estimates which they admit were not made. By another part of the contract it was provided that payments should be made to Mr. Randel semimonthly for his work, according to these certificates and estimates; if therefore estimates were withheld, it was a wrong to Mr. Randel, and the company are liable to him for all the injurious consequences necessarily resulting from their not inspecting and estimating the work according to the terms of the contract; and if one of those consequences was that Randel was not paid for all the work he did semimonthly, the defts. are liable for the amount of that work, and for the non-payment of the value at the time it was done, and when it ought to have been estimated, and certified, and paid.

*(4th, 5th and 6th counts.)* There are three other counts assigning breaches on this covenant which it is not necessary for the court particularly to explain; as, if found for the plff., any damage resulting from them would fall also within the breaches already considered; and if found for the defts. they would not diminish the amount of that damage. The particular issues on these counts, as distinct from the two breaches before mentioned, have not been presented in the argument as essentially varying the case; and a further examination of them might distract the attention of the jury, without leading to any beneficial result. Indeed the plff.'s counsel who last addressed the jury distinctly abandoned these three counts, and presented no claim for damages as resulting from them. The jury may therefore find for the defts. on the 4th, 5th and 6th counts.

Fourth. The next covenant declared on is what has been called the "prevention clause," which is a contract of the company, that in case Randel, from their default in any particular, should be prevented from pursuing the due and best mode of executing his contract, or from entering upon or flooding lands for that purpose, the pecuniary damage sustained by him in consequence thereof should be certified by their engineer for the time being, and that on his certificate they would pay Randel such reasonable compensation and allowance as should be fixed by the certificate.

The plff. has assigned five breaches of this covenant in different forms, alledging, in substance, that he was prevented by the default of the company from pursuing the due and best mode of executing his contract; that he was prevented from entering upon lands for the purpose of executing his contract; that he was prevented from flooding lands; that the company disposed of his contract to other persons, and thus prevented him from executing it in the due and best manner; that he sustained great pecuniary damage from these defaults of the company; and that their engineer has not certified the damage, although he well knew the premises and was aware of the extent of the damage. To all of these breaches the defts. have pleaded the "abandonment" simply, and the plff. replied the "waiver," as has before been explained to you at large. The issue, therefore, on all the breaches of the prevention clause is, whether the defts. have waived the power to declare the contract abandoned on Wright's

certificate of the 30th of July, 1825. If the jury are of opinion that the waiver has not been made out, there is an end, of course, to all claim for damages on this prevention covenant; but if you should think otherwise, you will then give the plff. such amount of damage as you are satisfied by the evidence he has sustained by reason of the acts stated in these breaches, and which the pleadings admit. We have been further requested by the plff.'s counsel to charge you that these pleadings admit the amount of damage stated in the breaches to have resulted from these defaults of the company, but we decline the expression of such an opinion. In our view the law is otherwise. The plea of abandonment, being a plea of confession and avoidance, necessarily admits all the material and traversable facts averred in the breach; it admits the prevention, the subsequent disposition of the contract, that damage to Randel was the consequence, and that the engineer did not certify the damage; but it admits no amount of damage, and the jury must resort to the evidence in the cause for the foundation of any other than nominal damages. For actual damages, therefore, and the amount thereof, we refer the jury to the proof, to decide according to their best judgment on all the facts that have been laid before them. There is, however, one matter of evidence connected with this subject that requires a passing remark. The plff. has offered some testimony to show that the possession of section No. 2, which he alledges would have been useful to him as a drain for section 3, was withheld from him by the default of the company. It appears that before the canal was commenced, the defts. had made a contract with Daniel Newbold, the owner of the land through which section 2 ran, for the purchase of that land. A dispute arose between them in relation to their contract, which was finally settled by arbitration; but, whatever may have been the merits of that controversy, it appears that the company did not get actual possession of the land until it was obtained under a writ of habere facias possessionem, issued out of the supreme court of this county, in April 1825. The jury must judge whether Mr. Randel suffered damage, or was obstructed in the prosecution of his work by the failure of the company to give him earlier possession of section 2, and remunerate him by such amount of compensation as the evidence enables them to ascertain. We refer to this matter only because we have been requested to charge that the covenant of Daniel Newbold of the 4th August, 1823, did not entitle the defts. to possession of this land, and we think it did not. It was a covenant to convey his land on condition that the company should execute and deliver to him an obligation under their corporate seal for the payment of one dollar per acre for the land, and also on the condition that the canal should pass through it. At all events, the issuing of the writ of habere facias shows that they did not get actual possession before that time, which they were bound to do if such possession was necessary or useful to Mr. Randel.

Fifth. The remaining clause of the contract for an alledged violation of which the plff. complains is a covenant on the part of the canal company to allow him four years from the date of his contract to complete the canal, with a qualification, which you understand, that under circumstances they might in a particular manner put an end to the contract at an earlier day for negligence on his part.

The breaches assigned on this covenant are, that the company unlawfully put an end to the contract, and prevented Mr. Randel from proceeding, and thus deprived him of the time which by the contract he was to be allowed for executing the work. The plea to these breaches is the "abandonment," and the replication, "waiver." The issue therefore is the same as explained under the last head; and the question whether any damage is to be assessed on this issue or not depends, in the first instance, on the decision of the jury on the waiver. If the jury sustain the waiver, the breach is proved; that is, it establishes the fact that the company illegally deprived Mr. Randel of his contract and stopt his work contrary to their covenant to allow him four years to complete the canal. The question will then be, what damage has the plff. sustained by reason of this act of the company? The only guide that the court can give you on this subject is the legal rule, that whatever loss or damage naturally and immediately results from the wrong complained of, the wrong-doer is bound to compensate. What was the loss which Mr. Randel incurred in consequence of being illegally deprived of his contract? He lost the ten per cent. on the $224,291 51, the amount of work done by him *before* the first October, 1825, or such other amount of work as you may be satisfied he had done before that time; he lost any profit that the jury may be of opinion he could have made on the work remaining to be done after the first of October, 1825, which profit must be ascertained by estimating the cost of the work and deducting it from the sum to be allowed to Randel therefor by his contract with the company; that is, by the revised schedule of prices, together with the ten per cent. for contingencies. The jury should add this ten per cent. to the revised price, and compare it with what they believe would have been the actual cost of the work; and the result, if in favor of the plff. will show the amount of profit he could have made on the work remaining to be done. If, on the other hand, the jury are of opinion, from such comparison of the cost and price, that the plff., had he been permitted to proceed in his work would not have realized from it any profit, the damages on account of the work remaining to be done will be merely nominal. These are specifications which the court feel at liberty to make; and we say to you, generally, that any loss fairly resulting to Mr. Randel from such illegal dismission should be considered in ascertaining the amount of damages. But such damage must be the immediate and natural result of the wrong, and not any remote or fancied injury that might be referred to that wrong as a probable cause.

In estimating the work remaining to be done after the first of October, 1825, the jury will bear in mind that payment for this, as indeed for all the work, was to be made by the *cubic yard;* and if the amount of excavation was increased by slips from the regulated slopes of the canal, or by earth pressed up in the chamber of the canal by the sinking of the canal banks, the contractor must have been paid for the removal of this accumulated earth, as for all other excavation, by the *cubic yard.*

The average price per cubic yard of the whole of section No. 5 is not to exceed 25 cents. One part of this section was let to Dexter, and the residue of it was let to Randel. Whatever may be ascertain-

ed by you, on a proper calculation, to be the fair average of this part of the section, you ought to allow him. You have seen the map of this canal; you have seen how this part of section 5 is defined and protracted. You will compare its greater elevation, or rather, perhaps its greater depth, when contrasted with the residue of that section. It is declared by the contract, after making a graduation of prices in proportion to the depth of cutting, that it is understood that this graduation of prices is made expressly to conform to the *difference in labor*, and to be so estimated when done as that the *whole* excavation of this section shall not exceed 25 cents per cubic yard for the *whole section;* not for that part only included in the plff.'s contract, but expressly for the *whole* section. Whatever, then, may be the fair average price of this part of section 5, you ought to allow the plff., although it may exceed 25 cents per cubic yard on that part of the section, being careful at the same time not to average the whole section higher than 25 cents per cubic yard. We think any other construction of the contract would be absurd. The parties graduate the prices expressly to conform to the difference in labor, and if Randel has to go much deeper upon his part of section 5 than is necessary on the part not let to him, justice and the spirit and terms of the contract require that he should receive a greater average in proportion to the difference in labor.

There remains, gentlemen, one other breach on this covenant, being the breach assigned in the seventh count of the declaration, and upon which the plff. has, as you have been informed, obtained a judgment and an order in the nature of a writ of inquiry for you to assess the damage. In relation to this part of the case, the matter of abandonment and waiver is not a subject of consideration. The effect of a judgment by default, or on demurrer, is to admit that the plff. has a cause of action; it establishes his right to recover: and where the contract declared on is for a sum certain, as in debt, and the declaration either ascertains the amount or sets out an instrument from which the amount can be certainly ascertained by calculation, the judgment is also conclusive as to the amount. Where the matter sued for sounds in damages, or is in its nature uncertain, the judgment, though it establishes no amount of damages, fixes the right to recover. In either case no proof need be offered, or would be allowed, of the cause of action, nor will the deft. be permitted to set up any defence denying the cause of action. Thus in an action on a contract the deft. will not be allowed even in mitigation of damages, to give evidence of fraud, or of any other matter which would render the contract void. (*East India Company* vs. *Glover*, Strange, 612. 1 Bos. & Pul. 363. 2 Saund. Pl. & Ev. 103. 2 Strange 1149. *Bevis* vs. *Lindsell.* Doug. 315, n. 2.) The judgment on the seventh count in this case admits that the canal company, contrary to their covenant, did take the time within which it should be incumbent on Mr. Randel to perform his contract to be less than four years from the date of that contract. Is it competent then for the defts. to set up, contrary to this admission, that they legally deprived him of his contract within the four years, and thus did not violate their contract, which is, in effect, the plea of abandonment? According to principles before stated and well esta-

blished, it is not competent for them to make such a defence. And the matter of abandonment and waiver being out of the way in relation to this count, whatever may be your opinion on that subject, it will be your duty to assess, on this writ of inquiry, such amount of damages as the proof satisfies you the plff. has sustained by reason of this breach of covenant, whether he did in fact unreasonably neglect the work or not. The measure of those damages, and the rule which is to govern you in assessing them, are the same as has been already stated to you in explaining the last breach on this covenant. The plff. will also be entitled to damages, by way of increase, for the detention of any sums that the jury may be of opinion he ought to have received from the defts., either for work done or injury and loss sustained; and a suitable rule for increasing such damages would be the rate of interest from the time such sums were due and ought to have been paid. The jury will exercise a sound discretion on this subject.

"In the course of the argument of this cause the rules and principles by which this contract is to be construed, have been stated so variously that it is difficult for us to know, as to some of the points, upon what grounds the defence is intended to rest. The counsel who opened this case, on the part of the defendants, took up the position that the plff. was dismissed from the contract, not because he had not a sufficient force on the work to complete it within the time limited by his contract, but because he would not put this force at such place as the company directed; thus contending that the company had a right to order the plff. to work *where* and *as* they should direct. But in the argument to you upon the evidence it has been contended that under the contract Randel had the right to execute the work as he saw best; that any orders given him by the company to execute the work according to their directions were illegal, not binding on Randel, and if he obeyed such orders it was a thing assented to by himself; that if any damage or loss was sustained by him in consequence of those orders it was his own folly; and that in this action, which is founded on the contract, he could not recover any thing for the injury thus sustained. Another of the defendant's counsel repudiates this construction; and contends that the cotemporaneous exposition given by the parties to this contract, as far as it has been executed, is that which binds them; and whether it be the true or false construction, as it was *communis error* both are bound by it. In this diversity of construction it is difficult for us to present to you the precise view taken by both sides of this contract. All you and the court can do, however, is to look to the contract itself, and gather from that what its stipulations are, and when these are ascertained they must govern us. The plff. undertook to perform a great work for the defendants. He had the right to perform, generally, this work as might seem best to him, without any control to be exercised over him, either by the company or their engineers; he had the right to begin the work where he pleased and to prosecute the work as he pleased, (with the exception of the third section) so that he did not unreasonably neglect to prosecute it; and the company stipulated that if in any particular by their default he should be prevented from using the due and best mode of prosecuting his contract, their engineer should certify the damage and they would pay it.

This precludes all idea of their right to interfere with him in the progress of the work. Not a word in the contract conveys such an idea; and he had a right to place his force on any part of the canal which he had contracted to make, and the company had no right to order him to do otherwise. They could not say to him put such a force here or there; and if they did he was not bound to obey. It is true that if the plff. *voluntarily* adopted and executed these orders he has no right to complain, nor do they afford any ground of damage.

We have excepted the third section from these general remarks, and it becomes necessary that we should show you in what respects his right to work as he pleased on this section differed from his rights when working upon other parts of the canal.

These are the provisions of the contract in respect to this section: "Price per cubic yard twelve and a half cents. For all earth excavated and placed in bank as required, to within two feet of bottom, eight cents, and when any *half mile is completed* the balance is to be paid. The contractor shall at all times excavate to the bottom, if in the opinion of the committee of works it can be done with good economy." This expression, shall at all times go to bottom when in the opinion of the committee of works it can be done with good economy, does not mean that the committee of works shall have power to compel Randel to complete this section in a day or a week or any limited time short of the four years, which the contract gave him to complete it in; nor did it give them the power to direct what number of men he should employ upon it, nor with what machines or means he should execute the work, nor at what times or periods he should work upon it. These were all discretionary with the plff. But as we understand this clause it means this: that whenever Randel chose to work on this section of the canal, the committee of works, if they deemed that it could be done with good economy, might direct him to go to bottom. But no order of this description accompanied by a resolution that he should receive no pay till he did go to bottom was binding on him; for the contract expressly stipulates that when he shall have gone to within two feet of bottom he shall receive eight cents per cubic yard, and when a half mile shall be excavated to bottom the remaining four and a half cents is to be paid. Perhaps when the parties made this contract they had it in contemplation that when any half mile should be excavated to within two feet of bottom then the committee of works might direct him to finish that half mile, without proceeding further until that was accomplished. But they had no right to direct what force he should employ upon it.

We have been required by both sides to give you our opinion on this clause of the contract. "Both banks (that is the towing path and the bank on the opposite side of the canal) shall be constructed of the best earth which the *adjoining excavation* will give, in a workman-like manner." It is contended on the one side that Randel was not obliged by his contract to go beyond the adjoining excavation for the *material* of which the banks were to be constructed; the adjoining excavation being the canal on the one side and the back drains upon the other. On the other hand it is contended that this

comes within the scope and meaning of the clause in relation to alterations and deviations. That clause provides that during the progress of the work the plff. will at all times conform to such deviations from the present line of the canal, and to such alterations in the *form*, *slope*, and *dimensions* of the banks, towing paths, or any other of the said works as the company or their engineer shall direct. These other works were the harbor, back-drains, &c. In the form, slope or dimensions of any of these alterations might be directed, and the plff. was bound to conform; and damages for any such deviations or alterations cannot be recovered in this action. But it is no where stipulated that the *material* of which the banks or other works were to be constructed may be changed. The plff. had a right to use the mud from the adjoining excavation to construct the banks, and if he made them in a workmanlike manner, and as well as the material provided would allow, he did every thing that his contract required of him."

We have been further requested by the defts. counsel to say to you, as we do, that the stipulation entered into in the sub-contracts of the plff. with his sub-contractors by which he directed them to obey the orders of the engineer-in-chief of the defts. did not impose on the said engineer a duty to give orders to the sub-contractors to go to bottom on section three, so as to constitute a default of defts. by reason of the *omission* to give such orders; and we add, that, according to our construction of the contract, the omission to order either Randel or his sub-contractors to go to bottom on section three, was not a default of the company or of their engineer, nor can it be a ground of damage; for Randel had the right to go to bottom, and to order his sub-contractors to go to bottom, if he chose so to do, without any orders from the company.

We have now, gentlemen of the jury, gone through those prominent and important points in this cause that particularly required from us a notice. The case is one of such magnitude, and embraces so many topics of consideration and remark, that it has been impossible for us to take any other than a very general view of it. Our only object has been to direct your attention to the proper points of inquiry; and to give you certain general and comprehensive rules as a guide in the investigation which you will have to make. The case now rests with you. Examine it, gentlemen. Investigate it with that patience which has hitherto, in the course of this tedious trial, so laudably distinguished you; and for which you are entitled to the thanks of the parties, the court and the public. Persevere in this laudable spirit; *go to bottom*; and let this cause, distinguished as it has been in many of its features, above all others heretofore tried in this State, be still more signally distinguished by the *propriety* and *justice* of its determination.

The jury retired on Tuesday evening, January 21st, and returned into court the following Saturday, at noon, with the following verdict:

And now to wit, this ninth day of December, in the year of our Lord one thousand eight hundred and thirty-three, thirty jurors having been, by the sheriff of this county, duly summoned, returned

and impannelled, out of which number a jury, to wit: John Clark, James Roberts, Baymon Deakyne, Thomas Morrison, George B. Meteer, Israel Garretson, Thomas Robinson, Jacob Whiteman, John W. Evans, Arthur J. Whitely, James C. Mansfield and George Foote, being duly drawn, who, after all causes of challenge allowed did appear at the bar, and were duly sworn and affirmed, well and truly to inquire and true inquisition make and return of the damages and costs sustained by the plaintiff on occasion of the breach of covenant in the seventh count of the declaration in the said cause mentioned and set forth, and well and truly to try the issues joined in this cause wherein the said John Randel, junior, is plaintiff, and the Chesapeake and Delaware Canal Company are defendants, and to speak the truth of and upon the premises, and a true verdict render according to the evidence. And the said cause and the inquiry aforesaid, and the trial of the issues aforesaid progressing from day to day, afterwards, to wit: on the twenty-fifth day of January, in the year of our Lord one thousand eight hundred and thirty-four, the jurors aforesaid, upon their oaths and affirmations, respectively, do return an inquisition, under their hands and seals, in the words following, to wit:

In the matter of the seventh count of the plaintiff's declaration, as amended in the above cause, and the judgment for the said plaintiff thereon.

Inquisition made, indented, taken and returned in open court of the Superior Court of the State of Delaware, held at Newcastle in and for the county of Newcastle, on the twenty-fifth day of January in the year of our Lord one thousand eight hundred and thirty-four. Prout the said declaration the proceedings and the judgment thereon.

*Whereas*, in and by the said judgment, it appears that the demurrer of the said the Chesapeake and Delaware Canal Company to the seventh count of the said declaration, being the fourth additional count of the said declaration contained, confesses the said contract or articles of agreement so set out on oyer as aforesaid, and the fact that the said the Chesapeake and Delaware Canal Company did take the time within which it should be incumbent on the said John Randel, junior, fully to perform and complete his contract to be less than four years, from and after the first day of May next ensuing the date of the said articles of agreement, and the matters and things aforesaid being also in full proof before this inquest: *And whereas*, heretofore, to wit: on the twenty-first day of November, in the year of our Lord one thousand eight hundred and thirty-three, the justices who gave the interlocutory judgment on the said seventh count of the said declaration did (at the motion of the plaintiff in the action wherein the said judgment was given) make their order in the nature of a writ of inquiry to charge the jury attending at this court being the next court after the said judgment was given, to inquire of the damages and costs sustained by the plaintiff by reason of the breach of covenant in the said count mentioned: *And whereas*, at this court afterwards, to wit: on the ninth day of December, in the year last aforesaid, came a jury to the bar, to wit: John Clark, James Roberts, Baymon Deakyne, Thomas Morrison, George B. Meteer, Israel

Garretson, Thomas Robinson, Jacob Whiteman, John W. Evans, Arthur J. Whitely, James C. Mansfield and George Foote, discreet, judicious and lawful men, being a jury attending at the next court after said interlocutory judgment was given, who were duly sworn and affirmed as the law requires, well and truly to inquire and true inquisition make and return of the damages and costs sustained by the plaintiff on occasion of the breach of covenant in the said seventh count of the declaration in the said cause mentioned and set forth, and the said jury being charged to inquire of the said damages and costs, and the said inquiry being made and evidence given in open court, and the inquest having considered thereof until this day, they do now forthwith return this their inquisition under their hands and seals, and they the said jurors do find upon their oaths and affirmations, respectively, that John Randel, junior, has sustained damages by reason of the premises and on occasion of the said breach of covenant in the sum of two hundred and four thousand seven hundred and sixteen dollars and thirty-six cents, lawful money of the United States of America, and they also find that the said plaintiff has sustained costs by reason and on occasion of the premises in the sum of five hundred dollars of like lawful money.

In witness whereof, we have hereunto, respectively, set our hands and seals the day and year aforesaid.

And the jurors aforesaid, on the day and year last aforesaid, upon their oaths and affirmations, respectively, do further say, that they find for the plaintiff and assess the damages sustained by him on occasion of the first and second breaches of covenant in the second count of the declaration mentioned and set forth, at the sum of thirteen thousand dollars, lawful money of the United States of America; on occasion of the third, fourth and fifth breaches in the second count, and the fourth and eighth breaches in the third count of the said declaration mentioned, at the sum of four thousand three hundred and fifty-eight dollars and seventy-nine cents, of like lawful money; and on occasion of the fifth breach in the third count of the declaration mentioned at the sum of four thousand three hundred and ten dollars and sixty-nine cents, of like lawful money, making in all, besides the damages assessed in the inquisition aforesaid, the sum of twenty-one thousand six hundred and sixty-nine dollars and forty-eight cents, with six cents costs besides the costs expended; and as to the other breaches of covenant in the said declaration mentioned, the jurors aforesaid find for the defendants.

Judgment nisi at fifty-five minutes past one o'clock, P. M.

*J. M. Clayton, Rogers, Read, jr.* and *Ingersoll* for plaintiff.

*J. A. Bayard, Frame* and *Jones* for defendants.